## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QATAR NATIONAL BANK, | : | |
| Plaintiff, | : | Civil Action No. 1:06-cv-1307(GK) |
| v. | : | |
| WINMAR, INC., | : | |
| Defendant and Third | : | |
| Party Plaintiff. | : | |
| _____ | : | |
| WINMAR, INC., | : | |
| Third Party Plaintiff | : | |
| and Counterclaim | : | |
| Defendant, | : | |
| v. | : | |
| ALJAZEERA INIERNATIONAL, | : | |
| Third Party Defendant | : | |
| and Counterclaim | : | |
| Plaintiff. | : | |
| _____ | : | |

## QATAR NATIONAL BANK'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION  FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.  PRELIMINARY STATEMENT ........................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................................ 2

III.  STATEMENT OF POINTS AND AUTHORITIES ........................................................... 6

    A.  STANDARD OF REVIEW ......................................................................................... 6

    B.  APPLICABLE STATUTORY PROVISIONS ............................................................. 8

    C.  QNB IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LAW OF MISTAKE AND UNJUST ENRICHMENT ................................................................. 9

    D.  QNB IS ENTITLED TO SUMMARY JUDGMENT ON WINMAR'S DISCHARGE-FOR-VALUE AFFIRMATIVE DEFENSE ........................................ 11

        1.  The UCC Incorporates D.C. Law on Mistake and Restitution, which Does Not Recognize the Discharge-for-Value Defense ................................................. 11

        2.  Winmar's Discharge-for-Value Defense Fails Because Winmar Had Actual Notice of the Error ........................................................................................... 12

        3.  Winmar's Discharge-for-Value Defense Fails Because Winmar Had Constructive Notice of the Error ....................................................................... 15

        4.  The Discharge-for-Value Defense Does Not Apply to Non-Liquidated Debts Like AJI's Alleged Debt to Winmar ......................................................... 16

    E.  DAMAGES ................................................................................................................ 18

IV.  CONCLUSION ............................................................................................................... 19

## TABLE OF AUTHORITIES

Note: Authorities upon which we chiefly rely are marked with an asterisk(*).

### CASES

*4934, Inc. v. District of Columbia Dep't of Employment Serv.,*
  605 A.2d 50 (D.C. 1992) ...................................................................... 9,11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................ 7,8

*Aon Risk Services, Inc. of Washington, D.C. v. Estate of Coyne,*
  915 A.2d 370 (D.C. 2007) ..................................................................... 18

*Association of American Railroads v. Connerton,*
  723 A.2d 858 (D.C. 1999) ..................................................................... 10

*Bank of America v. Sanati,*
  11 Cal. App. 4th 1079 (Cal. App. 1992) ................................................ 17

*Banque Worms v. BankAmerica Int'l,*
  570 N.E.2d 189 (N.Y. 1991) .................................................................. 15

*Beard v. Goodyear Tire & Rubber Co.,*
  587 A.2d 195 (D.C. 1991) ..................................................................... 10

*Bergman v. Paulson,*
  --- F. Supp..2d ----, 2008 WL 1905861 (D.D.C. May 01, 2008) ................... 7

*In re Calumet Farm Inc.,*
  398 F.3d 555 (6th Cir.), *cert. denied*, 546 U.S. 824 (2005) ................ *passim*

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .............................................................................. 7

*Credit Lyonnais-New York v. Washington Strategic Consulting Group, Inc.,*
  886 F. Supp. 92 (D.D.C. 1995) ..................................................... 8,10,11,18

*District of Columbia v. Pierce Assoc., Inc.,*
  527 A.2d 306 (D.C. 1987) ..................................................................... 18

*GECC v. Central Bank,*
  49 F.3d 280 (7th Cir. 1995) .................................................................. 15

*Hammond v. Chao,*
  383 F. Supp. 2d 47 (D.D.C. 2005) .......................................................... 8

*Hibbs v. Beall*,
   41 App. D.C. 592 (1914) .................................................................... 10

*Hillyard v. Smither & Mayton, Inc.*,
   76 A.2d 166 (D.C. 1950) .................................................................... 11

*Lanston v. American Sec. & Trust Co.*,
   32 A.2d 482 (D.C. 1943) .................................................................... 10

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................ 7

*Meadows v. Mukasey*,
   --- F. Supp..2d ----, 2008 WL 2211434 (D.D.C. May 29, 2008) ......... 6

*National Bank of Canada v. Artex Industries, Inc.*,
   627 F. Supp. 610 (S.D.N.Y. 1986) ....................................................... 8

*NBase Communications v. American Nat'l Bank & Trust*,
   8 F. Supp. 2d 1071 (N.D. Ill. 1998) ..................................................... 8

*Prowinsky v. Second Nat'l Bank*,
   49 App. D.C. 363, 265 F. 1003 (1920) ............................................... 10

*Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*,
   59 F.3d 212 (D.C. Cir. 1995) ........................................................... 9,10

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ............................................................................ 7

*Scott v. Harris*,
   --- U.S. ----, 127 S. Ct. 1769 (2007) ................................................... 7

*Standard Ins. Co. v. Burch*,
   540 F. Supp. 2d 98 (D.D.C. 2008) ....................................................... 9

*U.S. ex rel. Purcell v. MWI Corp.*,
   520 F. Supp. 2d 158 (D.D.C. 2007) ................................................... 7,8

*United States Fire Ins. Co. v. C & C Beauty Sales, Inc.*,
   674 So. 2d 169 (Fla. Dist. Ct. App. 1996) ......................................... 18

*Vicki Bagley Realty, Inc. v. Laufer*,
   482 A.2d 359 (D.C. 1984) .................................................................. 10

## CODE OF FEDERAL REGULATIONS

12 C.F.R. § 210.25 ("Regulation J") ................................................................ 8,14

12 C.F.R. § 210 Appendix B to Subpart B--Article 4A, Funds Transfers .................. 8,9,12

FED. R. CIV. P. 56(c) ............................................................................................ 6

## SECONDARY SOURCES

DOBBS, LAW OF REMEDIES
       § 4.1(2) ................................................................................................ 10

RESTATEMENT OF RESTITUTION
       § 14(1) ............................................................................................ 12,14,16,17

3 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE
       § 24-1 (5th ed. 2007) ............................................................................ 12

**QATAR NATIONAL BANK'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION  FOR SUMMARY JUDGMENT**

Plaintiff, Qatar National Bank ("QNB"), by and through its undersigned counsel, hereby respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on Counts I and II of its Complaint pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

## I.    PRELIMINARY STATEMENT

In this action, QNB seeks to rectify a simple clerical error resulting in an erroneous, duplicate payment it made to Winmar, Inc. ("Winmar") on behalf of Al-Jazeera International ("AJI").  QNB committed the clerical error by executing a single $474,677 payment order to Winmar a second time.  Winmar received quick notice of the error before it received notice that the duplicate payment had been made.  Winmar has refused to return the money to QNB.  Entirely separate from that single transaction, Winmar has various ongoing contractual legal disputes with Third-Party Defendant AJI, which involve money passing back and forth between those parties on numerous occasions.  Winmar has sought to use QNB's unfortunate error as leverage against AJI in their unrelated contractual quarrels.

The Court should grant summary judgment here because:

1.    The law in D.C. is clear that one who pays money to another under an honest mistake of fact may, in the absence of an equitable defense, recover the money so paid.

2.    Winmar's affirmative defense of discharge-for-value fails because no federal or state court in D.C. has recognized the discharge-for-value defense.

3.    Even if the Court applies the discharge-for-value defense to the facts at issue here, that affirmative defense fails because:

    a.    The discharge-for-value defense does not permit a defendant to avoid refunding money it received in error when the defendant had actual notice that the payment

was in error before the defendant credited the account of its debtor.  Winmar has admitted that it received notice of the error at the same time it received notice that the payment itself had been made.

b.    The discharge-for-value defense does not permit a defendant to avoid refunding money it received in error when the defendant had constructive notice that the payment was in error.  Prior to the payment, Winmar had constructive notice that it was in error because (a) it was in the exact amount of a previous payment; (b) it was in amount greater than Winmar was, at the time, claiming it was owed by AJI; and (c) at the time Winmar received notice of the payment, AJI had informed Winmar that AJI believed it owed Winmar nothing and that Winmar, in fact, owed AJI approximately $200,000.

c.    The discharge-for-value defense does not permit a defendant to avoid refunding money it received in error when the "value" that is allegedly being discharged is an unliquidated debt, such as the debts owed between Winmar and AJI.

## II.    STATEMENT OF FACTS

In November 2005, Winmar entered into a contract with AJI for work on office space in a building in Washington, D.C. ("the Contract").  *See* Statement of Material Facts to Which There is No Genuine Dispute (hereinafter "SMF") ¶ 1.  Winmar agreed that AJI could wire payments under the Contract to a Citibank Federal Savings Bank ("Citibank") account in Washington, D.C.  SMF ¶ 2.  On October 27, 2005,  AJI had paid Winmar an initial deposit of $645,164 for the work to be performed under the Contract.  SMF ¶ 3.  Contemplating this deposit, on October 20, 2005, Winmar and the project's Architect ("the Architect") had certified in an Application and Certificate

for Payment No. 2[1] that Winmar was due $474,677, in addition to the $645,164 initial deposit.  SMF ¶ 4.  Between October 20 and December 7, 2005, Winmar submitted three more Applications, collectively stating that AJI owed Winmar an additional total of $1,363,463 under the Contract in addition to the $645,164 deposit and the $474,677 payment requested in Application No. 2.  SMF ¶ 5.  These three Applications were certified for payment by the Architect on December 7, 2005.  *Id.*

On the next day, December 8, 2005, AJI faxed a payment order to QNB requesting QNB to wire $474,677 from AJI's account at QNB to Winmar's account at Citibank.  SMF ¶ 6.  On December 12, 2005, QNB executed that payment order, and wired the $474,677 in funds through the FedWire system to QNB's correspondent bank, JPMorgan Chase Bank.  *Id.*  JPMorgan Chase then routed the payment to Winmar's account at Citibank.  *Id.*

On December 22, 2005, Winmar's Vice President sent a letter to AJI and its counsel reaffirming Winmar's claim that AJI owed Winmar an additional total of $1,363,463 under the Contract at that time.  SMF ¶ 7.  On January 4, 2006, Winmar informed AJI that Winmar was suspending performance of the Contract as of that day for alleged non-payment in the amount of $1,363,463.  SMF ¶ 8.  However, on January 5 and 6, 2006, Winmar received notice in two letters from the Architect that Applications for the collective amount of $1,363,463 "have been certified in error … [d]ue to a number of discrepancies" in them "as well as a lack of supporting documentation."  SMF ¶ 8.  The Architect notified Winmar that it was rescinding the Applications and requesting documentation to support Winmar's claim that it was due $1,363,463 from AJI.  *Id.*

On January 11, 2006, AJI terminated the Contract for convenience.  SMF ¶ 9.  The next day, AJI notified Winmar of that termination in writing.  *Id.*  On January 18, 2006, Winmar submitted a revised Application, in which it certified that it was due $653,449 as its final payment under the

---

[1]      The Applications and Certificates for Payment submitted by Winmar are referred hereinafter to as "the Applications."

3

Contract. SMF ¶ 10. On January 19, 2006, the Architect notified Winmar that it was rejecting Winmar's revised Application because the scope of the work it covered was not clear, and it again included no supporting documentation. SMF ¶ 11.

On January 19, 2006, AJI's counsel notified Winmar's counsel by letter that AJI would not provide any further payment to Winmar until Winmar provided additional documentation. SMF ¶ 12. On January 23, 2006, Winmar submitted another revised Application, in which Winmar certified that it was then due $355,297 under the Contract. SMF ¶ 13. The January 23, 2006 revised Application, signed by Winmar's President, Edwin Villegas, states that the total earned by Winmar under the Contract was $1,475,135; the total of payments received from AJI was $1,119,838; and the current payment due was $355,297. SMF ¶ 13. The January 23, 2006 revised Application was the last such Application for payment Winmar made under the Contract before Winmar received notice of the January 31, 2006 duplicate payment of $474,677 made by QNB. SMF ¶ 14.

On January 30, 2006, AJI faxed the December 12, 2005 payment order again to QNB, but with a handwritten note seeking confirmation that the December 12th payment order had been executed. SMF ¶ 15. QNB misinterpreted the confirmation request to be a second payment order. SMF ¶ 16. As a result of this misinterpretation, on January 30, 2006, QNB duplicated the December 12, 2005 payment of $474,677 to Winmar's account at Citibank in error. *Id.* The funds were wired into Winmar's account on January 31, 2006. *Id.*

After learning of the error, on February 2, 2006, QNB wired instructions designated as urgent to JPMorgan Chase Bank stating that the January 30, 2006 payment had been wrongly duplicated from the December 12, 2005 payment with the same amount and same beneficiary details. SMF ¶ 17. The instructions asked JPMorgan Chase to treat the January 30 payment order as null and void and refund the amount to QNB's account. SMF ¶ 17. On the same day, JPMorgan

Chase notified QNB that the payment had already gone through, and JPMorgan Chase was contacting Citibank for a refund. SMF ¶ 17.

On February 3, 2006, Winmar was notified by AJI that AJI believed it owed nothing to Winmar, and in fact had overpaid Winmar by approximately $200,000. SMF ¶ 18. On February 3, 2006, Winmar's President informed a subcontractor by letter that, in response to AJI's termination of the Contract, Winmar had "submitted a final requisition for payment and payment has not been received to date." SMF ¶ 19. Winmar's President further stated in that letter that Winmar had "been advised that AJI is denying our requisition for payment." SMF ¶ 19.

On February 8, 2006, JPMorgan Chase notified QNB by wire that, on the same day, with respect to the request for a refund of the January 31 payment, Citibank had advised them "CLIENT REFUSE TO RETURN FUNDS." SMF ¶ 20. QNB interpreted this as a conclusive rejection by Winmar of QNB's request for a refund of the $474,677 duplicative payment. SMF ¶ 21. QNB received no further response from Winmar to its February 2, 2006 wire request for refund of the duplicate payment. SMF ¶ 21.

On February 24, 2006, AJI submitted a formal claim to the Architect stating that Winmar had been overpaid with respect to, *inter alia*, the $474,677 duplicative payment. SMF ¶ 22. On March 9, 2006, Winmar's counsel responded that Winmar was "unaware until [the February 24, 2006] letter was received that any wire had been accomplished on January 31, 2006." SMF ¶ 23. That letter also states that "[t]he excess over the amount last requisitioned by Winmar is reflected in the enclosed check for $119,380." SMF ¶ 23. On March 28, 2006, Winmar's counsel sent a letter to the Architect again stating that:

> Mr. Wiesenfelder's February 24, 2006 letter was the first notice Winmar received that AJI had wired money into Winmar's account. Prior to February 24, 2006, Winmar received no request from AJI to return the wired funds. We have verified that a total of $474,677 was wired into Winmar's account on January 31, 2006 …

SMF ¶ 24. Winmar has since taken the position that:

Mr. Wiesenfelder's [February 24, 2006] letter was the first notice that Winmar received from AJI or its representatives regarding the specific transfer of $474,677.00 that is at issue in the above captioned matter.   Winmar had become aware, through Citibank, in the days preceding Mr. Wiesenfelder's letter, that QNB was seeking reimbursement from Winmar for the payment of $474,677.00, made on or around January 31, 2006.   At that time, Winmar attempted to confirm the information provided to them by Citibank and the initial source of the payment.   It was during this period that Winmar received Mr. Wiesenfelder's letter.

SMF ¶ 25.  Winmar has further admitted that the Citibank notice to Winmar "'that QNB was seeking reimbursement from Winmar for the payment of $474,677.00, made on or around January 31, 2006,' was the first notice that Winmar received that the payment of $474,677.00 had been made on or around January 31, 2006 into Winmar's Citibank account."  SMF ¶ 25.

The January 31, 2006 payment was never authorized by AJI, and was made solely based on an erroneous interpretation of AJI's January 30, 2006 confirmation request.  SMF ¶ 26.  By March 12, 2006, AJI was threatening legal action against QNB unless QNB returned the funds without delay.  SMF ¶ 27.  On March 20, 2006 letter, QNB reimbursed AJI $474,677 for the erroneous January 31, 2006 duplicate payment QNB made to Winmar.  SMF ¶ 28.  On April 12, 2006, QNB again contacted Winmar seeking a refund of the January 31, 2006 duplicate payment, but received no response from Winmar.  SMF ¶ 29.  QNB has never received from Winmar, AJI, or any other person or entity, any refund of, or other compensation for, the $474,677 in funds paid by QNB to Winmar on January 31, 2006.  SMF ¶ 30.

## III.    STATEMENT OF POINTS AND AUTHORITIES

### A.    STANDARD OF REVIEW

"Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Meadows v. Mukasey*, --- F. Supp..2d ----, 2008 WL 2211434, at *3 (D.D.C. May 29, 2008) (Kessler, J.) (citing FED. R. CIV. P. 56(c)).  "A fact is 'material' if it might affect the outcome of the

action under the governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"To determine which facts are 'material,' a court must look to the substantive law on which each

claim rests." *U.S. ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 165 (D.D.C. 2007) (citing *Liberty

Lobby*, 477 U.S. at 248).

"The party seeking summary judgment bears the initial burden of demonstrating an absence

of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"Once the moving party makes its initial showing, however, the nonmoving party must demonstrate

'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

Thus, "the nonmoving party must provide evidence that would permit a reasonable jury to find in

his or her favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 255-56). Accordingly, " '[i]f the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (quoting

*Liberty Lobby*, 477 U.S. at 249-50) (citations omitted).

"In reviewing the evidence, 'the court must draw all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Id.*

(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). However, as this Court

has noted, and the U.S. Supreme Court has

> emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its
> opponent must do more than simply show that there is some metaphysical doubt as
> to the material facts.... Where the record taken as a whole could not lead a rational
> trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" …
> "[T]he mere existence of some alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact."

*Scott v. Harris*, --- U.S. ----, 127 S. Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Industrial Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Liberty Lobby*, 477 U.S. at 247-48); *see also Bergman v. Paulson*,

--- F. Supp..2d ----, 2008 WL 1905861, at *3-*4 (D.D.C. May 1, 2008) (Kessler, J.) (quoting *Scott v.

Harris*). "A nonmoving party … must establish more than 'the mere existence of a scintilla of

evidence' in support of its position." *Purcell*, 520 F. Supp. 2d at 165 (quoting *Liberty Lobby*, 477 U.S. at 252).

Further, because Winmar's discharge-for-value defense "is an affirmative defense, defendant bears the burden of proof of establishing the facts supporting this defense." *Hammond v. Chao*, 383 F. Supp. 2d 47, 54 (D.D.C. 2005); *see also Credit Lyonnais-New York v. Washington Strategic Consulting Group, Inc.*, 886 F. Supp. 92, 93 (D.D.C. 1995) (holding in a similar case that "[b]ecause the particular circumstances of this case place the duty to go forward with controverting facts upon [the defendant], its failure to discharge that duty entitles [the bank] to summary judgment."); *Nbase Communications v. American Nat'l Bank & Trust*, 8 F. Supp. 2d 1071, 1077 n. 10 (N.D. Ill. 1998) (holding that the discharge-for-value defense is an affirmative defense); *National Bank of Canada v. Artex Industries, Inc.*, 627 F. Supp. 610, 611 (S.D.N.Y. 1986) ("The reliance apparently asserted by [defendant] is an affirmative defense, the burden of proof of which is on the defendant. ... There is no issue of material fact, no valid defense, and [plaintiff] is entitled to judgment as a matter of law. Accordingly, its motion for summary judgment is granted.").

## B.     APPLICABLE STATUTORY PROVISIONS

Part 210 of Title 12 of the Code of Federal Regulations regulates, *inter alia*, "funds transfers through Fedwire." 12 C.F.R. § 210.25. Part 210 is also referred to as "Regulation J." *Id.* Subpart 210.25 provides in pertinent part:

> This subpart incorporates the provisions of Article 4A set forth in appendix B to this subpart. ... this Subpart governs the rights and obligations of ... parties to a funds transfer any part of which is carried out through Fedwire to the same extent as if this subpart were considered a funds-transfer system rule under Article 4A.

12 C.F.R. § 210.25. Appendix B to Subpart B--Article 4A, Funds Transfers provides in relevant part:

> Section 4A-303. Erroneous Execution of Payment Order

(a) A receiving bank that … issues a payment order in execution of the sender's order and then issues a duplicate order, is entitled to payment of the amount of the sender's order under section 4A-402(c) if that subsection is otherwise satisfied.  <u>The bank is entitled to recover from the beneficiary of the erroneous order the excess payment received <i>to the extent allowed by the law governing mistake and restitution</i></u>.[2]

12 C.F.R. § 210 Appendix B to Subpart B--Article 4A, Funds Transfers (emphasis added).

### C.    QNB IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LAW OF MISTAKE AND UNJUST ENRICHMENT

As required by section 4A-303, the Court should apply the law of restitution in this District, which is incorporated into the Federal Regulations for Fedwire transactions occurring in the District of Columbia.  12 C.F.R. § 210 Appendix B to Subpart B-§ 4A-303.  As this Court has held in another case:

> Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another. …  In such a case, the recipient of the benefit has a duty to make restitution to the other person " if the circumstances of its receipt or retention are such that, as between two persons, it is unjust for [the recipient] to retain it." …  Thus the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit, not on whether the person or persons who bestowed the benefit had any duty to do so. …  "A claim of unjust enrichment does not require fault on the part of the recipient to the benefit." …  "His innocence in receiving the benefit does not mean that his retention of that benefit without payment is just."

*Standard Ins. Co. v. Burch*, 540 F. Supp. 2d 98, 104-05 (D.D.C. 2008) (quoting *4934, Inc. v. District of Columbia Dep't of Employment Serv.*, 605 A.2d 50, 55-56 (D.C. 1992).  Clearly, it would not be fair or just to permit Winmar to retain funds it received only through a clerical error that QNB committed by executing a payment order twice.  *See also Rapaport v. U.S. Dep't of Treasury, Office of Thrift*

---

[2]    Section 4A-402(c) simply provides that:

With respect to a payment order issued to [QNB] other than [Winmar's] bank, acceptance of the order by [QNB] obliges [AJI] to pay the bank the amount of [AJI's] order.  Payment by [AJI] is not due until the execution date of [AJI's] order.  The obligation of [AJI] to pay its payment order is excused if the funds transfer is not completed by acceptance by [Winmar's] bank of a payment order instructing payment to the beneficiary of that sender's payment order.

12 C.F.R. § 210 Appendix B to Subpart B--Article 4A, Funds Transfers.

*Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995) ("'Unjust enrichment' is a term of art at common law and … [T]he fundamental characteristic of unjust enrichment is 'that the defendant has been unjustly enriched by receiving something ... that properly belongs to the plaintiff[, thereby] forcing restoration to the plaintiff.'") (quoting Dobbs, LAW OF REMEDIES § 4.1(2)).

> As the District of Columbia Court of Appeals has held:
>
>> For more than a century, the courts of this jurisdiction have "follow[ed] the established rule that one who pays money to another under an honest mistake of fact may, in the absence of an equitable defense, recover the money so paid." … "To [this] rule ... there is no exception." … These authorities are consistent with this court's recognition that "equity abhors forfeitures," … so, indeed, does the law. ... There is no evidence in this case of detrimental reliance by [defendant] on [plaintiff's] initial payment of the disputed amounts, nor has [defendant] established any other equitable defense. "If there is any question[, in a case of money paid by the plaintiff under a mistake of fact,] whether it would be inequitable to require the defendant to refund, the burden of proving the fact rests upon him."

*Association of American Railroads v. Connerton*, 723 A.2d 858, 862 (D.C. 1999) (quoting *Lanston v. American Sec. & Trust Co.*, 32 A.2d 482, 483 (D.C. 1943); *Prowinsky v. Second Nat'l Bank*, 49 App. D.C. 363, 364, 265 F. 1003, 1004 (1920); *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 203 (D.C. 1991); *Hibbs v. Beall*, 41 App. D.C. 592, 598 (1914); citing *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 367-68 (D.C. 1984)).

The law of restitution in this District as it relates to circumstances very similar to those presented here is articulated in *Credit Lyonnais-New York v. Washington Strategic Consulting Group, Inc.*, 886 F. Supp. 92, 92-93 (D.D.C. 1995) (Robertson, J.). In *Credit Lyonnais*, the plaintiff bank, upon receipt of a confirmation request of a previous payment in the amount of $171,821.30, committed a clerical error and executed a second, duplicate payment in the same amount. *Id.* at 92-93. Unlike in this case, where QNB sought a refund from Winmar within three days of the erroneous payment, in *Credit Lyonnais*, "[i]t took nearly six months for [the bank] to discover its mistake" and make "demand upon [plaintiff] for the return of the funds." *Id.* at 93.

The Court held that "the outcome of this case is controlled by settled law:  Where one person receives money that in equity and good conscience belongs to another, an action will lie for 'money had and received,'" and that "[t]he equitable doctrine of unjust enrichment is very similar." *Id.* at 93 (citing *Hillyard v. Smither & Mayton, Inc.*, 76 A.2d 166, 167 (D.C. 1950)).  As in the present case:

> [The defendant]'s theory of defense is that the second payment was in fact authorized, or in any case that [the defendant] was entitled to the money because its client still owed it about $170,000 when the second wire transfer arrived.  <u>The trouble with this theory is that it does not raise or depend upon a *material* issue of fact.  The unjust enrichment issue is drawn between [the plaintiff bank] and [the defendant].</u>  [The defendant]'s Cameroonian client is not a party, and <u>the question whether the client owed the money or authorized its payment is not material to that narrowly drawn issue</u>.

*Id.* (underlined emphasis added) (citing *4934, Inc. v. District of Columbia Dep't of Employment Serv.*, 605 A.2d 50, 56 (D.C. 1992)).  The Court found that "[b]ecause the particular circumstances of this case place the duty to go forward with controverting facts upon [the defendant], its failure to discharge that duty entitles [the bank] to summary judgment."  *Id.* at 93.  Accordingly, this Court held that "[t]here are no genuine issues of material fact.   Plaintiff is entitled to judgment <u>as a matter of law</u>." *Id.* at 92 (emphasis added).  Similarly, the unjust enrichment claim asserted in QNB's Complaint "is drawn between [QNB] and [Winmar]."  *Id.*  "[T]he question whether [AJI] owed the money or authorized its payment is not material to that narrowly drawn issue."  *Id.*  QNB is entitled to recover the money it paid to Winmar by mistake as a matter of law.

### D.    QNB IS ENTITLED TO SUMMARY JUDGMENT ON WINMAR'S DISCHARGE-FOR-VALUE AFFIRMATIVE DEFENSE

#### 1.    The UCC Incorporates D.C. Law on Mistake and Restitution, which Does Not Recognize the Discharge-for-Value Defense

No federal or state court from the District of Columbia has discussed, let alone adopted, the discharge for value defense.  As noted, the applicable U.C.C. § 4A-303 governing "Erroneous

Execution of Payment Order" states that "[t]he bank is entitled to recover from the beneficiary of the erroneous order the excess payment received to the extent allowed by the law governing mistake and restitution." 12 C.F.R. § 210 Appendix B to Subpart B-§ 4A-303. As one prominent commentator has noted:

> The last sentence of subsection (a) states that the receiving bank is entitled to recover in restitution to the extent the common law of restitution would allow it to do so. In most of those cases there would be a restitution cause of action; this would be a classic case of payment by mistake.

3 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 24-1 (5th ed. 2007). Consequently, this Court need not apply the discharge-for-value rule. It has never been adopted in this jurisdiction and is not entirely consistent with the law of unjust enrichment cited above. However, even if this Court applies the discharge-for-value in this case, it fails as a matter of law for the reasons set forth below.

### 2.    Winmar's Discharge-for-Value Defense Fails Because Winmar Had Actual Notice of the Error

Although the courts in D.C. have not addressed at all the discharge-for-value defense, the Restatement of Restitution defines the discharge-for-value defense as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

RESTATEMENT OF RESTITUTION § 14(1). In 2005, the Sixth Circuit became the only court of appeals in the U.S. to apply the discharge-for-value rule to a wire transfer to address the point in time by which notice of the mistake must be received to invoke the discharge-for-value defense. *See In re Calumet Farm Inc.*, 398 F.3d 555, (6th Cir.) ("[T]he two other appellate courts that have concluded that the discharge-for-value rule applies to wire transfers also failed to focus on the timing question."), *cert. denied*, 546 U.S. 824 (2005).

The Sixth Circuit firmly held that the discharge-for-value does not apply if "the beneficiary [Winmar] receives notice of a mistake before the beneficiary of the transfer credits the debtor's [AJI's] account." *Id.* at 560 (emphasis added). Consequently, under this clear rule, Winmar's discharge-for-value defense cannot prevail because Winmar received notice that the January 31, 2006 $474,677 payment was in error at the same time it received notice that the payment had occurred at all. SMF ¶ 25. As Winmar has admitted, "Winmar had become aware, through Citibank, in the days preceding ... [February 24, 2006] ..., that QNB was seeking reimbursement from Winmar for the payment of $474,677.00, made on or around January 31, 2006," and this "was the first notice that Winmar received that the payment of $474,677.00 had been made on or around January 31, 2006 into Winmar's Citibank account." SMF ¶ 25 (Exh. 3, ¶ 2 (Stipulation)). Thus, it is literally impossible for Winmar to have credited AJI's account before it received notice of the error: Winmar received notice of the error at the same time it became aware that the funds had been wired at all. *Id.* No time elapsed for Winmar to credit AJI's account. Winmar's receipt of notice of the error before it possibly could have credited AJI's account deprives Winmar of a discharge-for-value defense as a matter of law. *See Calumet Farm*, 398 F.3d at 561-62 ("Thus, even if the bankruptcy court and district court correctly determined that [defendant] did not have notice of the error before receiving the funds, [defendant] certainly had notice before crediting Calumet's account. We therefore hold as a matter of law that [defendant] had prior notice of the mistake in the funds transfer for purposes of the discharge-for-value rule and cannot avail itself of that defense.").

As noted, the Sixth Circuit's *Calumet Farm* opinion is the only one by a court of appeals to address this issue of timing. *Calumet Farm*, 398 F.3d at 559. Similar to the present facts, in *Calumet Farm*, a claim arose out of a "botched electronic wire transfer" from Calumet Farm to White Birch Farm. 398 F.3d at 556. On March 8, 1991, Calumet originated the wire in the amount of $77,301.58 by a payment order to its bank, First National Bank ("FNB"). *Id.* The purpose of the

wire was for Calumet to make an agreed interest payment on a loan it had obtained from White Birch to finance purchase of a racehorse. At the time of the wire, the balance on the loan was "over $1 million." *Id.* at 556. Note that the application of the discharge-for-value defense would be even more inappropriate in the present case, where Winmar was claiming that it had a debt <u>less</u> than the amount of the erroneous payment. SMF ¶ 13.

In handling the wire, FNB inadvertently added a zero in the amount field, ordering Citibank to pay its customer, White Birch, the princely sum of $770,301.58. *Id.* at 557. After learning of the error on March 11, Calumet immediately notified FNB of the mistake and FNB contacted Citibank to request reversal. *Id.* When Citibank declined, Calumet sued FNB for $693,000 (the excess amount); the two parties settled for a $550,000 loan to Calumet secured by the note. Calumet assigned to the bank any right it had against White Birch. *Id.* at 557-58. When Calumet filed bankruptcy, FNB sued White Birch for recovery of the $770,301 mistaken payment. The lower courts found in favor of White Birch, based on the discharge-for-value rule. *Id.*

The Sixth Circuit reversed, applying the provisions of U.C.C. § 4A-303 through Regulation J. *Id.* at 559, 562. The court noted that the Restatement of Restitution states that the discharge-for-value defense can allow a creditor who has received from a third person any benefit in discharge of the debt to retain the funds "*if the transferee* made no misrepresentation and *did not have notice of the transferor's mistake.*" *Id.* at 559 (emphasis in original) (quoting Restatement of Restitution § 14(1)). The court put it this way:

> Thus, when a creditor receives what appears to be a payment on a debt from someone other than the debtor, the creditor becomes a bona fide purchaser and may keep the mistaken payment if the creditor discharges the obligation of its debtor prior to becoming aware of the mistake.

*Id.* The court noted, however, neither the Restatement, the U.C.C., nor the two cases decided by courts of appeals that apply the discharge-for-value rule to wire transfers specifies the point in time

by which notice of the mistake must be received. *Id.* (citing *GECC v. Central Bank*, 49 F.3d 280 (7th Cir. 1995); *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189 (N.Y. 1991)). The court noted:

> Traditionally, the U.C.C. provides that payment in discharge of an obligation occurs under the first option—"at the time a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank in the funds transfer." U.C.C. § 4A-406(a). But this approach does not square with the notice exception to the discharge-for-value rule. Application of this U.C.C. definition of discharge would mean that the entity that must receive notice (here White Birch) is an entity other than the entity to whom the funds were wired (here Citibank). To divide the "receipt of payment" and "notice of error" elements between different entities makes little sense and at any rate is a recipe for reading the notice exception out of the rule. … That leaves what seems to us to be the most desirable option—that <u>the discharge-for-value defense will apply unless the beneficiary receives notice of a mistake before the beneficiary of the transfer credits the debtor's account</u>.

*Id.* at 559-60 (emphasis added).

The *Calumet* court held that the discharge-for-value rule did not apply because the undisputed record showed that Calumet "notified White Birch of the error on the morning of March 11, 1991," and White Birch "did not apply that amount to reduce Calumet's debt on the … note until later that day." *Id.* at 561. Accordingly, the Sixth Circuit reversed the summary judgment granted by the district court to the defendant and remanded the case for the entry of judgment in favor of the plaintiff bank. *Id.* at 562. Because Winmar received notice of QNB's error in duplicating the December 12, 2005 payment on January 31, 2006 at the same time it received notice of the wire transfer itself, it clearly could not have credited AJI's account *before* even knew about the wire transfer at all. Consequently, Winmar's discharge-for-value defense fails as a matter of law, and QNB is entitled to summary judgment.

### 3. Winmar's Discharge-for-Value Defense Fails Because Winmar Had Constructive Notice of the Error

The discharge-for-value defense does not permit Winmar to avoid refunding the money it received from QNB in error because Winmar also had constructive notice that the payment was in error. *See Calumet Farm*, 398 F.3d at 560. Prior to the payment, Winmar had constructive notice that

it was in error because (a) it was in the exact amount of a previous payment, SMF ¶¶ 6, 16; (b) it was

in amount greater than Winmar was, at the time, claiming it was owed by AJI, SMF ¶¶ 13, 14; (c) at

the time Winmar received notice of the payment, AJI had informed Winmar that AJI believed it

owed Winmar nothing and that Winmar, in fact, owed AJI approximately $200,000. SMF ¶¶ 12, 18,

19. As the court in *Calumet Farm* held:

> Equally unpersuasive is the argument that the discharge-triggering event necessarily
> occurs only when the beneficiary has actual notice that funds have been placed in its
> account. Such notice may not connect the funds to a given debtor or to the size of
> the debtor's outstanding obligation. Furthermore, while actual notice of a mistake
> may of course be independently disclosed by the originator to the beneficiary,
> <u>constructive notice of a mistake may also occur simply as a result of the size of the
> transfer when considered in connection with the name of the originator</u>. … <u>Any
> sensible application of the discharge-for-value rule in this unique setting must
> account for constructive as well as actual notice of a mistake</u>.

*Calumet Farm*, 398 F.3d at 560 (emphasis added). Clearly, any reasonable person at Winmar would

have realized that the second payment by QNB in the exact amount of the previous payment of

$474,677 was in error because it was greater than the debt even Winmar claimed AJI owed it, and

that debt was openly disputed by AJI to Winmar. Further, as noted above, Winmar had actual

notice of the error before it could have credited AJI's account.

### 4.    The Discharge-for-Value Defense Does Not Apply to Non-Liquidated Debts Like AJI's Alleged Debt to Winmar

Even if the discharge-for-value defense applies to transfers, such as the one at issue here,

Winmar cannot prevail on that defense also because the discharge-for-value defense applies only to

liquidated debts—not the amorphous, contested debts on which Winmar relies. As one court noted:

> Examples in the Restatement of Restitution describing the "discharge for value" rule
> describe debts that are liquidated, concrete and preexisting, not merely probable and
> undetermined. (E.g., REST., RESTITUTION, § 14, com. b, illus. 1 [no restitution for
> proceeds erroneously used to pay existing mortgage on real estate]; illus. 2 [no
> restitution from city for property taxes paid on property not actually owned]; illus. 3
> [no restitution where bank erroneously cashes customer's check given to payee in
> payment for services rendered]; illus. 4 [no restitution from judgment creditor for
> execution of judgment of wrong person's property].) <u>No decision we are aware of
> has applied the discharge for value rule where the debt or lien in question was</u>

anything less than an objectively verifiable, preexisting, liquidated obligation. (*See* REST., RESTITUTION (appen.) § 14 and cases collected.) Indeed, allowing the rule to apply to debts or obligations any less substantial would risk destroying the certainty of the rule and allow the exception to control its application.

Consequently, it does not appear the "discharge for value" rule can be properly invoked in a case such as this where the alleged preexisting debt or lien is at best a probable yet undetermined interest …

*Bank of America v. Sanati*, 11 Cal. App. 4th 1079, 1088-89 (Cal. App. 1992) (emphasis added) (citing RESTATEMENT OF RESTITUTION § 14 and cases collected therein). There appears to be no subsequent opinion contradicting this rule of law.

The debt AJI allegedly owed to Winmar was, at best, "probable and undetermined" rather than "liquidated, concrete and preexisting." *Id.* On January 4, 2006, Winmar suspended its performance of the Contract for alleged non-payment by AJI of $1,363,463. SMF ¶ 8. Within two days, Winmar received notice from the Architect that it was rescinding certification of Winmar's Applications for the collective amount of $1,363,463 because of "a number of discrepancies" in them "as well as a lack of supporting documentation." SMF ¶ 8. Five days later, AJI terminated the Contract for convenience. SMF ¶ 9. A week after that, on January 18, Winmar submitted a revised Application, in which it certified that it was due $653,449 as its final payment under the contract. SMF ¶ 10. The next day, the Architect notified Winmar that it was rejecting that revised Application because it again included no supporting documentation. SMF ¶ 11. Also on January 19, 2006, AJI notified Winmar that AJI would not pay anything further to Winmar until the additional documentation was forthcoming. SMF ¶ 12. On January 23, Winmar submitted another, its last, revised Application, in which Winmar certified it was then due only $355,297 under the Contract. SMF ¶¶ 13, 14. In fact, Winmar has admitted that after received the duplicative payment, "Winmar returned to AJI $119,380 on March 9, 2006, following a claim made to the Architect disputing the amounts owed." SMF ¶ 23.

Under the law in this District, such an undefined, nebulous debt does not constitute a liquidated debt. *See Aon Risk Services, Inc. of Washington, D.C. v. Estate of Coyne*, 915 A.2d 370, 379 (D.C. 2007) ("'A liquidated debt is one which at the time it arose ... was an easily ascertainable sum certain.'") (quoting *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 311 (D.C. 1987); and quoting *United States Fire Ins. Co. v. C & C Beauty Sales, Inc.*, 674 So. 2d 169, 171-72 (Fla. Dist. Ct. App. 1996) for the principle that "'damages are not liquidated if the ascertainment of their exact sum requires the taking of testimony to ascertain facts upon which to base a value judgment'"). Accordingly, because the debt Winmar alleged it was owed by AJI at the time that the erroneous January 31, 2007 payment occurred was not a liquidated debt, it cannot give rise to a discharge-for-value defense as a matter of law.

## E.    DAMAGES

The Court should grant QNB Summary Judgment for damages in the full amount of the $474,677 January 31, 2006 duplicative transfer improperly retained by Winmar. Neither Winmar, AJI, nor any other party has every compensated QNB for this loss. SMF ¶ 30. "[T]he question whether [AJI] owed the money … is not material to that narrowly drawn issue." *Credit Lyonnais-New York v. Washington Strategic Consulting Group, Inc.*, 886 F. Supp. 92, 92-93 (D.D.C. 1995). Winmar refused to return the funds to QNB, and it is QNB who has the right to a refund of those funds. *See*, *supra*. Winmar has asserted an unjust enrichment claim against AJI as part of their complex contract disputes on the grounds that "Al-Jazeera accepted $119,380 from Winmar on March 9, 2006 and then accepted $474,677 from Qatar National Bank on March 20, 2006." *See* Winmar's Third-Party Complaint, ¶ 28 (Dkt # 15). As indicated by the authorities cited above, Winmar owes restitution to QNB for the mistaken payment that QNB made to Winmar. Winmar's claim, if it has one, to recover the $119,380 it paid to AJI belongs among Winmar's many claims against AJI— either as an offset against AJI's ultimate recovery against Winmar or as an additional source of

damages in Winmar's claim for unjust enrichment against AJI.  As set forth above, Winmar unlawfully retained QNB's funds, and it owes QNB a refund of those funds as a matter of law, independent of Winmar's dispute against AJI.  If Winmar refunded the money, it did so to the wrong party.

In the alternative, if the Court finds that there is somehow a genuine issue of material fact, which QNB denies, as to whether QNB's recovery against Winmar can somehow be offset by amounts Winmar paid to AJI, QNB seeks Summary Judgment in the amount of $355,297, which is the difference between the duplicate payment unlawfully retained by Winmar and the amount Winmar subsequently paid to AJI—not QNB.

## IV.    CONCLUSION

For the foregoing reasons, QNB respectfully requests this Court grant summary judgment in its favor.

DATED:        June 16, 2008                    Respectfully submitted,


        /s/ Alan T. Dickey
Alan T. Dickey (DC Bar # 496403)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone:  (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Plaintiff*
*Qatar National Bank*