# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QATAR NATIONAL BANK,<br> Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | Civil Action No. 1:06-cv-1307 (GK/JMF) |
| | : | |
| WINMAR, INC.,<br> Defendant and Third<br> Party Plaintiff. | : | |
| | : | |
| WINMAR, INC.,<br> Third Party Plaintiff<br> and Counterclaim<br> Defendant, | : | |
| v. | : | |
| AL JAZEERA INTERNATIONAL,<br> Third Party Defendant:<br> and Counterclaim<br> Plaintiff. | : | |

**QATAR NATIONAL BANK'S FIRST SET OF REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS
<u>FOR PRODUCTION OF DOCUMENTS TO WINMAR INC.</u>**

Pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, Plaintiff Qatar

National Bank hereby propounds, in accordance with the Instructions and Definitions set forth

below and the rules of this Court, the following requests for admissions and requests for production

of documents to Defendant Winmar, Inc. Sworn and signed answers to the interrogatories, requests

for admission, and responsive documents, or copies thereof, are to be served on Alan T. Dickey at

the offices of Patton Boggs LLP, 2550 M Street, N.W., Washington, DC 20037, or such other place

as may be agreed upon by counsel, on or before April 4, 2008.

<u>DEFINITIONS</u>

A.    "Winmar" means Defendant Winmar, Inc. and includes all present and former

partners, parent companies, affiliates, subsidiaries, divisions, directors, officers, principals,

administrators, board members, employees, agents, servants, representatives, assigns, predecessors, successors, attorneys, experts, insurers and any person or entity (as those terms are defined below) acting or purporting to act on behalf of any of the foregoing.

B.     "QNB" means Plaintiff Qatar National Bank and includes all present and former partners, parent companies, affiliates, subsidiaries, divisions, directors, officers, principals, administrators, board members, employees, agents, servants, representatives, assigns, predecessors, successors, attorneys, experts, insurers and any person or entity acting or purporting to act on behalf of any of the foregoing.

C.     "Al Jazeera" means Third Party Defendant and Counterclaim Plaintiff Al Jazeera International and includes all present and former partners, parent companies, affiliates, subsidiaries, divisions, directors, officers, principals, administrators, board members, employees, agents, servants, representatives, assigns, predecessors, successors, attorneys, experts, insurers and any person or entity acting or purporting to act on behalf of any of the foregoing.

D.     "You" and "your" each means Winmar (as defined above).

E.     "Communication" means the giving, receiving, exchanging, recording or transmitting of information or data of any kind by any means whatsoever.

F.     "Complaint" means the Complaint filed in this case by QNB against Winmar.

G.     "Entity" means and includes organizations of any type, including but not limited to, agencies, governmental bodies, departments, divisions, committees, subcommittees, task forces, firms, corporations, limited liability companies, partnerships, proprietorships, companies, joint ventures, associations, clubs, orders, and societies.

H.     "Person" means natural persons as well as any Entity.

I.     "Document" shall be interpreted in its broadest possible sense. At a minimum, "Document" shall have the broadest meaning accorded to it under Rule 34 of the Federal Rules of

Civil Procedure.  By way of example and not by way of limitation, Documents include but are not limited to all of the following: printed, written, typed, graphic, mechanical, electronic, or magnetic records or recordings of any information of any kind, such as papers, reports, studies, tabulations, analyses, comparisons, diagrams, charts, presentations, questionnaires, surveys, summaries, compilations, agreements, contracts, memoranda of understanding, letters of intent, books, magazines, newspapers, publications, pamphlets, articles, bulletins, circulars, brochures, notes, post-its, messages, calendars, diaries, notices, minutes, transcripts, agendas, orders, instructions, resolutions, consents, declarations, invoices, purchase orders, accounts, audits, checks, check stubs, receipts, notebooks, lists, logs, ledgers, carbon copies, press releases, tickets, ticket stubs, maps, working papers, pleadings, testimony, correspondence, letters, envelopes, memoranda, facsimiles, telegrams, cablegrams, teletypes, electronic mail, records of oral conversations, photographs, slides, audio or video tape recordings, microfilm or microfiche, computer data files, computer disks or diskettes, ZIP files, CD-ROMS, DVD-ROMS, computer drives or memories, web pages, intranet files, and other computer-generated or computer-stored information.

J.     "Referring to," "Related to," "Regarding," "Relating to," or "Concerning" each shall be interpreted in its broadest possible sense and at a minimum means directly or indirectly about, relating to, alluding to, analyzing, being, commenting on, concerning, pertaining to, constituting, evidencing, identifying, stating, describing, discussing, in connection with, in respect of, dealing with, mentioning, reflecting, regarding, responding to, showing, embodying or supporting.

K.     "Date" means the exact day, month, and year, if ascertainable or, if not ascertainable, the answering party's best approximation thereof, including the temporal relationship of the event in question to other events for which you can fix the date with greater precision.

L.     "Possession, custody or control" includes individual, joint or several possession, custody or control by Winmar or any person responding to the following interrogatories and

requests for production (individually and collectively, "Requests") on behalf of Winmar, as well as individual, joint or several possession, custody or control by any other person acting or purporting act on behalf of Winmar, whether as an agent, an employee, a consultant, an accountant, an attorney, or in any other capacity.

## INSTRUCTIONS

A.    Responses, answers, and documents should be served or produced by delivery to the offices of Patton Boggs LLP, 2550 M Street, N.W., Washington, DC 20037, or such other place as may be agreed upon by counsel, on or before April 4, 2008.

B.    Each of the Requests seeks information and/or Documents in the possession, custody or control, including individual, joint or several possession, custody or control, of Winmar.

C.    Words used herein in the singular shall include the plural and words used in the plural shall include the singular so as to bring within the scope of these Requests all information and/or Documents that might otherwise be construed as outside their scope.

D.    The conjunctions "and" and "or" shall include both the disjunctive and the conjunctive so as to bring within the scope of these Requests all information and/or Documents that might otherwise be construed as outside their scope.

E.    The term "any" shall include "all," "each" and "every" so as to bring within the scope of these Requests all information and/or Documents that might otherwise be construed as outside their scope.

F.    The present tense shall be construed to include the past tense and the past tense shall be construed to include the present tense so as to bring within the scope of these Requests all information and/or Documents that might otherwise be construed as outside their scope.

G.    If anyone interpreting these Requests feels any part of these Requests, definitions or instructions is ambiguous, the Request, definition or instruction shall be construed in the broadest

manner possible so as to bring within the scope of these Requests all information and Documents that might otherwise be construed as outside their scope and the interpreter shall set forth in the answer or response to any allegedly ambiguous Request, definition, or instruction the construction used.

H.     As provided for by Rule 26(e) of the Federal Rules of Civil Procedure, these Requests are continuing so as to require additional or amended responses, answers or productions promptly if new or further information and/or Documents are obtained or discovered subsequent to the time any responses are served, answers given, or documents produced.

I.     In each instance, if any, where you deny knowledge or information sufficient to respond to a Request, or any part thereof, identify each person known or believed to have such knowledge or information.

J.     If any information responsive to any of these Requests is withheld under a claim of privilege or other exemption or protection from production, furnish a list at the time all other answers and responses are furnished which contains the following information: (1) a brief description of the information being withheld, (2) the basis on which the information is being withheld, and (3) the Request to which the withheld information responds.

K.     If any Document responsive to any of these Requests is withheld under a claim of privilege or other exemption or protection from production or disclosure, furnish a list at the time all other Documents are furnished which contains the following information for each responsive Document withheld:

    1.     A brief description of the Document, including the following information:

        a.     the date of the Document,

        b.     identify the author or creator of the Document,

      c.     identify each person who prepared or directed or assisted in the preparation of the Document,

      d.     identify each addressee and recipient of the Document,

      e.     identify all other persons to whom the contents of the Document have been disclosed and the dates of such disclosures, and

      f.     the subject matter of the Document,

  2.    The basis on which the Document is being withheld, and

  3.    The request or requests to which the Document responds.

L.    If any information is redacted from a Document furnished pursuant to these Requests, identify the area from which information has been redacted by stamping the word "Redacted" on the area and list each redaction on the log requested above.

M.    If any requested information is no longer in Winmar's possession, custody, or control, furnish a list at the time all other responses and answers are furnished which contains the following information: (1) a brief description of the information, (2) the date the information left Winmar's possession, custody or control, (3) the manner in which the information left Winmar's possession, custody or control, (4) the reason the information left Winmar's possession, custody or control, and (5) the interrogatories and/or requests to which the information responds.

N.    If any requested Document is no longer in Winmar's possession, custody or control, furnish a list at the time all other Documents are furnished which contains the following information:

  1.    A brief description of the Document, including the following information:

      a.     the date of the Document,

      b.     identify the author or creator of the Document,

      c.       identify each person who prepared or directed or assisted in the preparation of the Document,

      d.       identify each addressee and recipient of the Document,

      e.       identify all other persons to whom the contents of the Document have been disclosed and the dates of such disclosures, and

      f.       the subject matter of the Document,

2.      The date on which the Document left Winmar's possession, custody, or control,

3.      The manner in which the Document left Winmar's possession, custody, or control, and

4.      Every reason the Document left Winmar's possession, custody or control.

O.      Produce each Document as it is kept in the ordinary course of business.

P.      If any part of a Document responds to any of these Requests, produce the Document in its entirety, including all attachments thereto.

Q.      Produce all non-identical copies of responsive Documents, including all versions as well as all drafts of responsive Documents or Documents which differ because of handwritten notations.

## REQUESTS FOR ADMISSIONS

1.      Admit that the document attached as Exhibit A hereto is a true and correct copy of a letter that you received on or about February 24, 2006.

2.      Admit that the document attached hereto as Exhibit B is a true and correct copy of a letter your counsel, James Lee, sent to Leslie Wiesenfelder on or about March 9, 2006.

3.      Admit that the document attached hereto as Exhibit C is a true and correct copy of a letter your counsel, James Lee, sent to Dennis Janson on or about March 28, 2006.

4.    Admit that, on or about January 31, 2006, a wire transfer of $474,677.00 was credited to a bank account of Winmar's at Citibank Federal Savings Bank.

5.    Admit that Winmar was unaware that any wire transfer of $474,677.00 had been credited to a bank account of Winmar on or about January 31, 2006 until Winmar received Leslie Wiesenfelder's February 24, 2006 letter to Dennis Janson (the document attached as Exhibit A hereto).

6.    Admit that the following statements by James Lee in the letter attached hereto as Exhibit B are true and correct:

> I am writing in response to your letter of February 24 to Mr. Janson.  My clients were unaware until your letter was received that any wire had been accomplished on January 31st.  However, the amount received by my client's bank was $474,677.

7.    Admit that the following statements by James Lee in the letter attached hereto as Exhibit C are true and correct:

> Mr. Wiesenfelder's February 24, 2006 letter was the first notice Winmar received that AJI had wired money into Winmar's account.  Prior to February 24, 2006, Winmar received no request from AJI to return the wired funds.  We have verified that a total of $474,677 was wired into Winmar's account on January 31, 2006 …

## INTERROGATORIES

1.    Identify each and every payment or other transfer of money by wire transfer or any other means that Winmar has received from either Al Jazeera or QNB.

2.    If you denied or otherwise did not admit in full any of the above Requests for Admissions numbered 1 through 5, identify, for each and every payment or other transfer of money by wire transfer or any other means that Winmar has received from either Al Jazeera or QNB, the following information:

        a.    The amount of the payment or other transfer;

        b.    The form of the payment;

  c.  The payor(s), transferor(s), payee(s), and transferee(s);

  d.  All banks through which the payment passed;

  e.  The time and date of the payment, transfer, and receipt;

  f.  Each and every transfer of, or credit or debit, or other action affecting the disposition of the paid or transferred funds for 210 days after the funds were received by Winmar, by any of Winmar's bank accounts, or by any bank on its behalf; and

  g.  The time and date that Winmar first became aware that it had received the payment or transfer, and the manner, form, and source of that notice.

3.  If you denied or otherwise failed to admit any of the above Requests for Admissions numbered 6 or 7, identify:

  a.  The portion(s) of the statements quoted therein that is false or incorrect;

  b.  What facts on which Winmar bases its belief that the quoted statements are false or incorrect; and

  c.  The time and date that Winmar learned that any of the statements quoted in Requests for Admissions numbers 6 and 7 were false or incorrect, and the form and source of that notice.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

Produce all Documents described below:

1.  All Documents comprising, describing, referring to, or concerning any written, electronic, or oral communications between Winmar and either QNB, Al Jazeera, or any banking or other financial entity concerning in any way the January 31, 2006 wire transfer of $474,677.00 that is the subject of QNB's Complaint.

2.    All Documents comprising, describing, referring to, or concerning any written, electronic, or oral communications between any officers, directors, employees, or contractors of Winmar, or any other persons included within the Definition of "Winmar" set forth above, concerning in any way the January 31, 2006 wire transfer of $474,677.00 that is the subject of QNB's Complaint.

3.    All Documents comprising, describing, referring to, or concerning the receipt by Winmar or any banking or financial institution at which Winmar has an account of the January 31, 2006 wire transfer of $474,677.00 that is the subject of QNB's Complaint. This includes, but is not limited to, the records of any banking or financial institution showing the receipt of those funds.

4.    All Documents comprising, describing, referring to, or concerning any and all transfers or any other actions affecting the disposition of any funds that comprise any portion of the January 31, 2006 wire transfer of $474,677.00 that is the subject of QNB's Complaint, occurring during the period from January 31, 2006 until August 31, 2006. This includes, but is not limited to, the records of any banking or financial institution showing any transfer or other disposition of those funds, including, but not limited to, any transfers from, to, or between, any accounts, entities, or persons. This also includes, but is not limited to, any Documents showing, in any way, how Winmar allocated, or credited those funds as part of its accounting or bookkeeping procedures.

5.    All Documents relied on, referred to, or identified in your responses to any of the Interrogatories and Requests for Admissions above.

6.    All Documents referring to, related to, or regarding any of your responses to any of the Interrogatories and Requests for Admissions above.

DATED:        March 5, 2008                    By: _____
                                                   Alan T. Dickey (DC Bar # 496403)
                                                   PATTON BOGGS LLP
                                                   2550 M Street, N.W.
                                                   Washington, D.C. 20037
                                                   Telephone: (202) 457-6000
                                                   Facsimile: (202) 457-6315

                                                   *Attorneys for Plaintiff*
                                                   *Qatar National Bank*


## CERTIFICATE OF SERVICE

I, Alan T. Dickey, hereby certify that a copy of the foregoing was served on the following persons on this 5th day of March 2008, as indicated below:

**VIA HAND DELIVERY**

James F. Lee, Jr., (DC Bar No. 247718)
Arthur T. K. Norris, (DC Bar No. 438907)
1211 Connecticut Avenue, N.W.
Suite 425
Washington, D.C. 20036


**VIA UNITED STATES MAIL**

Leslie H. Wiesenfelder (D.C. Bar No. 173500)
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W.
Suite 800
Washington, DC 20036


                                                   _____
                                                   Alan T. Dickey

# EXHIBIT A

# DOW, LOHNES & ALBERTSON, PLLC

### ATTORNEYS AT LAW

LESLIE H. WIESENFELDER
DIRECT DIAL 202·776·2726
lwiesen@dowlohnes.com

WASHINGTON, D.C.

1200 NEW HAMPSHIRE AVENUE, N.W. · SUITE 800 · WASHINGTON, D.C. 20036-6802
TELEPHONE 202·776·2000 · FACSIMILE 202·776·2222
www.dowlohnes.com

ONE RAVINIA DRIVE · SUITE 1600
ATLANTA, GEORGIA 30346-2108
TELEPHONE 770·901·8800
FACSIMILE 770·901·8874

February 24, 2006

**VIA EMAIL & UPS**

Dennis C. Janson
Managing Partner
Janson Design Group
257 Park Avenue South, Suite 303
New York, NY 10010

Re:    **Contract Between Al Jazeera International and Winmar, Inc.**

Dear Mr. Janson:

As you know, this firm represents Al Jazeera International ("AJI"). In this capacity, we write to you in your capacity as Architect with respect to AJI's contract with Winmar, Inc. ("Winmar") for the 1627 K Street, N.W., Washington, D.C. project (the "Contract"). As you also know, AJI terminated the Contract for convenience pursuant to Section 14.4 of the General Conditions as of the close of business, January 11, 2006.

Section 4.2.11 of the General Conditions provides in relevant part:

> The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

In addition, Section 4.3 of the General Conditions deals with Claims and Disputes. In light of the foregoing, and in accordance with Section 4.2.11, AJI hereby formally requests the following:

1.    By your letter to Chris Condon of Winmar dated January 5, 2005, you rescinded certification of Applications and Certificates for Payment Nos. 1, 2b, and 3, dated December 7, 2005, October 31, 2005, and November 30, 2005, respectively, totaling $1,363,463 (the "Rescission Letter"). The Rescission Letter stated that you were rescinding those certifications due to "a number of discrepancies" in those Applications and Certificates for Payment, "as well as the lack of appropriate supporting documentation." AJI understands that your determination

Dennis C. Janson
February 24, 2006
Page 2

that Winmar's supporting documentation was inadequate was based on your interpretation of the Contract, as the Architect, and your understanding of your obligations, and Winmar's, under the Contract. Please confirm that this understanding is correct.

      2.     If AJI is correct in understanding that you rescinded the certification of Applications and Certificates for Payment Nos. 1, 2b, and 3 based on your interpretation of the obligations imposed on Winmar under the Contract, AJI then requests that you, as the Architect, rescind the portions of Application and Certificate for Payment No. 2 that also lack the supporting documentation required by the Contract. Specifically, AJI requests that you rescind certification of Application and Certificate for Payment No. 2's requested payment of $157,000 for Change Order No. 1 and requested payment of $225,000 for Change Order No. 2.

      3.     AJI requests that you, as the Architect, issue a determination, pursuant to Section 4.2.11 of the General Conditions, that Winmar has not submitted any Claims (as defined by Section 4.3.1) and that there are no Claims by Winmar currently pending before you as the Architect.

      4.     Pursuant to Sections 4.3 and 4.4 of the General Conditions, AJI requests that you determine, in your capacity as the Architect, that Winmar has been overpaid by AJI based on the services performed by Winmar prior to termination of the Contract and that AJI therefore is entitled to a refund from Winmar in the amount of $855,976, less that portion of the overhead and fee to which Winmar is determined to be entitled as a result of AJI's termination of the Contract.

      Each of these is addressed in full below.

**1.     The Rescission Letter Was Based On The Architect's Determination That Winmar Had Failed To Document Its Applications And Certificates For Payment As Required By The Contract**

      Your letter of January 6, 2006, to Chris Condon of Winmar stated that you had rescinded certification of Winmar's Applications and Certificates for Payment Nos. 1, 2b, and 3 pursuant to Section 9.5 of the General Conditions. Section 9.5.1 states in relevant part:

> The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 9.4.2 cannot be made. . . . The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible. . . .

Dennis C. Janson
February 24, 2006
Page 3

Please confirm that you issued the Rescission Letter based on your judgment, as the Architect, that your office had erred in certifying the subject Applications and Certificates for Payment and that rescission was therefore appropriate under Section 9.5.1.

Your letter to Chris Condon of January 6, 2006, requested that Winmar provide certain information, described in the letter, to support its Application and Certificate for Payment in the amount of $1,363,463. AJI requests that you state, pursuant to Section 4.2.11, whether it is your judgment, as the Architect, that Winmar is required to provide the requested information as a condition for receiving payment.

If your Rescission Letter and your follow-up letter of January 6 did not constitute your determination regarding the nature and extent of the documentation Winmar is obligated to provide under the Contract to support its entitlement to payment, AJI hereby requests that you formally determine and describe the documentation that Winmar must provide to support its entitlement to payment.

**2.    The Amounts Included In Winmar's Application And Certificate for Payment No. 2 For Change Orders Nos. 1 and 2 Should Be Rescinded**

AJI believes that when you issued your Rescission Letter, you should also have rescinded certification of Application and Certificate for Payment No. 2 for Change Orders Nos. 1 and 2, in the amounts of $157,000 and $225,000, respectively, because Winmar had not provided any documentation supporting them.

Therefore, AJI requests that you determine that those portion of Certificate and Application for Payment No. 2 are rescinded.

**3.    Winmar Has No Claim Pending Before The Architect**

As AJI reads the Contract, as a result of AJI's termination of the Contract for convenience, Winmar became obligated to submit a Claim under the Contract for whatever amount it seeks as a final payment under the Contract. AJI's understanding is based on Section 4.3.1 of the General Conditions, which provides:

> Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

Please indicate whether you, as the Architect, agree with AJI's reading of the Contract. If you do, please indicate whether you also agree that any such Claim that Winmar submits for

Dennis C. Janson
February 24, 2006
Page 4

final payment under the Contract must comply with the standards established in your Rescission Letter and your follow-up letter of January 6. Finally, AJI would also appreciate your confirming that Winmar has not submitted such a Claim, and that Winmar has no Claim presently pending before you.

**4.     Winmar Has Already Been Overpaid And Owes A Refund to AJI**

As reflected in the Rescission Letter, before AJI terminated the Contract for convenience, Winmar was claiming that it was entitled to be paid an additional $1,363,463 over and above the $1,119,841 it had already received.

On January 18, 2006, i.e., after AJI's termination of the Contract for convenience, Winmar submitted a 2-page Application and Certificate for Payment in the amount of $653,449 to the Owner's Representative, Mark G. Anderson Consultants ("MGAC"). MGAC forwarded this application to you, as the Architect. You rejected that Application and Certificate for Payment due to the lack of any supporting documentation.

On January 25, 2006, counsel for Winmar provided undersigned counsel with still another Application and Certificate for Payment, this one dated January 23, 2006, in the amount of $355,297, which did include some supporting documentation. Counsel for Winmar's letter indicates that a complete copy was provided to you, as the Architect. That $355,297 was the product of the following calculation:

| | |
|---|---|
| Total Completed and Stored to Date per Winmar | $1,475,135 |
| Less Previous Payments to Winmar per Winmar | $1,119,838 |
| Total Claimed Due to Winmar | $355,297 |

However, on January 31, 2006, through the mistake of AJI's bank, Winmar was paid an additional $477,677, which Winmar has refused to return in whole or in part. This refusal continues even in the face of the fact that based on Winmar's own claim of $355,297, it has now received $122,380 more than even it believes it is entitled to. In any event, as a result, the amount which Winmar has actually been paid is not $1,119,838 but rather $1,597,515. Taking this fact into account, the above calculation becomes as follows:

| | |
|---|---|
| Total Completed and Stored to Date per Winmar | $1,475,135 |
| Less Previous Payments to Winmar | $1,597,515 |
| Total Claimed Due to Winmar | ($122,380) |

Moreover, to the extent items included in the $1,475,135 were not for work completed or for materials and equipment delivered and suitably stored as required by Section 9.3.2 of the

Dennis C. Janson
February 24, 2006
Page 5

General Conditions ("Completed and Stored to Date"), the overpayment to Winmar must be increased.[1] The following is the list of items included in $1,475,135 that need to be adjusted:

•

### Change Orders

For the convenience of the Architect, Winmar and AJI, AJI is willing to credit Winmar with 100% of all amounts it paid to any subcontractor in connection with the Contract. This credit will be applied to the base contract. As a result, AJI will add all of those payments to subcontractors to the base contract amount Winmar has claimed. Where that results (as shown below) in an increase to the amount Winmar is claiming for a given item, AJI has increased the amount of that item dollar-for-dollar for what was paid to a subcontractor.

This has no negative impact on Winmar and simplifies the process of determining the net amount of the overpayment to Winmar by eliminating any issues regarding how Winmar may have intended a payment be applied versus how a given subcontractor applied that payment.

Accordingly, for change orders, AJI agrees to 100% of the $24,500 in suspension fees and to the $12,345 Winmar actually paid to the Buckhoist supplier. Thus, of the total of $576,504 claimed for change orders, Winmar is entitled to $36,845 and the amount it is claiming as "Completed and Stored to Date" should be reduced by $539,659.

To the extent that you, as the Architect, disagree with AJI treating change orders in this manner and are of the opinion that, under the Contract, Winmar is due a higher or lower amount than $36,845 for any of these change orders, your decision will increase or decrease the adjustment AJI is claiming for these change orders.

### Demolition/Site Work

For Demolition/Site Work, the approved contract amount is $9,500. Winmar claims this item is 100% complete and seeks $9,500. AJI agrees that this item is 100% complete and

---

[1] Section 9.3.2 provided:

> Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of, storage and transportation to the site for such materials and equipment stored off the site.

Dennis C. Janson
February 24, 2006
Page 6

therefore AJI is not claiming any adjustment to the amount Winmar is claiming as "Completed and Stored to Date" based on this item.

Nevertheless, to the extent that you, as the Architect, based on your knowledge of the job, believe that a higher or lower amount than $9,500 for work done on this item is warranted, your decision will increase or decrease the amount Winmar is claiming based on this item.

### Rough Finished Carpentry

For the Rough Finished Carpentry, the approved contract amount is $36,525. Winmar claims this item was 40% done and seeks $14,610. All of this work was to have been performed by Winmar itself. However, AJI estimates that only 14%, or $5,000 worth, of this work has been done, and all of that was for blocking and hoist landings. No work has been done on the following: elevator protection, site protection, doors/frames/hardware installation or blocking for studio partition and windows.

Therefore, for this item, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be reduced by $9,610. Nevertheless, to the extent that you, as the Architect, based on your knowledge of the job, believe that a higher or lower estimate than $5,000 for work done on this item is warranted, your decision will increase or decrease the $9,610 reduction AJI is claiming for this item.

### Drywall Partitions & Framing

For the Drywall Partitions & Framing, the approved contract amount is $156,215. Winmar claims this item was 75% complete and seeks $117,161; however, AJI estimates this item is only 26% complete because the framing is only 70% complete on the 7th floor and 10% complete on the 4th floor; some drywall has been stacked on the floor, but none was hung; no drywall hanging, taping or finishing was done; no work was done on ceiling grids or ceilings; and there is no acoustic material on site or installed. In addition, neither Winmar nor its counsel has provided any documentation showing that any acoustic material has been ordered or paid for.

Therefore, for this item, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be reduced by $76,539. Nevertheless, to the extent that you, as the Architect, based on your knowledge of the job, believe that a higher or lower estimate than 26% for work done on this item is warranted, your decision will increase or decrease the $76,539 reduction AJI is claiming for this item.

### Plumbing and HVAC

For Plumbing and HVAC, the approved contract amounts are $21,945 and $686,312, respectively, for a total of $708,257. Winmar claims these items are 80% and 39% complete and seeks $17,556 and $264,916, respectively. For the sake of simplicity, and because these are

Dennis C. Janson
February 24, 2006
Page 7

items subcontracted by Winmar to John J. Kirlin, Inc. ("Kirlin"), these two items will be combined. As a result, of the approved contract amounts, which total $708,257, Winmar is seeking $282,472. However, Kirlin has actually been paid $379,185. This amount is being credited here in its entirety, consistent with AJI's treatment of change orders, discussed above. That $379,185 was paid for Kirlin Invoices Nos. 1 and 3. Kirlin Invoice No. 2 was processed by Winmar, but Winmar's check to Kirlin bounced due to insufficient funds. Kirlin no longer expects Invoice No. 2 nor any of its other invoices to be paid by Winmar.

Therefore, for these items, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be increased by $96,713. Nevertheless, to the extent that you, as the Architect, are of the opinion that, under the Contract, Winmar is due a higher or lower amount than $379,185 for these items, your decision will increase or decrease the adjustment AJI is claiming for these items.

### Fire Protection

For Fire Protection, the approved contract amount is $53,515. Winmar claims this item is 40% complete and seeks $21,406; however, this item is only 21% complete. Winmar has actually incurred only $11,075 in connection with this item and this item should be decreased by $10,331.

Therefore, for this item, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be reduced by $10,331. Nevertheless, to the extent that you, as the Architect, based on your knowledge of the job, believe that a higher or lower amount than $11,075 for work done on this item is warranted, your decision will increase or decrease the adjustment AJI is claiming for this item.

### Electrical & Fire Alarm

For Electrical & Fire Alarm, the approved contract amount is $865,955. Winmar claims this item is 17% complete and seeks $145,480; however, because Pel-Bern Electric, Inc. has actually been paid $202,050, this amount is being credited here in its entirety, consistent with AJI's treatment of change orders, discussed above. This item is therefore increased by $56,570 to $202,050. In addition, like Kirlin, Pel-Bern does not expect to receive any further payments from Winmar and will not seek any further payments from Winmar in connection with this Project.

Therefore, for this item, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be increased by $56,570. Nevertheless, to the extent that you, as the Architect, are of the opinion that Winmar is due a higher or lower amount than $202,050 for this item under the Contract, your decision will increase or decrease the adjustment AJI is claiming for this item.

Dennis C. Janson
February 24, 2006
Page 8

**Overhead and Fee**

For Overhead and Fee, the approved contract amount is $250,740. Winmar claims this item was 100% complete, presumably based on the termination for convenience; however, Winmar is not automatically entitled to the entirety of its overhead and fee simply by virtue of a termination for convenience. Unless and until the remainder of the items in dispute between AJI and Winmar are resolved, this item cannot be calculated and, therefore, Winmar's claim for overhead and fee must, for the present, be reduced by $250,740. The amount ultimately agreed upon or determined for this item will be added back in.

Therefore, at this juncture, for this item, AJI contends that the amount Winmar is claiming as "Completed and Stored to Date" should be reduced by $250,740. Nevertheless, to the extent that you, as the Architect, are of the opinion that you have obtained or can obtain from Winmar sufficient information to calculate the amount of overhead and fee due to Winmar under the Contract, your decision will lower this $250,740 reduction by the amount so calculated.

The adjustments described above are summarized in the chart below:

| RECAP | | |
|---|---|---|
| Total Completed and Stored to Date Per Winmar | | $1,475,135 |
| Adjustments Per AJI | | |
| | Change Orders | (539,659) |
| | Demolition/Site Work | 0 |
| | Rough Finished Carpentry | (9,610) |
| | Drywall Partitions & Framing | (76,539) |
| | Plumbing and HVAC | 96,713 |
| | Fire Protection | (10,331) |
| | Electrical & Fire Alarm | 56,570 |
| | Overhead and Fee | (250,740)[2] |
| Total Adjustments to Completed and Stored to Date Per AJI | | ($733,596) |
| Net Total Completed and Stored to Date Per AJI | | $741,539 |
| Less Previous Payments to Winmar | | ($1,597,515) |
| Plus Overhead and Fee | | TBD |
| Overpayment to Winmar (Subject to reduction for Overhead and Fee) | | ($855,976) |

In support of these Claims and requests, AJI has attached photographs of the job site taken shortly after the termination for convenience as well as various job-related documents.

---

[2] As already noted, Winmar is entitled to some portion of this amount, which remains to be determined.

Dennis C. Janson
February 24, 2006
Page 9

For purposes of evaluating these Claims and requests, AJI represents to the Architect that neither Kirlin nor Pel-Bern has asserted or will assert any claims against Winmar that either of them is owed any money under its respective subcontract with Winmar.

Accordingly, AJI requests that the Architect rule that AJI has overpaid Winmar by $855,976 minus that portion of the overhead and fee to which Winmar is determined to be entitled.

Unless Winmar waives the 30-day deadline set forth in Section 4.4.1, AJI asks that the Architect rule on each of these items within no more than 30 days, i.e., on or before March 24, 2006. Moreover, because "Claim" as defined in the Contract includes each of the four numbered items set forth herein, AJI requests that the Architect request Winmar to provide responses to each, as provided for in Section 4.4.4:

> If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

To the extent that you, as the Architect, need any further supporting data from AJI or wish to consult with AJI or MGAC regarding any of the items raised herein, please let me know. We will be pleased to assist you in any way we can.

AJI hereby expressly reserves the right to submit additional Claims and to modify this Claim as circumstances or additional information warrant.

Sincerely yours,

Leslie H. Wiesenfelder

LHW/cds
Enclosures
cc (w/encl.):    Gary Napier [Via Email]
                 Clive Brady [Via Email]
                 Jonathan Hart, Esq. [Via Email]
                 Randall Smith, Esq. [Via Email]
                 Mark Anderson [Via Email]
                 Kris Collins [Via Email]
                 James F. Lee, Jr., Esq. [Via Email and U.S. Mail]
                 Edwin Villegas [Via Email]

# EXHIBIT B

 

# Lee & McShane, PC
**Attorneys at Law**

| | | |
|---|---|---|
| 1211 Connecticut Avenue, N.W. | 1401 Bank of America Center | 11130 Main Street |
| Suite 425 | 100 South Charles Street | Suite 310 |
| Washington, DC 20036 | Baltimore, MD 21201-2725 | Fairfax, VA 22030 |
| (202) 530-8100 | | |
| Fax: (202) 530-0402 | The Adams Law Center | 6411 Ivy Lane |
| (800) 493-3483 | 25 Wood Lane | Suite 116 |
| WWW.LEEMCSHANE.COM | Rockville, MD 20850 | Greenbelt, MD 20770-1405 |

James F. Lee, Jr.
(202) 530-8101
Admitted in DC, MD and NY
E-Mail JFL@Lee-McShane.Com

March 9, 2006

**VIA HAND DELIVERY**
Leslie H. Wiesenfelder, Esq.
Dow, Lohnes & Albertson, PLLC
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Dear Les:

I am writing in response to your letter of February 24 to Mr. Janson. My clients were unaware until your letter was received that any wire had been accomplished on January 31st. However, the amount received by my client's bank was $474,677. The excess over the amount last requisitioned by Winmar is reflected in the enclosed check for $119,380.

If you have evidence that the larger amount was wired as your letter indicates, we will be happy to take that evidence to our bank to try and determine why there is a difference between the records.

We are preparing our response to your letter and intend to forward that to Mr. Janson in the next seven days. If either you or Mr. Janson have any questions, please let me know.

Sincerely,

James F. Lee, Jr.
JFL/dvb

Encl.

cc:    Dennis C. Janson (Via U.S. Mail)

S:\070\03dx022\060309-slvh-01.doc

# EXHIBIT C

 

# Lee & McShane, PC
## Attorneys at Law

| | | |
|---|---|---|
| 1211 Connecticut Avenue, N.W. | 1401 Bank of America Center | 11130 Main Street |
| Suite 425 | 100 South Charles Street | Suite 310 |
| Washington, DC 20036 | Baltimore, MD 21201-2725 | Fairfax, VA 22030 |
| (202) 530-8100 | | |
| Fax: (202) 530-0402 | The Adams Law Center | 6411 Ivy Lane |
| (800) 493-3483 | 25 Wood Lane | Suite 116 |
| WWW.LEEMCSHANE.COM | Rockville, MD 20850 | Greenbelt, MD 20770-1405 |

**James F. Lee, Jr.**
**(202) 530-8101**
Admitted in DC, MD and NY
E-Mail JFL@Lee-McShane.Com

March 28, 2006

**VIA E-MAIL AND U.S. MAIL**
Dennis C. Janson
Managing Partner
Janson Design Group
257 Park Avenue South, Suite 303
New York, NY 10010

RE:    Contract Between Al Jazeera and Winmar, Inc.
       <u>Our File No.:07003DC022</u>

Dear Mr. Janson:

This firm represents Winmar, Inc. ("Winmar"). We are in receipt of Mr. Leslie H. Wiesenfelder's February 24, 2006 letter to you and are responding to the statements and claims made on behalf of Al Jazeera International ("AJI") regarding the above-mentioned contract. We would like to reiterate to you, as Architect, that this project was actively bid out to a number of contractors, including RAND, who initially rejected the invitation to bid the project. AJI made the decision to use Winmar to perform the construction work on this project based on a <u>lump sum</u> contract. As such, Winmar was not obligated and AJI was not entitled to a breakdown of costs or fees incurred by Winmar on this project, nor was AJI entitled to copies of invoices, contracts and other documents and information requested by AJI as a condition precedent to payment. To cooperate, Winmar has entertained meetings with AJI to discuss the progress of the work and to mutually agree on amounts owed under the Contract. These efforts failed and AJI has terminated the contract for convenience.

We request that you consider the following in responding to the claims made by the parties.

1.    Mr. Wiesenfelder's February 24, 2006 letter was the first notice Winmar received that AJI had wired money into Winmar's account. Prior to February 24, 2006, Winmar received no request from AJI to return the wired funds. We have verified that a total of $474,677 was wired into Winmar's account on January 31, 2006, and not the $477,677 as is stated in Mr. Wiesenfelder's letter. The excess over the amount last requisitioned by Winmar in the amount of $119,380 was delivered to Mr. Wiesenfelder on or about March 9, 2006.

 

# Lee & McShane, PC
**Attorneys at Law**

Dennis C. Janson
March 28, 2006
Page two

2.    In response to items 1 and 2 on pages 1 -3 of Mr. Wiesenfelder's letter, Winmar responds as follows: AJI is seeking, among other things, confirmation that your January 5, 2006 letter to Chris Condon of Winmar (the "Rescission Letter") was a rescission of the previously approved Applications for Payment based on the Winmar's alleged failure to provide supporting documentation for its applications and certificates for payment as required by the Contract. As you know, each Application and Certificate for Payment was approved by both the Owner and the Architect and as such, Winmar is entitled to the payments. Pursuant to paragraph 9.4.2 of the General Conditions, by certifying the Applications for payment, the Architect made a representation to the Owner that,

> "based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the work is in accordance of the Contract Documents ... [t]he issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified."

You, as the Architect, visited the site and affirmatively determined and certified that the Work had progressed to the percentages indicated. You had the opportunity to withhold certification if you did not feel that the work had progressed as indicated; you did not do so. At no time prior to January 5, 2006 did you state or even indicate that an error had been made in certifying the Applications for Payment.

Furthermore, you withdrawal of certification of the previously approved applications for payment is improper under the terms of the Contract. Your letter of January 5, 2006 states that you are withdrawing certification on Applications for Payment 1, 2b and 3 "[d]ue to a number of discrepancies in the below listed Application and Certification for Payment documents, as well as the lack of appropriate supporting documentation ..." These reasons are not valid reasons for withdrawing certification under the Contract. Paragraph 9.5.1 of the contract states that

> "[t]he Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of the Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of:

> .1    defective Work not remedied;
> .2    third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;
> .3    failure of the Contractor to make payments properly to the Subcontractors or for labor, materials or equipment;
> .4    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract

 

# Lee & McShane, PC
**Attorneys at Law**

Dennis C. Janson
March 28, 2006
Page three

> Sum;
> .5    damage to the Owner or another Contractor;
> .6    reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or
> .7    persistent failure to carry out the Work in accordance with the Contract Documents.

Your reasons for withdrawing certification as stated in your January 5, 2006 letter do not fall within any of these categories and as such, you have no basis for withdrawing your certification as to the previously approved Applications for Payments. Each Application of Payment was and is still certified and approved by the Architect and Owner and AJI's request for a confirmation of the rescission of the Applications for Payment must be denied.

3.    In Mr. Wiesenfelder's letter, AJI argues that Winmar has no claim pending before the Architect and that Winmar was obligated, as a result of AJI's termination of the Contract for convenience, "to submit a Claim under the Contract for whatever amount its seeks as final payment under the Contract." Winmar is not required to submit a claim under the Contract for final payment. Paragraph 14.4.3 of the General Conditions states,

> "In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for the Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed."

Winmar submitted its final Application for Payment on January 23, 2006 in the amount of $355,297. This was all Winmar was required to do to submit its Final Application for Payment. Winmar was not required under the Contract to comply with the "standards" established in the January 5, 2006 Rescission Letter or the January 6, 2006 follow up letter. The Architect is not permitted to unilaterally amend the contract between the Owner and Contractor with a simple letter, and as such, Winmar was under no duty to comply.

4.    Additionally, AJI has claimed that the price of the fuel tank was included in the base contract. This is clearly not the case. The Contract specifically excluded the price of the fuel tank and related equipment (See Attachment B to the Contract–September 16, 2005 Construction Proposal and Exclusions). Item 13 on Attachment B specifically states "Fuel tank or equipment not included." When it was later determined that the fuel tank would be necessary for this project, Winmar notified AJI that the fuel tank and related equipment would have to be added to the Contract as a Change Order. AJI disputed Winmar's statement and argued that the price of the fuel tank was included in the base contract. Winmar requests that the Architect confirm that the price of the fuel tank was <u>not</u> included in the amount of the base contract and that Winmar is entitled to the amount in Change Order 6B for $31,507.

# Lee & McShane, PC
## Attorneys at Law

Dennis C. Janson
March 28, 2006
Page four

5.    **Claims Made By AJI:**

AJI is disputing the percentage of work complete as represented by Winmar's Requisition Number 3 (Revision 2). These percentages are supported by the photographs attached to Mr. Wiesenfelder's February 24, 2006 letter and were clear at the time the inspection to support Requisition Number 3 (Revision 2) was completed by your representative. The percentages are also supported by the Architect's and the Owner's certification of the Applications for Payment. Nonetheless, Winmar is compelled to respond to the statements and claims made by AJI to you, as the Architect of Record.

A.    Change Orders: AJI has unilaterally decided that, "[f]or the convenience of the Architect, Winmar and AJI, AJI is willing to credit Winmar with 100% of all amounts it paid to any subcontractor in connection with the Contract. This credit will be applied to the base contract. As a result, AJI will add all of those payments to subcontractors to the bas amount Winmar has claimed. Where that results (as shown below) in an increase to the amount Winmar is claiming for a given item, AJI has increased the amount of that item dollar-for-dollar for what was paid to a subcontractor."

The method that AJI has used to calculate the percentage of work complete and the amount it feels is owed to Winmar is inappropriate and not a valid quantification of the work completed and in place. Moreover, AJI's determination of the work complete is not in any way supported by any provision in the Contract. This was a lump sum contract. Winmar's figures for determining the percentage of work complete in its requisitions are based on the amount and percentage of work <u>actually</u> <u>complete</u>. This is the proper method of determining the amounts due to Winmar.

B.    Demolition/Site Work: AJI has agreed that this item is 100% complete and AJI is not claiming any adjustment to this amount.

C.    Rough Finished Carpentry: Winmar states that 40% of the rough finished carpentry is complete. AJI claims that only 14%, or $5,000 worth of this work has been done and "all of that was for blocking and hoist landing". A review of the photographs along with the Architect's certification of the previous applications for payment shows that this statement by AJI is incorrect. Winmar confirms and reiterates that 40% of the millwork backing was complete and that it is entitled to 40% of the schedule of values for the Rough Finished Carpentry item, or $14,610.

D.    Drywall Partitions & Framing: Winmar states that this item is 75% complete and it seeks $117,161 in fees owed for this item. AJI claims that the work is only 26% complete and it bases its determination on the assertion that "the framing is only 70% complete on the 7th and 10% complete on the 4th floor; some drywall has been stacked on the floor, but none was hung; no drywall hanging, taping or finishing was done; no work on ceiling grids or ceilings; and there is no acoustical material on site or installed." Again, this statement is

# Lee & McShane, PC
**Attorneys at Law**

Dennis C. Janson
March 28, 2006
Page five

incorrect. Winmar completed 95% of the framing on the 7th floor and completed 65-70% of the framing on the 4th floor per the Contract Drawings. The metal framing was the most labor intensive portion of this item. Because of the layout of the space and the location of utilities, the metal framing was more complicated and intricate than most projects. Once the framing was complete, the drywall could be hung within one day. Thus, Winmar confirms that the percentages as stated on Requisition Number 3 (Revision #2) are accurate and that Winmar is entitled to the full amount claimed.

E.      Plumbing and HVAC: AJI admits that Winmar's statement of the percentage of the work complete for plumbing and HVAC is correct. However, in order to determine the percentage of work complete and the amounts owned to Winmar, AJI has lumped the payments made by Winmar to its subcontractors (on signed Owner/Architect approved change orders) and has credited this amount against the schedule of values. The contract between AJI and Winmar does not permit this type of credit and AJI's attempt to determine the percentage of work complete and the amounts owed to Winmar is misleading and wrong. Thus, Winmar's determination and calculation should be the basis of determining the work complete.

F.      Fire Protection: The approved amount for fire protection is $53,515. This item is 40% complete and Winmar seeks $21,406. AJI contends that only 21% of this item is complete. However, AJI is again dividing the dollars actually paid to a subcontractor against the schedule of values. This calculation is inappropriate and is not a valid quantification of the work completed and in place. The subcontractor has been paid 40% of his contract value and therefore, AJI owes Winmar 40% of the amount of the schedules of values on this lump sum contract.

G.      Electrical & Fire Alarm: The approved fire amount is $865,955. This item is 17% complete and Winmar seeks $145,480. AJI is again dividing the dollars actually paid to a subcontractor against the schedule of values and is crediting the base contract amount based on the amount paid to the subcontractor. This calculation is inappropriate and is not a valid quantification of the work completed and in place. The subcontractor has been paid 17% of his contract value and therefore, AJI owes Winmar 17% of the amount of the schedules of values on this lump sum contract.

H.      Overhead and Fee: The approved contract amount for overhead and fee is $250,740. AJI has claimed that Winmar "is not automatically entitled to the entirety of its overhead and fee simply by virtue of a termination for convenience." As such, AJI is refusing to pay Winmar any amount for overhead and fee "until the remainder of the items in dispute between AJI and Winmar are resolved". This refusal is without basis as AJI cites no provision in the Contract that allows AJI to withhold this amount. Winmar is entitled to this amount, per the Contract and AJI is entitled to no refund.

Accordingly, Winmar requests that the Architect rule that AJI is entitled to no refund under the terms of the Contract and that Winmar is entitled to the full amount paid by AJI to Winmar, less the amount Winmar has

 

# Lee & McShane, PC
**Attorneys at Law**

Dennis C. Janson
March 28, 2006
Page six

refunded to AJI as an overpayment.

To the extent that you need any further information or supporting data from Winmar to resolve this claim, please feel free to contact me.

Sincerely,

*James Lee* (FMS)

James F. Lee, Jr.

cc:    Edwin Villegas (via e-mail)
        Chris Condon (via e-mail)
        Leslie Wiesenfelder, Esq. (via e-mail and mail)
        Randall Smith, Esq. (via e-mail)
        Mark Anderson (via e-mail)
        Kris Collins (via e-mail)
        Clive Brady (via e-mail)
        Gary Napier (via e-mail)