# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QATAR NATIONAL BANK, | : | |
| Plaintiff, | : | Civil Action No. 1:06-cv-1307(GK) |
| v. | : | |
| WINMAR, INC., | : | |
| Defendant and Third | : | |
| Party Plaintiff. | : | |
| _____ | : | |
| WINMAR, INC., | : | |
| Third Party Plaintiff | : | |
| and Counterclaim | : | |
| Defendant, | : | |
| v. | : | |
| ALJAZEERA INTERNATIONAL, | : | |
| Third Party Defendant | : | |
| and Counterclaim | : | |
| Plaintiff. | : | |
| _____ | : | |

## QATAR NATIONAL BANK'S REPLY IN SUPPORT
## OF ITS MOTION  FOR SUMMARY JUDGMENT


DATED:        July 21, 2008             Respectfully submitted,


                              _____/s/ Alan T. Dickey_____
                              Alan T. Dickey (DC Bar # 496403)
                              PATTON BOGGS LLP
                              2550 M Street, N.W.
                              Washington, D.C. 20037
                              Telephone:  (202) 457-6000
                              Facsimile: (202) 457-6315

                              *Attorneys for Plaintiff*
                              *Qatar National Bank*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.    WINMAR CONCEDES THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT ................................................................................................................1

II.   WINMAR'S UNSUPPORTED REQUEST TO DELAY A RULING ON QNB'S MOTION FAILS AS A MATTER OF LAW..........................................................4

III.  QNB IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LAW OF MISTAKE AND UNJUST ENRICHMENT.........................................................8

      A.    Undisputed Fact Demonstrate that QNB Is Entitled to Summary Judgment Under the Law Of Mistake and Unjust Enrichment.......................................8

      B.    Winmar's Disputes with AJI Are Immaterial Except That They Demonstrate Winmar Did Not Have A Liquidated Debt. ..................................................................1
            1

IV.   QNB IS ENTITLED TO SUMMARY JUDGMENT ON WINMAR'S DISCHARGE-FOR-VALUE AFFIRMATIVE DEFENSE ..................................................................1
      5

      A.    There is No Genuine Issue of Fact regarding the Non-Liquidated Nature of AJI's Alleged Debt to Winmar and, thus, the Discharge-for-Value Defense Does Not Apply to that Debts as a Matter of Law ..................................................................1
            5

      B.    There is No Genuine Issue of Fact regarding the Winmar's Actual and Constructive Notice of QNB's Error Before Winmar Could Have Credited AJI's Account, and, thus, Winmar's Discharge-for-Value Defense Fails as a Matter of Law ..................................................................1
            6

# TABLE OF AUTHORITIES

Note: Authorities upon which we chiefly rely are marked with an asterisk(*).

## CASES

*4934, Inc. v. District of Columbia Dep't of Employment Servs.,
  605 A.2d 50 (D.C. 1992). ........................................................................................ 13, 14, 15

Aon Risk Services, Inc. of Washington, D.C. v. Estate of Coyne,
  915 A.2d 370 (D.C. 2007). .............................................................................................. ..16

*Association of American Railroads v. Connerton,
  723 A.2d 858 (D.C. 1999). ........................................................................................ 8, 9, 19

*Bank of America v. Sanati,
  11 Cal. App. 4th 1079 (1992) ......................................................................................... ..16

*Banks v. Veneman,
  402 F. Supp. 2d 43 (D.D.C. 2005). ................................................................................... .6

Banque Worms v. BankAmerica Int'l,
  568 N.Y.S.2d 541, 570 N.E.2d 189 (1991). ................................................................... ..17

Berkeley v. Home Ins. Co.,
  68 F.3d 1409 (D.C. Cir. 1995). .......................................................................................... .7

*In re Calumet Farm Inc.,
  398 F.3d 555 (6th Cir. 2005). .......................................................................... 16, 17, 18, 20

*Canning v. U.S. Dept. of Defense,
  499 F. Supp. 2d 14 (D.D.C. 2007). ................................................................................... .1

Chase Manhattan Bank v. Burden,
  489 A.2d 494 (D.C. 1985). .......................................................................................... ...10, 11

*Credit Lyonnais-New York v. Washington Strategic Consulting Group, Inc.,
  886 F. Supp. 92 (D.D.C. 1995) ................................................................................... ...passim

District of Columbia v. Pierce Assoc., Inc.,
  527 A.2d 306 (D.C. 1987). ............................................................................................ ..16

GECC v. Central Bank,
  49 F.3d 280 (7th Cir. 1995). ............................................................................................ ..17

Hammond v. Chao,
  383 F. Supp. 2d 47 (D.D.C. 2005). ............................................................................. ...14, 19

*Hibbs v. Beall,*
    41 App. D.C. 592 (1914). ........................................................................9, 19

*\*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,*
    101 F.3d 145 (D.C. Cir. 1996). ..................................................................1

*\*Kakeh v. United Planning Organization, Inc.,*
    537 F. Supp. 2d 65 (D.D.C. 2008). ..........................................................7

*\*Nat'l Bank of Canada v. Artex Indus., Inc.,*
    627 F. Supp. 610 (S.D.N.Y. 1986). ..............................................12, 14, 19

*NBase Communications v. American Nat'l Bank & Trust,*
    8 F. Supp. 2d 1071 (N.D. Ill. 1998). ........................................................19

*Rowland v. Walker,*
    245 F. Supp. 2d 136 (D.D.C. 2003). ........................................................7

*Scott v. Harris,*
    --- U.S. ----, 127 S. Ct. 1769 (2007). ......................................................2

*Securities and Exch. Comm'n v. Banner Fund Int'l,*
    211 F.3d 602 (D.C. Cir. 2000). ................................................................1

*Siemens Westinghouse Power Corp. v. Dick Corp.,*
    299 F. Supp. 2d 242 (S.D.N.Y. 2004) ......................................................12

*\*Standard Ins. Co. v. Burch,*
    540 F. Supp. 2d 98 (D.D.C. 2008). ..............................................10, 11, 14

*Strauss v. Hensey,*
    9 App. D.C. 541 (1896). ..........................................................................9

*Walker v. Seldman,*
    471 F. Supp. 2d 106 (D.D.C. 2007). ........................................................6

## RULES OF CIVIL PROCEDURE

D.D.C. Local Rules 7(h), 56.1. ..........................................................................1,2

Federal Rule of Civil Procedure 56(f). ........................................................1, 5, 6

## SECONDARY SOURCES

6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1446 (2008). ......................................................................................12

RESTATEMENT OF RESTITUTION § 14. ......................................................16, 17

**QATAR NATIONAL BANK'S REPLY IN SUPPORT**
**OF ITS MOTION  FOR SUMMARY JUDGMENT**

Plaintiff, Qatar National Bank ("QNB"), by and through its undersigned counsel, hereby respectfully submits this Reply in Support of its Motion for Summary Judgment on Counts I and II of its Complaint pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7(h) and 56.1.

## I.    WINMAR CONCEDES THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT

Winmar has substantively and procedurally conceded that there is no genuine issue of material fact relevant to QNB's Motion for Summary Judgment Motion (hereafter QNB's "Motion"). Winmar has failed to comply with Local Rule 7(h). Winmar's "Statement of Material Facts as to Which There is <u>no</u> Genuine Dispute" (hereafter "WSMF") (emphasis added) violates Local Rules 7(h) and 56.1 because it simply identifies a number of facts that Winmar believes are uncontested instead of providing a "concise statement of genuine issues setting forth all material facts as to which it is <u>contended there exists a genuine issue</u> necessary to be litigated" required of the non-movant under both of those Rules. L.Cv.R. 7(h) (emphasis added). As this court has noted:

> This Circuit has held that "[i]f the party opposing the motion fails to comply with this local rule, then <u>the district court is under no obligation to sift through the record</u> and should [i]nstead ... deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule [7(h)] statement." *Securities and Exch. Comm'n v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000) (internal citations omitted). *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (concluding that Local Rule 7(h) "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record."). This Circuit demands strict compliance with this Rule. *See id.*

*Canning v. U.S. Dept. of Defense*, 499 F. Supp. 2d 14, 15 (D.D.C. 2007) (Kessler, J.) (emphasis added); *see also* this Court's Scheduling Order (Dkt. # 29) ("Counsel are admonished to read the Circuit's opinion in *Jackson v. Finnegan*[, 101 F.3d at 149-53] (in upholding the trial court's implementation of the scheduling order entered at the beginning of the case and insisting on its reasonable observance

during litigation, affirming the grant of summary judgment because of failures to comply with Local Rule 7(h))").

Even if this Court, due to Winmar's failure to meet its burden under Local Rule 7(h), were to "sift through the record," it could find no issue of material fact hidden in Winmar's Opposition or elsewhere.  In its Opposition, Winmar has either expressly conceded or failed to contest at all the following dispositive facts:

● At the time of the erroneous January 31, 2006 duplicate payment, the Architect on the Project had decertified or refused to certify all of Winmar's outstanding Application for payments from AJI because they were not supported by the documents.  *See* QNB's Statement of Material Facts to Which There is No Genuine Dispute (hereinafter "SMF") ¶¶ 8-12 & WIN012-14, 20.[1]

● Prior to Winmar receiving notice of the January 31, 2006 duplicate payment, even Winmar claimed that AJI only owed it $355,297 under the Contract, and AJI claimed that Winmar owed AJI approximately $200,000.  SMF ¶¶ 13-14, 18-19.[2]

---

[1]     On page 3 of its Opposition, Winmar incorrectly and misleadingly states that "[t]he architect furthermore certified all such payments in accordance with the project Contract Documents." (emphasis in original). Winmar fails to mention, but does not dispute, that the Architect withdrew its certification of all of Winmar's outstanding applications for payments because they included no supporting documentation at all.  *See* SMF ¶¶ 8, 11 & WIN012-14, 20.  There is no dispute that Winmar had no certified applications at the time the duplicate transfer went through.  Further, Winmar misleadingly states, with respect to the January 5-6, 2006 letters from the Architect withdrawing his certifications due to Winmar's lack of documentation, that "AJI then provided their first Notice to Winmar that they believed the previously certified payments totaling $1,363,463 were in error."  Winmar Opp. at p. 3 (emphasis added).  To the contrary, those letters were written to Winmar by the Architect, not AJI.  *See* SMF ¶¶ 8, 11 & WIN012-14, 20.  Nowhere does Winmar actually contest this, and in fact admitted to the authenticity of those letters from the Architect.  *See* SMF, Exh. 3 (June 12, 2008 Stipulation by Winmar and QNB).  Thus, Winmar's misstatement of fact in these respects is really more spin than anything that would defeat QNB's "properly supported motion for summary judgment."  *Scott v. Harris*, --- U.S. ----, 127 S. Ct. 1769, 1776 (2007).

[2]     Winmar further does not dispute anywhere any of the facts set forth by QNB as to the events occurring from January 18 to January 23, 2006.  However, Winmar does not specify the order of those events (SMF ¶ 15; Winmar Opp. at p. 3).  As noted, in QNB's Opening Memorandum, on January 18, 2006, Winmar submitted a revised Application, in which it certified that it was due $653,449 as its final payment under the contract.  *See* SMF ¶¶ 10-14 & WIN015-25. Afterward, the architect rejected that Application, and only then did Winmar submit another revised Application, in which Winmar certified that it was due only $355,297 under the Contract, rather than the $653,449 it claimed one week earlier.  *Id.*

- At the time of the duplicate transfer and Winmar's notice thereof, Winmar was owed no liquidated debt from AJI.  SMF ¶¶ 1-14.[3]

- The erroneous January 31, 2006 duplicate payment by QNB to Winmar was the result of a clerical mistake, and was never authorized by AJI.  WSMF ¶ 17; SMF ¶¶ 15-16, 26.

- Three days later, upon learning of its error, QNB demanded a refund from Winmar.  WSMF ¶ 18; SMF ¶ 17.

- Winmar received this demand, and it was, as expressly admitted by Winmar, "the first notice that Winmar received that the payment of $474,677.00 had been made on or around January 31, 2006 into Winmar's Citibank account."  SMF ¶ 25; *see also* WSMF ¶ 18.

- Winmar had both actual and constructive notice that the January 31, 2006 payment was in error at or before the time Winmar had notice that the payment was made at all. SMF ¶¶ 13-14, 17-20.[4]

- On February 8, 2006, Winmar communicated through its bank that it would refuse to return the funds wired by QNB into Winmar's account on January 31, 2006.   SMF ¶¶ 20-21.

- After realizing its mistake, QNB refunded the money that had be drawn from AJI's account to make the duplicate transfer.  SMF ¶¶ 27-28; WSMF ¶ 21.

- QNB has never received from Winmar, AJI, or any other person or entity, any refund of, or other compensation for, the in $474,677.00 funds paid by QNB to Winmar on January 31, 2006.  SMF ¶ 30; WSMF ¶ 21.

---

[3]     Winmar claims only that Winmar was "believing that they were due at least $355,297."  WSMF ¶ 19.  This does not constitute a liquidated debt.  *See infra*, Section IV.A; QNB's Opening Memorandum, Section III.D.4.

[4]     Winmar does not contest its actual or constructive knowledge anywhere.  Rather, Winmar argues contrary to applicable law that "whether or not Winmar had actual of constructive notice of the alleged error" is "immaterial."  Opp. at p. 10.

Nowhere in Winmar's Opposition or WSMF has Winmar contested <u>any</u> of the above facts. As demonstrated in QNB's Motion and herein *infra*, the above, undisputed facts establish QNB's entitlement to summary judgment as a matter of law on several, independent grounds.

## II.    WINMAR'S UNSUPPORTED REQUEST TO DELAY A RULING ON QNB'S MOTION FAILS AS A MATTER OF LAW

Because the dispositive facts cited above are indisputable, Winmar avoids them and instead focuses its Opposition around the unsupported and conclusory argument that summary judgment is not appropriate because "[d]iscovery is ongoing" between Winmar and AJI. *See* Winmar's Opp. at pp. 2, 6, 9. The lack of merit in this argument is illustrated by the following:

- On February 5, 2008, Winmar agreed to a Scheduling Order setting a shorter schedule for discovery on QNB's claims against Winmar than for the claims between AJI and Winmar, and agreed that: (1) those "deadlines for discovery … are sufficient to address foreseeable issues relating to QNB's claims against Winmar and Winmar's defenses thereto;" and that "discovery should commence immediately." *See* Dkt. # 28, at p. 7. In the same document, QNB set forth the legal and factual theories that subsequently formed the basis of QNB's Motion. *Id.* at pp. 1-3. On the same day, this Court signed the Scheduling Order to which Winmar agreed. *See* Dkt. # 30.

- The next day, on February 6, 2008, AJI served Winmar with written discovery requests.

- On April 1, 2008, Winmar agreed to extend QNB's deadline for filing its summary judgment motion against Winmar from April 8 to June 16, 2008 and retained the previous discovery deadlines: (1) for all discovery on QNB's claims against Winmar to close on May 16, 2008 and (2) for all discovery on claims between Winmar and AJI to close on September 8, 2008. *See* Dkt. # 33. The Court granted the Agreed Motion the next day. *See* Dkt. #34.

- On May 16, 2008, as agreed by Winmar, discovery closed as to QNB's claims against AJI after written discovery was exchanged between the two parties.

- At no time prior to filing its Opposition did Winmar: (1) ever ask QNB's counsel to extend the deadline for discovery as to QNB's claims against Winmar; or (2) ever request that the Court amend the scheduling order to continue the close of discovery as to QNB's claims against Winmar to permit more discovery from AJI.

- On June 2, 2008, Winmar finally served its first discovery requests on AJI. *See* Exh. "A."

- On June 16, 2008—the last day permissible under deadlines set by agreement of Winmar— QNB filed its Motion along with all supporting documents.

- On July 7, 2008, Winmar filed its Opposition for the first time stating that it has not had sufficient discovery to oppose QNB's Motion.

- Winmar has not filed a Rule 56(f) affidavit identifying any specific discovery needed to oppose QNB's Motion. Winmar has not otherwise identified any specific discovery necessary to need oppose QNB's Motion.

Thus, Winmar agreed to a discovery and summary judgment schedule "sufficient to address foreseeable issues relating to QNB's claims against Winmar and Winmar's defenses thereto;" failed to serve discovery on AJI until two weeks after that discovery period had closed; never sought to extend the discovery period as to QNB's claims against Winmar; waited for QNB to spend its resources to file its Motion setting forth supporting evidence, arguments, and authorities; and then only now claims that its agreed-to discovery schedule is a basis for denying QNB's Motion without even filing a Rule 56(f) affidavit or otherwise identifying what specific discovery Winmar argues it may need. The Court should reject Winmar's unsupported delay tactic because Winmar has not met any of the burdens required for such relief. Further, as noted below, the argument has no substantive merit. Resolution of QNB's action against Winmar is, in no way, dependant on the resolution of the claims and counterclaims between AJI and Winmar. Winmar either owes QNB a

refund of the money that QNB accidentally paid to Winmar, or it does not. How much AJI owes Winmar or vice versa can be decided entirely separate from QNB's claims against Winmar.

Winmar's procedural waiver of its argument that the Court should delay ruling on QNB's Motion is an extension of the reality that no discovery regarding Winmar's relationship with AJI could be material to QNB's Motion. *See infra*, Sections III.B, IV; QNB's Opening Memorandum, Section III.D. This Court has held that such a combination of (1) a failure to satisfy Rule 56(f), and (2) a substantively weak argument for delay, will defeat a request for additional discovery. *See Walker v. Seldman*, 471 F. Supp. 2d 106, 114 n.12 (D.D.C. 2007) (Kessler, J.) ("Walker argues that summary judgment is inappropriate at this stage because he has not had any opportunity for sufficient discovery. Walker has not filed a FED. R. CIV. P. Rule 56(f) motion, nor met its requirements. … Walker has not shown that additional discovery would do anything more than impose unnecessary burdens on Defendants."); *Banks v. Veneman*, 402 F. Supp. 2d 43, 47 (D.D.C. 2005) (Kessler, J.) ("The party seeking discovery bears the burden of identifying the facts to be discovered that would create a triable issue and why the party cannot produce those facts in opposition to the motion."). Winmar has not met its "burden of identifying the facts to be discovered that would create a triable issue" and its request should be denied. *Id.*

Winmar's delay tactic should also be rejected because Winmar waited to serve its first discovery on AJI until (1) almost four months after discovery commenced in this case; (2) more than two weeks after discovery as to QNB's claims against Winmar had closed; and (3) only two weeks days before QNB's deadline for filing it Motion. As this Court has previously held:

> Requests for additional discovery pursuant to Rule 56(f) are routinely granted, but "the rule is not properly invoked to relieve counsel's lack of diligence." … Were it otherwise, parties could "belatedly devise[ ] new theories to delay resolution of long-pending dispositive motions." *Id.* … Here, Plaintiff had more than ample opportunity to obtain the requested discovery from Richardson, but chose not to do so. … "<u>A request to postpone resolution of a motion for summary judgment when the party opposing the motion has failed to avail himself of discovery to secure the information should be denied.</u>"

6

*Kakeh v. United Planning Organization, Inc.*, 537 F. Supp. 2d 65, 71 (D.D.C. 2008) (Kessler, J.) (emphasis added) (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995); *Rowland v. Walker*, 245 F. Supp. 2d 136, 140 (D.D.C. 2003)).  Winmar's unexcused delay of almost four months before serving its first discovery request on AJI constitutes such a failure to avail itself of discovery.

Winmar's delay argument also fails because Winmar's belated discovery to AJI has nothing to do with QNB's claims against Winmar.  For example, Winmar does not even seek discovery on issues Winmar claimed in the Joint Meet and Confer Statement to be relevant to QNB's claims against Winmar.  The parties stated in the February 5, 2008 Joint Meet and Confer Statement:

> QNB believes that only limited discovery is necessary to resolve its claims against Winmar because the discharge for value defense either (1) is inapplicable; or (2) can be resolved by applying the law to a narrow set of indisputable facts and because QNB is not AJI's agent as a matter of law.
> Winmar disagrees and <u>believes that it needs to conduct discovery with respect to QNB's claims against it covering such topics as the relationship between AJI and QNB, the circumstances surrounding the wire transfer at issue, the investigation conducted by QNB into the wire transfer, and AJI's actions following the wire transfer.</u>
> QNB and Winmar <u>have agreed that the deadlines for discovery set forth in the proposed Order attached hereto as Exhibit A</u> **are sufficient to address foreseeable issues relating to QNB's claims against Winmar and Winmar's defenses thereto**.

Dkt # 28 at pp. 9-10 (emphasis added); *compare* Winmar's discovery requests in Exh. "A" hereto (relating to its Contract disputes with AJI).  In the very same Meet and Confer Statement, QNB identified the same factual and legal theories it has recently presented in its Motion.  *Id.* at pp. 1-3.  Winmar stated in the Meet and Confer Statement that, by May 16, it would have had sufficient time to conduct discovery relevant to QNB's Motion.  Any assertion to the contrary would have been baseless back then, and is baseless now.  There is no legal support for Winmar's unsupported theory that QNB's claim against Winmar "is derivative of the issues pertinent to the matter between Winmar and AJI," and the law of mistake in this district and others interpreting the discharge-for-

value defense decisively defeat that argument.  *See infra*, Sections III.B, IV; QNB's Opening Memorandum, Section III.D.

Winmar's claims against Al-Jazeera are focused on the contract between those two entities and their performance of, or failure to perform, the obligations contained therein.  As noted *infra*, QNB's claim for restitution of the funds it erroneously transferred to Winmar is a simple, straight-forward matter under the law of restitution incorporated into the applicable federal regulations. QNB should not be dragged into Winmar's independent disputes with Al-Jazeera involving issues completely unrelated to QNB's attempt to obtain a return of the money that it erroneously sent to Winmar through a clerical error.

## III.  QNB IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LAW OF MISTAKE AND UNJUST ENRICHMENT

### A.    <u>Undisputed Fact Demonstrate that QNB Is Entitled to Summary Judgment Under the Law Of Mistake and Unjust Enrichment</u>

Winmar has not, and cannot, dispute that (1) QNB made the January 31, 2006 duplicate payment to Winmar in error; (2) Winmar received notice of the error and a demand to return the funds before it even knew that the deposit of those funds had occurred; and (3) Winmar did not detrimentally rely on the mistake or spend or credit the funds before it received the notice of the error and the demand for repayment.  *See supra*, Section I.  Thus, Winmar, as a matter of law, must be required to return those funds to QNB.

Winmar has not, and cannot, cite to any authority dispelling the reality identified in QNB's Opening Memorandum (at p. 10) that:

> For more than a century, the courts of this jurisdiction have "follow[ed] the established rule that one who pays money to another under an honest mistake of fact may, in the absence of an equitable defense, recover the money so paid." … "<u>To [this] rule … there is no exception</u>."

*Association of American Railroads v. Connerton*, 723 A.2d 858, 862 (D.C. 1999) (citations omitted) (emphasis added).  In *Connerton*, the court further noted that, " '[i]f there is any question[, in a case of

money paid by the plaintiff under a mistake of fact,] whether it would be inequitable to require the defendant to refund, the burden of proving the fact rests upon him.'" *Id.* (quoting *Hibbs v. Beall*, 41 App. D.C. 592, 598 (1914)).  Winmar has fallen far short of its burden on this issue.

> The *Connerton* court further elaborated that:
>
>> In *Strauss v. Hensey*, … the court, speaking through Mr. Chief Justice Alvey, explicated the controlling principle:
>>
>>> The leading case upon the subject of the right to recover back money paid by mistake of fact, is that of *Kelly v. Solari*, 9 M. & W. 54. … In the course of his opinion Mr. Baron Parke said, "I think that where money is paid to another under the influence of a mistake, that is, upon the supposition that a specific fact is true, which would entitle the other to the money, but which fact is untrue, and the money would not have been paid if it had been known to the payer that the fact was untrue, an action will lie to recover it back, and it is against conscience to retain it, though a demand may be necessary in those cases in which the party receiving may have been ignorant of the mistake." …
>>
>> *Strauss* thus stands for the proposition that, where no equitable defense has been established, "bona fide forgetfulness of facts"—i.e., negligence-will not bar a plaintiff's recovery of sums paid out under a mistake of fact.

*Connerton*, 723 A.2d at 862 (quoting *Strauss v. Hensey*, 9 App. D.C. 541, 547-48 (1896)).  The court in *Connerton*, required the recipient of a mistaken payment, "in the absence of a showing of detrimental reliance on the part of" the defendant, to return the funds.  *Id.* at 863; *see also id.* at 862 ("There is no evidence in this case of detrimental reliance by AAR on Connerton's initial payment of the disputed amounts, nor has AAR established any other equitable defense").

Thus, the rules set forth in *Connerton* and *Strauss* require Winmar to refund money mistakenly paid to it by QNB because:

- it was paid under a mistake of fact by QNB, *supra*, Section I;

- QNB demanded that Winmar return the money, *id.*; and

- there has been no "showing of detrimental reliance on the part of" Winmar, which was notified of the error before it even knew that the duplicate transfer had occurred or could spend any of it.  *Id.*

This Court recently held in another case that the husband of a deceased insured was unjustly enriched by his receipt and squandering of $172,033.99 in life insurance proceeds that were erroneously paid to him before the insurer learned of the insured's updated beneficiary designation form that omitted the husband as beneficiary, and the husband did not begin spending the money until he received a call from the insurer's representative alerting him that there was an issue with his distribution. *Standard Ins. Co. v. Burch*, 540 F. Supp. 2d 98, 100-06 (D.D.C. 2008). In *Burch*, this Court held:

> The Court … easily concludes that Mr. Burch has been unjustly enriched by his receipt and squandering of $172,033.99 from Standard and that he should be ordered to repay all of it, <u>since he did not begin his spending spree until after Ms. Carstens's phone call on October 5, 2006, alerting him that there was an issue with the distribution.</u>

*Id.* at 106 (emphasis added). Thus, in both *Burch* and in this case, notice of <u>erroneous</u> payments came <u>before</u> the funds were spent by the recipients. As with the plaintiff in *Burch*, QNB is entitled to a return of its money.

Plaintiff instead offers the guidance of the opinion in *Chase Manhattan Bank v. Burden*, 489 A.2d 494 (D.C. 1985)—a case where the demand for the return of <u>voluntarily-transferred</u> funds did not occur until <u>after</u> the money was spent by the recipient. In *Burden*, a partnership's general partner ("Williams") instructed his bank ("Union Chelsea") to transfer $15,000 to the account of the partnership's limited partner ("Burden") at another bank ("NS & T"). *Id.* at 494. Then:

> [Burden] instructed Union Chelsea to transfer $15,000 to Burden's account at [NS & T]. It is undisputed that this transfer represented a distribution of partnership capital to Burden in accordance with the partnership agreement. Union Chelsea in turn requested Chase, as a correspondent bank, to transfer the $15,000 into Burden's account at NS & T. Shortly thereafter, however, Union Chelsea notified Chase to cancel the transfer because there were insufficient funds in Williams' account. It appears that Chase either ignored this notice or transferred the funds before receiving it, because the $15,000 did end up in Burden's account at NS & T.
>
> <u>Several months later, after Burden had spent most of the money,</u> NS & T informed him that Chase was claiming it was owed $15,000 as a result of the erroneous transfer.

*Id.* at 495 (emphasis added). *Burden* is unlike in this case because:

- In *Burden*, the debtor authorized and ordered the payment. In the present case, AJI never authorized QNB's mistaken duplicate payment. *Id.*

- In *Burden*, the court noted that the transferor bank "voluntarily undertook to make the transfer before receiving any money from Union Chelsea, or even some sort of confirmation that the money would be forthcoming." *Id.* at 496 (emphasis added). In the present case, QNB's duplicate payment was indisputably the result of a clerical error rather than a voluntary decision to transfer funds. WSMF ¶ 17; SMF ¶¶ 15-16, 26.

- In *Burden*, the bank's demand for return of the voluntarily-sent funds occurred several months after the beneficiary had spent the money. *Id.* at 495. Here, QNB sought a refund of the erroneously sent funds as soon as it discovered its mistake, and Winmar received notice of the mistake before it even discovered that it had received the funds at all.

The undisputed facts here are the same as the operative facts in *Credit Lyonnais* (*see*, *infra*) and *Burch*.

## B.   Winmar's Disputes with AJI Are Immaterial Except That They Demonstrate Winmar Did Not Have A Liquidated Debt.

The status of the disputes between Winmar and AJI over the amount of the debt, if any, owed by AJI to Winmar is material in deciding this Motion only because such an unliquidated debt cannot support Winmar's discharge-for-value defense. *See infra*, Section IV.A. Otherwise, the dealings between Winmar and AJI are irrelevant to Winmar's obligation to return the money that QNB paid to it in error. *See infra*, Sections III.B, IV; QNB's Opening Memorandum, Section III.D.

Winmar makes the non sequitur that, because, AJI was joined as a party, no relief can be awarded to QNB prior to the Court's determination of the claims asserted between and among Winmar and AJI. There is nothing to this. Winmar states that "if this Court determines that Winmar wrongfully retained the monies paid by QNB, then the Court had thus made a determination that Winmar wrongfully retained the monies paid by QNB." Nothing could be

further from the truth.  "[I]f this Court determines that Winmar wrongfully retained the monies paid

by QNB," the court has simply found that Winmar wrongfully retained QNB's money, and the

Court can decide later who, among AJI and Winmar, may owe who what damages.

Winmar relies on Rule 18 as somehow supporting the denial of QNB's motion.   Winmar

Opp. at pp. 5-6.  However, Winmar sought and obtained joinder under Rule 14, not Rule 18, which

deals with joinder of claims rather than parties.  Winmar's characterization of "the lack of payment

from AJI to Winmar" as "[t]the main dispute in the above-captioned action" is meaningless and

incorrect.  The "main dispute" in this action is set forth in complaint of QNB—the Plaintiff who

initiated this action, which is the dispute over Winmar's unlawful retention of money rightfully

belonging to QNB.   As one court noted, "[t]he essential purpose of Rule 14 requires that

defendant's third-party claim derive from the **main claim**, and that 'the claim of liability to the

defendant and third-party plaintiff accrue only upon a finding of defendant's liability to the plaintiff

on the main claim.'"  *Nat'l Bank of Canada v. Artex Indus., Inc.*, 627 F. Supp. 610, 613 (S.D.N.Y. 1986)

(emphasis added) (citations omitted)).  Consequently, Winmar's "third-party claim derive[s] from the

main claim," and "the claim of liability to [Winmar] accrue only upon a finding of [Winmar's]

liability to [QNB] on the main claim," not the other way around.  *Id.*  "The crucial characteristic of a

Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability

asserted against him by the original plaintiff."  6 Charles Alan Wright, Arthur R. Miller, & Mary Kay

Kane, FEDERAL PRACTICE AND PROCEDURE § 1446 (2008) (collecting cases) (emphasis added);

*Siemens Westinghouse Power Corp. v. Dick Corp.*, 299 F. Supp. 2d 242, 248 (S.D.N.Y. 2004) (same).

Winmar has it backwards.  QNB's unjust enrichment claim is the "main claim," and it is ripe for this

Court's determination.

Winmar's attempts to distinguish this Court's opinion in *Credit Lyonnais-New York v.*

*Washington Strategic Consulting Group, Inc.*, 886 F. Supp. 92 (D.D.C. 1995), on the ground that the

defendant's alleged debtor was not a party, fails because the court did not state that that distinction made any difference in the court's substantive analysis of the facts there, which are nearly identical to those in this case. The court merely acknowledged that the debtor was a party:

> [The defendant]'s theory of defense is that the second payment was in fact authorized, or in any case that [the defendant] was entitled to the money because its client still owed it about $170,000 when the second wire transfer arrived. The trouble with this theory is that it does not raise or depend upon a *material* issue of fact. The unjust enrichment issue is drawn between [the plaintiff bank] and [the defendant]. [The defendant]'s Cameroonian client is not a party, and the question whether the client owed the money or authorized its payment is not material to that narrowly drawn issue.

*Id.* at 93 (citing *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992)) (emphasis in original); *see* QNB's Opening Memorandum at pp. 10-11. However, the *Credit Lyonnais* holding does not state it at all depends on the fact that the defendant's client was not a party. It does not say that "[t]he unjust enrichment issue is drawn between [the plaintiff bank] and [the defendant]" <u>because</u> "the [the defendant]'s Cameroonian client is not a party," as Winmar implies. There is no authority to support Winmar's argument that the procedural party-status of an unjust enrichment defendant's alleged debtor can impact the liability of that defendant to the plaintiff.

Further, Winmar neglects three important components of *Credit Lyonnais*, which are equally applicable to QNB's Motion here:

(1)    the defendant "<u>has identified no record evidence on its</u> [affirmative defense] <u>authorization theory</u>," *Credit Lyonnais*, 886 F. Supp. at 93;

(2)    "nor has [defendant] filed Rule 56(f) affidavits setting forth reasons why it cannot sustain its burden at this stage," *id.*; and

(3)    "the particular circumstances of this case place the duty to go forward with controverting facts upon [defendant], its failure to discharge that duty entitles [plaintiff bank] to summary judgment." *Id.*

*See also Hammond v. Chao*, 383 F. Supp. 2d 47, 54 (D.D.C. 2005) (holding that, on "an affirmative defense, defendant bears the burden of proof of establishing the facts supporting this defense"); *Nat'l Bank of Canada*, 627 F. Supp. at 613-14 (holding that a bank was entitled to recover money paid on behalf of a contractor to a supplier and then credited back to the contractor by mistake, where the contractor did not contest that the bank paid the supplier by mistake, and the contractor's purported affirmative defenses failed; and holding: "<u>NBC is entitled to judgment as a matter of law</u>. Under New York law 'a party who has made a mistaken payment to another based upon a unilateral mistake of fact may recover the payment unless the payee has changed his position to his detriment in reliance upon the mistaken payment.' … <u>Artex does not contest that NBC paid Artex by mistake</u>. … <u>On that fact alone, absent a valid affirmative defense, NBC is entitled to the return of the mistaken payment</u>. … <u>The reliance apparently asserted by Artex is an affirmative defense, the burden of proof of which is on the defendant</u>.") (emphasis added) (citations omitted).

In addition, the D.C. Court of Appeals opinion relied on by this Court in *Credit Lyonnais* unambiguously states that "<u>whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution</u>." *4934, Inc.*, 605 A.2d at 56 (emphasis added). This Court recently confirmed that principle, also relying on the *4934, Inc.* decision. *See Standard Ins. Co. v. Burch*, 540 F. Supp. 2d 98, 104-05 (D.D.C. 2008) ("Every unjust enrichment case is factually unique, and whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution.") (citing *4934, Inc.*, 605 A.2d at 56).

In the present case, the facts supporting QNB's unjust enrichment claim are neither complex, nor in dispute. *See* QNB's Opening Memorandum at Section III.C. "The modern law of unjust enrichment and restitution has its roots in the common law concept of quasi-contract. … When the essential facts are not in dispute, as in this case, the question of whether a quasi-contract

14

should be recognized is one of law." *4934, Inc.*, 605 A.2d at 56.  Consequently, this Court may make

a determination as a matter of law, based on the undisputed material facts, that QNB is entitled to a

refund of the duplicate payment it made to Winmar in error.

    The only materiality to QNB's unjust enrichment claim against Winmar of the ongoing,

complex disputes among Winmar and AJI is that any debt owed by AJI to Winmar is, indeed,

disputed, and the amount was disputed by both sides before the duplicate payment was made.  This

is material because it demonstrates clearly that the debt was not liquidated and, thus, defeats

Winmar's discharge-for-value defense on that ground alone.  *See infra*, Section IV.A; QNB's Opening

Memorandum, Section III.D.2.

## IV.   QNB IS ENTITLED TO SUMMARY JUDGMENT ON WINMAR'S DISCHARGE-FOR-VALUE AFFIRMATIVE DEFENSE

### A.   There is No Genuine Issue of Fact regarding the Non-Liquidated Nature of AJI's Alleged Debt to Winmar and, thus, the Discharge-for-Value Defense Does Not Apply to that Debts as a Matter of Law

    Nowhere does Winmar dispute that any debt AJI may have owed Winmar was not liquidated

on January 31, 2006, when the duplicate transfer occurred.  The transactions relating to the amounts

owed between and among AJI and Winmar prior to the January 31, 2006 Duplicate Payment show

that any such debt was disputed and not liquidated and, thus, cannot support Winmar's discharge-

for-value defense. SMF ¶¶ 1-14, 18-19.  Otherwise, they are immaterial.  Winmar's belief that, on

January 31, 2006 or now for that matter, it was owed $1, or $10, or $1 million, is irrelevant in the

absence of a liquidated debt existing at the time of Winmar's notice of QNB's error.

    For example, on the one hand, Winmar states that "as of December 8, 2005, Winmar

believed that they had completed enough work to warrant payment from AJI in the total amount of

$2,463,301"--$1,363,463 of which remained unpaid.  Winmar Opp. at p. 3.  On the other hand,

Winmar states that, "Winmar, believing they were due <u>at least</u> $355,297, in good faith reimbursed

AJI in the amount of $119,380."  Winmar Opp. at p. 4 (emphasis added).  Even Winmar did not

know how much it was owed. This was clearly not a liquidated debt as a matter of law. *See Aon Risk Services, Inc. of Washington, D.C. v. Estate of Coyne*, 915 A.2d 370, 379 (D.C. 2007) ("'A liquidated debt is one which at the time it arose ... was an easily ascertainable sum certain.'") (quoting *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 311 (D.C. 1987)). Accordingly, QNB is entitled to summary judgment as a matter of law. *See Bank of America v. Sanati*, 11 Cal. App. 4th 1079, 1088-89 (1992) ("No decision we are aware of has applied the discharge for value rule where the debt or lien in question was anything less than an objectively verifiable, preexisting, liquidated obligation. (*See* REST., RESTITUTION (appen.) § 14 and cases collected.) Indeed, allowing the rule to apply to debts or obligations any less substantial would risk destroying the certainty of the rule and allow the exception to control its application. … Consequently, it does not appear the 'discharge for value' rule can be properly invoked in a case such as this where the alleged preexisting debt or lien is at best a probable yet undetermined interest …") (citing RESTATEMENT OF RESTITUTION § 14 and cases collected therein)).

> **B.    There is No Genuine Issue of Fact regarding the Winmar's Actual and Constructive Notice of QNB's Error Before Winmar Could Have Credited AJI's Account, and, thus, Winmar's Discharge-for-Value Defense Fails as a Matter of Law**

Winmar concedes that "[t]he only authority which addresses the 'timing issue' is derived from the Sixth Circuit Court of Appeals' opinion in *In re Calumet Farm*." Winmar Opp. at p. 10. The Sixth Circuit in that case held clearly and directly that "[a]ny sensible application of the discharge-for-value rule … must account for constructive as well as actual notice of a mistake" and that, when applicable, "the discharge-for-value defense will apply unless the beneficiary receives notice of a mistake <u>before the beneficiary of the transfer **credits the debtor's account**</u>." *In re Calumet Farm Inc.*, 398 F.3d 555, 560 (6th Cir. 2005) (emphasis added). Applying that rule, QNB is entitled to a refund of the funds it mistakenly paid to Winmar as a matter of law. Winmar does not dispute that

it had both actual and constructive notice that the December 31, 2006 duplicate payment was made in error. WSMF ¶ 18; SMF ¶¶ 17, 25; *see supra* n.4.

In an attempt to avoid this clear and simple reality, Winmar misleadingly cites the quotation in *Calumet Farm* of the Seventh Circuit opinion in *GECC v. Central Bank*, 49 F.3d 280 (7th Cir. 1995) for the false proposition that, to defeat the discharge-for-value defense, the notice of the error must occur before "arrival of the funds" rather than "before the beneficiary of the transfer credits the debtor's account." *Calumet Farm Inc.*, 398 F.3d at 559-60; Opp. at p. 10. In deciding this issue, the Sixth Circuit analyzed the provisions of Regulation J; all of the applicable provisions of the U.C.C.; the Restatement of Restitution § 14(1); and numerous court opinions from jurisdictions across the country. *Calumet Farm*, 398 F.3d at 559-62. After that analysis, the Sixth Circuit decisively rejected the same argument proffered by Winmar here, stating:

> Isolated language in both of the above cases, however, indicates that the notice must occur before the funds arrive. *See GECC*, 49 F.3d at 284 (holding that "a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds"); *Banque Worms* [*v. BankAmerica Int'l*], 568 N.Y.S.2d 541, 570 N.E.2d [189,] 196 (1991) (explaining that "[w]hen a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation"). <u>But the question in each case</u> (as in this court's prior decision) <u>was whether the discharge-for-value rule applies in this setting, not how it applies.</u> <u>Nor, at any rate, does the quoted language squarely address the point.</u> <u>In a wire transfer setting, is the relevant event when the beneficiary's bank receives the money, or when the beneficiary learns that the money is in its account, or when the beneficiary credits the money to the debtor's account?</u> <u>Neither this court's prior decision, *GECC*, nor *Banque Worms* purports to consider the question, much less answer it.</u>

*Id.* (emphasis added). The following resulting conclusions in *Calumet Farm* are dispositive of Winmar's discharge-for-value defense:

> Traditionally, the U.C.C. provides that payment in discharge of an obligation occurs under the first option—"at the time a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank in the funds transfer." U.C.C. § 4A-406(a). But this approach does not square with the notice exception to the discharge-for-value rule. Application of this U.C.C. definition of discharge would

mean that the entity that must receive notice (here White Birch) is an entity other than the entity to whom the funds were wired (here Citibank). To divide the "receipt of payment" and "notice of error" elements between different entities makes little sense and at any rate is a recipe for reading the notice exception out of the rule.

   Equally unpersuasive is the argument that the discharge-triggering event necessarily occurs only when the beneficiary has actual notice that funds have been placed in its account. Such notice may not connect the funds to a given debtor or to the size of the debtor's outstanding obligation. Furthermore, while actual notice of a mistake may of course be independently disclosed by the originator to the beneficiary, constructive notice of a mistake may also occur simply as a result of the size of the transfer when considered in connection with the name of the originator. In this case, for example, White Birch assuredly would have had constructive notice of the mistake if the transfer had been, say, for $7.7 million-if, in other words, First National had made a two-digit error rather than a one-digit error in transmitting Calumet's payment order. Any sensible application of the discharge-for-value rule in this unique setting must account for constructive as well as actual notice of a mistake.

   That leaves what seems to us to be the most desirable option—that the discharge-for-value defense will apply unless the beneficiary receives notice of a mistake before the beneficiary of the transfer credits the debtor's account. In addition to aligning the entity that receives notice of any mistake with the entity that receives the payment, and permitting constructive notice to trigger the rule, this approach is consistent with one of the underlying principles of the discharge-for-value rule; namely, that the creditor has given value for the mistaken payment.

*Id.* at 559-60 (emphasis added).

   The *Calumet Farm* court held that the discharge-for-value rule did not apply in that case because the undisputed record showed that Calumet "notified White Birch of the error on the morning of March 11, 1991," and White Birch "did not apply that amount to reduce Calumet's debt on the … note until later that day"—a gap of only a few hours. *Id.* at 561. Not only did the Sixth Circuit reverse the summary judgment granted by the district court for defendant, but remanded the case for the entry of judgment in favor of the plaintiff bank. *Id.* at 562.

   Similarly, because there is no dispute regarding Winmar's receipt of notice of QNB's error making the January 31, 2006 duplicate payment before it had even received notice of the wire transfer itself, summary judgment is appropriate here as a matter of law. Without the benefit of a time machine, Winmar clearly could not have credited AJI's account *before* it even knew about the

wire transfer at all.  WSMF ¶ 18; SMF ¶¶ 17, 25.  Consequently, Winmar's discharge-for-value defense fails as a matter of law, and QNB is entitled to summary judgment.

Winmar confused its own burden in stating that "there is not … evidence that Winmar, upon receipt of the questioned finds, segregated them from the funds they believed they were owed."  Winmar Opp. at p. 11.  In fact, there is no evidence that Winmar did anything with the funds before it had notice of the error, which came before it even knew that the funds existed and could be segregated, because that would be physically impossible, which is what the discharge-for-value defense requires.  In any event, Winmar has the burden of proof on this issue and has completely failed to meet it.  *See Hammond*, 383 F. Supp. 2d at 54 (holding that, on "an affirmative defense, defendant bears the burden of proof of establishing the facts supporting this defense"); *see also Credit Lyonnais*, 886 F. Supp. at 93 (holding in a similar case that "[b]ecause the particular circumstances of this case place the duty to go forward with controverting facts upon [the defendant], its failure to discharge that duty entitles [the bank] to summary judgment."); *Nat'l Bank of Canada*, 627 F. Supp. at 611 ("The reliance apparently asserted by [defendant] is an affirmative defense, the burden of proof of which is on the defendant. …  There is no issue of material fact, no valid defense, and [plaintiff] is entitled to judgment as a matter of law.  Accordingly, its motion for summary judgment is granted."); *Connerton*, 723 A.2d at 862 (" '[i]f there is any question[, in a case of money paid by the plaintiff under a mistake of fact,] whether it would be inequitable to require the defendant to refund, the burden of proving the fact rests upon him.'") (quoting *Hibbs v. Beall*, 41 App. D.C. 592, 598 (1914)); *NBase Communications v. American Nat'l Bank & Trust*, 8 F. Supp. 2d 1071, 1077 n.10 (N.D. Ill. 1998) (holding that the discharge-for-value defense is an affirmative defense).  Winmar's reliance of a lack of evidence on allegedly exculpatory matters is inappropriate at this stage of the proceedings on its affirmative defense.

What is material and decisive here is that there is undisputed, affirmative evidence that Winmar did not know that the funds existed in its account until after it received notice that they were put there though an error. Whether or not Winmar afterward segregated or credited an account is not material. Under the rule stated in *Calumet*, the only issue is whether the erroneously transferred funds were <u>credited</u> <u>before</u> the <u>notice of the error</u>. *Calumet Farm*, 398 F.3d at 559-62. There is no genuine issue of material fact on that issue in this case and QNB is entitled to summary judgment as a matter of law.

## V.    CONCLUSION

Winmar admits that Citibank informed Winmar that the duplicate payment was in error. Winmar has expressly admitted, and does not now dispute, that the notice of the error was the first notice Winmar ever received that the payment was made at all. Winmar also does not dispute that Winmar had constructive notice that the duplicate transfer was in error. Winmar also does not dispute that it did not have a liquidated debt owing from AJI. QNB respectfully requests that this Court apply the law to these undisputed facts and grant summary judgment in QNB's favor.

DATED:    July 21, 2008    Respectfully submitted,

    /s/ Alan T. Dickey
Alan T. Dickey (DC Bar # 496403)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone:  (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Plaintiff*
*Qatar National Bank*