**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **QATAR NATIONAL BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1307 (GK)** |
| | ) | |
| **WINMAR, INC.,** | ) | |
| **d/b/a WINMAR CONSTRUCTION,** | ) | |
| | ) | |
| **Defendant and Third-** | ) | |
| **Party Plaintiff.** | ) | |
| | ) | |
| **WINMAR, INC.,** | ) | |
| **d/b/a WINMAR CONSTRUCTION,** | ) | |
| | ) | |
| **Third-Party Plaintiff** | ) | |
| **and Counterclaim** | ) | |
| **Defendant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AL-JAZEERA INTERNATIONAL,** | ) | |
| | ) | |
| **Third-Party Defendant** | ) | |
| **and Counterclaim** | ) | |
| **Plaintiff.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Qatar National Bank ("QNB") brings this action against Defendant and Third Party Plaintiff Winmar, Inc. ("Winmar").  QNB alleges that Winmar had no right to retain funds that were mistakenly transferred to it (Count I), and that Winmar was unjustly enriched as a result of the mistaken transfer (Count II).  This matter is now before the Court on QNB's Motion for

Summary Judgment [Dkt. No. 35].  Upon consideration of the Motion, Opposition, Reply, Surreply, the entire record herein, and for the reasons set forth below, QNB's Motion for Summary Judgment is **granted.**

**I.    Background**[1]

   **A.    Plaintiff's Statement of Material Facts Is Admitted**

Defendant submitted a Statement of Material Facts as to Which There is No Genuine Dispute, but failed to submit a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated," as required by Local Rule 7(h).  See LCvR 7(h).

According to Local Rule 7(h), "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Id.  As our Court of Appeals has held, "[i]f the party opposing the motion fails to comply with [Local Rule 7(h)], then the district court is under no obligation to sift through the record and should [i]nstead . . . deem as admitted the moving party's facts that are

---

[1]  Unless otherwise noted, the facts set forth herein are drawn from Plaintiff's Statement of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).  As noted <u>infra</u>, Defendant failed to comply with Local Rule 7(h) because it did not submit a response to QNB's Statement of Material Facts as to Which There Is No Genuine Dispute.

uncontroverted by the nonmoving party's Rule [7(h)] statement." Secs. & Exch. Comm'n v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (internal citations and quotation marks omitted); see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996) (the local rules place "the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record").

Here, Defendant failed to comply with Rule 7(h) because it did not file a statement of disputed facts. Instead, it submitted only its own Statement of Material Facts as to Which There Is No Genuine Dispute. Therefore QNB's facts are admitted because they have not been controverted.

**B.   QNB's Duplicate Payment and Refund Request**

On November 23, 2005,[2] Winmar and Third Party Defendant Al-Jazeera entered into a contract for the renovation of Al-Jazeera's office at 1627 K Street N.W. in Washington, D.C. Under the terms of the contract, Al-Jazeera agreed to submit payments by wiring funds to an account at Citibank Federal Savings Bank in Washington ("Citibank"). On October 20, 2005, Winmar and Janson Design Group ("Janson"), the architect on the project, certified that Winmar was

---

[2]   Both parties agree on this date, even though it would appear from the following chronology that the correct date is 2004, not 2005.

due an initial deposit of $645,164, plus a first payment of $474,677.

On October 27, 2005, Al-Jazeera wired an initial deposit of $645,161 to the Citibank account. On December 7, 2005, Janson certified that Winmar was owed three additional payments of $115,872, $775,913, and $471,678, which totaled $1,363,463.

On December 8, 2005, Al-Jazeera faxed a payment order to QNB, requesting that QNB wire $474,677 to the Citibank account. On December 12, 2005, QNB used the FedWire system to wire the funds to JPMorgan Chase Bank, its correspondent bank, which in turn wired the funds to the Citibank account.

On December 22, 2005, Christopher Condon, Winmar's Vice President, sent Al-Jazeera a letter reiterating that it owed Winmar an additional $1,363,463.

On January 4, 2006, Winmar informed Al-Jazeera that it planned to suspend its performance of the contract unless it received a payment of $1,363,463.

On January 5 and January 6, 2006, Winmar received two letters from Janson. In the letters, Janson stated that it had erred in certifying the $1,363,463 amount, and it requested that Winmar provide documentation to support its claim that it was owed $1,363,463. On January 11, 2006, Al-Jazeera terminated the contract for convenience.

On January 18, 2006, Winmar submitted a revised certification, claiming Al-Jazeera owed it $653,449 as a final payment under the contract.  On January 19, 2006, Janson rejected this certification. On the same date, Al-Jazeera wrote a letter to Winmar, stating that Winmar was not entitled to any additional payments until it provided supporting documentation.  On January 23, 2006, Winmar submitted a revised certification in which it claimed that Al-Jazeera owed it $355,297.

On January 30, 2006, Al-Jazeera faxed a second copy of the December 2005 payment order to QNB.  Pl.'s Mot., Ex. 4.  At the top of the fax, there was a handwritten note stating that Al-Jazeera had not "received any . . . transfer confirmation for this" and requesting QNB to "please send the Confirmation."  See id.

QNB mistakenly understood this fax to constitute a second payment order, rather than a request for confirmation that the first payment order had been processed.  On January 30, 2006, QNB wired a duplicate payment of $474,677 to the Citibank account.  The funds arrived in the Citibank account on January 31, 2006.  Al-Jazeera did not authorize this second payment.[3]

_____

[3] In its submissions, Winmar repeatedly refers to this mistake as an "alleged error."  See, e.g., Def.'s Statement of Material Facts as to Which There Is No Genuine Dispute ¶ 17.  In the Surreply, it argues that the payment was not a mistake, claiming that the January 30, 2006 request for confirmation "may well not have been a confirmation request, but a further direction to affect payment to Winmar."  Def.'s Corrected Surreply at 4.  The sole support for this argument is that Al-Jazeera had already sent
(continued...)

After it had wired the funds to the Citibank account, QNB recognized that it had erred in sending the duplicate payment. On February 2, 2006, it wired the following instructions to JPMorgan Chase Bank:

> URGENT . . . URGENT . . .
> THE ABOVE PAYMENT HAS BEEN WRONGLY DUPLICATED FROM OUR SIDE WITH REF 6202790001932 DATED 12.12.2005 WITH THE SAME AMOUNT AND THE SAME BENEFICIARY DETAILS
> KINDLY TREAT THE PAYMENT ORDER . . . DATED 30.01.2006 AS NULL AND VOID AND REFUND THE AMOUNT TO OUR ACCOUNT WITH YOU UNDER URGENT SWIFT ADVISE TO US.
> SORRY FOR THE INCONVENIENCE CAUSED

JPMorgan Chase responded on the same day, stating that it had already processed the payment and that it would contact Citibank to request the refund.

On February 3, 2006, Al-Jazeera notified Winmar that it owed nothing on the contract and that in fact, it was owed $200,000 from Winmar.

---

[3](...continued)

Winmar a confirmation letter on December 19, 2005. See id. ("If [Al-Jazeera] already had confirmation of the December payment, it does not stand to reason that they would seek re-confirmation a month later."). In contrast, QNB provides an actual copy of the January 30, 2006 fax. See Pl.'s Mot., Ex. 4. The handwritten note on the fax clearly indicates that it was intended to be a request for confirmation and not a second payment order. Thus, QNB's assertion that the second transfer was a mistake may be admitted because it has not been adequately controverted. See Hussain v. Nicholson, 435 F.3d 359, 365 (D.C. Cir. 2006) ("In deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record.") (emphasis in original).

On the same date, Winmar's President informed a subcontractor that it had been notified by Al-Jazeera about the termination of the contract, that it had submitted a "final requisition of payment," that it had not yet received the payment, and that it had been "advised" that Al-Jazeera denied the requisition for payment.

On February 8, 2006, JPMorgan Chase informed QNB that it had contacted Citibank about receiving a refund from Winmar, but that Winmar had refused to refund the money.  QNB did not receive any additional response from Winmar regarding its February 2, 2006 refund request.

On February 24, 2006, Al-Jazeera submitted a formal claim to Janson in which it stated that the $474,677 payment was an overpayment.

On March 9, 2006, Winmar responded by letter.  It stated that it was "unaware until your [February 24, 2006 claim] was received that any wire had been accomplished on January 31st [2006]."  Pl.'s Mot., Ex. 6.  It acknowledged that it had received a payment of $474,677, and stated that the "excess over the amount last requisitioned by Winmar is reflected in the enclosed check for $119,380."  Id.

On March 12, 2006, Al-Jazeera informed QNB by letter that QNB was responsible for the mistaken transfer.  It threatened to initiate legal proceedings if QNB did not refund the money.  On March 20, 2006, QNB refunded $474,677 to Al-Jazeera.

On March 28, 2006, Winmar wrote a letter to Janson in which it stated that the "February 24, 2006 letter was the first notice Winmar received that [Al-Jazeera] had wired money into Winmar's account. Prior to February 24, 2006, Winmar received no request from [Al-Jazeera] to return the wired funds." Pl.'s Statement of Material Facts ¶ 24.

On April 12, 2006, QNB sent a second refund request to Winmar. QNB received no response.

QNB filed a Complaint against Winmar in this Court on July 24, 2006. QNB alleged that Winmar has no right to retain money it received by mistake (Count I) and that Winmar has been unjustly enriched as a result of retaining the money (Count II). On November 9, 2006, Winmar filed a Third Party Complaint against Al-Jazeera [Dkt. No. 19]. On February 1, 2007, Al-Jazeera filed a Counterclaim against Winmar [Dkt. No. 20]. On June 16, 2008, QNB filed a Motion for Summary Judgment [Dkt. No. 35]. On July 7, 2008, Winmar filed an Opposition [Dkt. No. 37], on July 21, 2008, QNB filed a Reply [Dkt. No. 38], and on August 4, 2008, Winmar filed a Surreply [Dkt. No. 40].

## II.  **Standard of Review**

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed.

R. Civ. P. 56(c), as amended December 1, 2007; <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006).   In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.   "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Arrington</u>, (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).   A fact is "material" if it might affect the outcome of the case under the substantive governing law.   <u>Liberty Lobby</u>, 477 U.S. at 248.

In its most recent discussion of summary judgment, in <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986) (footnote omitted).   "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will <u>not</u> defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Liberty Lobby</u>, 477 U.S. at 247-48 (emphasis in original).

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 248, 249.   In both <u>Liberty Lobby</u> and

<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 255. "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)." <u>Arrington</u>, 473 F.3d at 335.

## III. Analysis

### A.   QNB's Motion for Summary Judgment May Be Decided Before the Dispute Between Winmar and Al-Jazeera Is Resolved

Winmar argues that granting summary judgment for QNB would be "premature" because QNB's claim is "entirely derivative of the core dispute" between Winmar and Al-Jazeera and because there are "numerous issues of material fact" remaining in that dispute. Def.'s Corrected Surreply at 2. Winmar also alleges that summary judgment would be "improper" because discovery is "ongoing" in the dispute between Winmar and Al-Jazeera. Def.'s Opp'n at 2.

Winmar has cited to no case holding that a court may not decide a plaintiff's motion for summary judgment when a case includes a third party and unresolved claims remain between the defendant/third party plaintiff (here Defendant Winmar) and the third party defendant (here Al-Jazeera). In fact, courts have

granted a plaintiff's motion for summary judgment even when a third party remains in the case.  See, e.g., Jordan v. Can You Imagine, Inc., 485 F. Supp. 2d 493 (S.D.N.Y. 2007).

In addition, the Court's Scheduling Order in this case clearly established two different discovery schedules and two different dispositive motion schedules: one for the dispute between QNB and Winmar and one for the dispute between Winmar and Al-Jazeera [Dkt. No. 34].  For example, the Corrected Scheduling Order set June 16, 2008 as the deadline for dispositive motions on QNB's claims against Winmar and October 8, 2008 as the deadline for "all other" dispositive motions.  Corrected Scheduling Order (Apr. 2, 2008).  These separate schedules show that Winmar was on notice that the issues between the three parties would not be resolved at the same time.

It is telling that in the Third-Party Complaint against Al-Jazeera, Winmar acknowledges that Al-Jazeera's liability to Winmar derives from Winmar's liability to QNB.  See Third-Party Complaint Against Al-Jazeera International (Nov. 9, 2006) [Dkt. No. 19] ("Third-party defendant Al-Jazeera is liable to defendant and third-party plaintiff Winmar for all or part of the plaintiff's claim against the defendant . . . .").  Thus, as Winmar itself acknowledges, the claim that is derivative is Winmar's Third-Party Complaint, not QNB's Complaint against Winmar.

Finally, Winmar argues, at p. 5 of its Opposition, that a summary judgment decision in favor of QNB "would be partially determinative of the claims between Winmar and Al-Jazeera." That is simply not true. Nor is it true, as Winmar argues at p. 6, that if the Court rules that QNB is entitled to summary judgment and restitution, the Court will have "made a determination that Winmar is not entitled to payment from Al-Jazeera in any amount, or in an amount less than $474,677." As Judge Robertson of this Court pointed out in <u>Credit Lyonnais-New York v. Washington Strategic Consulting Group</u>, 886 F. Supp. 92, 93 (D.D.C. 1995), "the question whether [Al-Jazeera] owed the money . . . is not material" to QNB's claim for restitution.

For these reasons, it is appropriate to resolve QNB's Motion for Summary Judgment prior to resolving the dispute between Winmar and Al-Jazeera.[4]

**B.     Winmar Has Not Shown that Requiring It to Refund the Mistaken Payment Would Be Inequitable**

Transfers of funds which use the FedWire system must comply with the provisions set forth in the Code of Federal Regulations. <u>See</u> 12 C.F.R. § 210.25 (2009). According to these Regulations,

---

[4] Winmar repeatedly tries to suggest that there are material facts in dispute, without giving any specifics. It is noteworthy that Winmar has failed to file any Rule 56(f) motion which requires the opponent of such a motion to show by affidavit the specific reasons why it is necessary to allow further discovery in order to present sufficient facts it deems essential to justify its opposition to the motion.

also known as "Regulation J," a bank that mistakenly issues a duplicate order is "entitled to recover from the beneficiary of the erroneous order the excess payment received to the extent allowed by the law governing mistake and restitution." Id., Appendix B to Subpart B, Section 4A-303; Pl.'s Mot. at 8-9; Def.'s Opp'n at 7.[5]

In the District of Columbia, the law of mistake provides that "one who pays money to another under an honest mistake of fact may, in the absence of an equitable defense, recover the money so paid." Ass'n of Am. R.Rs. v. Connerton, 723 A.2d 858, 862 (D.C. 1999) (quoting Lanston v. Am. Sec. & Trust Co., 32 A.2d 482, 483 (D.C. 1943)). There is "no exception" to this rule. Id. (quoting Prowinsky v. Second Nat'l Bank, 49 App. D.C. 363, 364 (1920)). When one party mistakenly transfers money to another, restitution is equitable when it would "put the parties in the same position that they would have been in had the error in transferring the funds not occurred." In re Calumet Farm, Inc., 398 F.3d 555, 562 (6th Cir. 2005).

Restitution is also required when one party has been unjustly enriched. Rapaport v. Dep't of Treasury, Office of Thrift Supervision, 59 F.3d 212, 217 (D.C. Cir. 1995) ("[T]he fundamental characteristic of unjust enrichment is that the defendant has been unjustly enriched by receiving something that properly belongs to

---

[5] This section of the Code of Federal Regulations is identical to U.C.C. § 4A-303, which was enacted as § 28:4A-303 of the D.C. Code.

the plaintiff, thereby forcing restoration to the plaintiff.")
(internal citations and punctuation omitted); Standard Ins. v.
Burch, 540 F. Supp. 2d 98, 104 (D.D.C. 2008) ("In such a case [of
unjust enrichment], the recipient of the benefit has a duty to make
restitution to the other person."); Jordan Keys & Jessamy, LLP, v.
St. Paul Fire & Marine Ins. Co., 870 A.2d 58, 63 (D.C. 2005)
(holding that the "modern law of unjust enrichment and restitution"
requires restitution when retention of a benefit would be unjust).

     In the District of Columbia, a defendant has been unjustly
enriched and must pay restitution if "(1) the plaintiff confers a
benefit on the defendant; (2) the defendant retains the benefit,
and (3) under the circumstances, the defendant's retention of the
benefit is unjust."  Armenian Assembly of Am., Inc. v. Cafesjian,
597 F. Supp. 2d 128, 134 (D.D.C. 2009).

     To succeed on a claim for unjust enrichment, the plaintiff
need not show that the defendant is at fault, so long as he
demonstrates that in spite of the defendant's "innocence in
receiving the benefit," his retention of that benefit would be
unjust.  Burch, 540 F. Supp. 2d at 105 (internal citations and
quotation marks omitted).  When unjust enrichment occurs as the
result of a mistake of fact, the defendant bears the burden of
proving that restitution would be inequitable.  Connerton, 723 A.2d
at 862 ("If there is any question, in a case of money paid by the
plaintiff under a mistake of fact, whether it would be inequitable

to require the defendant to refund, the burden of proving the fact rests upon him.") (quoting <u>Hibbs v. Beall</u>, 41 App. D.C. 592, 598 (D.C. 1914)) (internal quotations marks and punctuation omitted).

It is not disputed that QNB's duplicate payment of $474,677 resulted from an honest mistake of fact,[6] that it conferred a benefit on Winmar, or that Winmar retained this benefit. Therefore, the only issue in dispute is whether Winmar's retention of this benefit is unjust.  As the beneficiary of money paid as the result of a mistake of fact, Winmar bears the burden of proving that restitution would be unjust.

Winmar argues that it is entitled to retain the mistakenly-transferred funds in accordance with the discharge-for-value defense. Def.'s Opp'n at 9. According to Winmar, summary judgment is not appropriate because factual disputes remain as to whether Winmar rightfully retained the mistaken payment in order to discharge a portion of the debt owed it by Al-Jazeera.  Id. at 5.

The discharge-for-value defense is defined in the official comment to Section 4A-303 of the Uniform Commercial Code ("UCC"). The defense has been adopted in the District of Columbia as Section 28:4A-303 of the D.C. Code.  <u>See</u> <u>In re Calumet Farm, Inc.</u>, 398 F.3d at 559 (stating that U.C.C. § 4A-303(a) "incorporates the discharge-for-value defense"); <u>In re Calumet Farm, Inc.</u>, 1997 WL 253278, at *4 (6th Cir. 1997) ("[A] wire transfer effected via

---

[6] <u>See</u> <u>supra</u> note 2.

Fedwire is covered by the provisions of U.C.C. § 4A-303(a) and its official commentary, and is therefore subject to the discharge-for-value rule."). In the Code of Federal Regulations, the text of Section 4A-303[7] is construed in light of the discharge-for-value defense. <u>See</u> 12 C.F.R. § 210.25, Appendix A to Subpart B ("The official comments to Article 4A are not incorporated in subpart B of this part or this Commentary to subpart B of this part, but the official comments may be useful in interpreting Article 4A.").

In describing the discharge-for-value defense, Section 4A-303 states that a bank that makes a mistaken payment to a beneficiary would "normally have a right to recover the overpayment" from that beneficiary. D.C. Code § 28:4A-303. However, it goes on to state that "in unusual cases the law of restitution might allow Beneficiary to keep all or part of the overpayment." <u>Id.</u>[8] The comment provides one example of an unusual case: if the bank's client "owed $2,000,000 to Beneficiary and Beneficiary received the

---

[7] Section 4A-303 is located in Appendix B to Subpart B of 12 C.F.R. § 210.25.

[8] The comment adds one clarifying statement about the rights of the bank that made the error vis-a-vis the rights of the beneficiary: "[i]n this case Originator's Bank has paid an obligation of Originator and under the law of restitution, . . . Originator's Bank would be subrogated to Beneficiary's rights against Originator on the obligation paid by Originator's Bank." D.C. Code § 28:4A-303.

extra $1,000,000 in good faith in discharge of the debt, Beneficiary may be allowed[9] to keep it."  Id.

The Restatement of Restitution provides the following definition of the discharge-for-value defense:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

Restatement (First) of Restitution § 14(1) (1937).

Thus, it is clear that the discharge-for-value defense allows a transferee to keep mistakenly transferred funds only when it has received no notice of the mistake and has made no misrepresentations.  In re Calumet, 398 F.3d at 559.  However, as the court pointed out in In re Calumet, few authorities have "specif[ied] the point in time by which notice of mistake must be received."  Id.  Previous cases addressing the discharge-for-value defense examined "whether the discharge-for-value rule applies in this setting, not how it applies."  Id. (discussing Gen. Elec. Capital Corp. v. Cent. Bank, 49 F.3d 280 (7th Cir. 1995) and Banque Worms v. BankAmerica Int'l, 570 N.E.2d 189 (N.Y. 1991)) (emphasis

---

[9]  "[T]he 'usual presumption is that "may" confers discretion, while "shall" imposes an obligation to act.'" Consumer Fed'n of Am. v. Dep't of Health and Human Servs., 906 F. Supp. 657, 664-65 (D.D.C. 1995) (quoting Int'l Union, UAW v. Dole, 919 F.2d 753, 756 (D.C. Cir. 1990)).

in original).    For this reason, those cases do not offer substantial guidance in determining when notice must be received.

In re Calumet does provide a detailed analysis of this issue. See Def.'s Opp'n at 10 ("The only authority which addresses the 'timing issue' is derived from . . . In re Calumet").  It rejected two possible interpretations of the notice rule: (1) that notice must occur before "a payment order . . . is accepted by the beneficiary's bank" and (2) that notice must be actual, rather than constructive.   398 F.3d at 560.

Instead, the court reached two key conclusions.  First, it reasoned that the "most desirable option" is to apply the discharge-for-value defense "unless the beneficiary receives notice of a mistake before the beneficiary of the transfer credits the debtor's account."  Id.  This approach is desirable because it is "consistent with one of the underlying principles of the discharge-for-value rule; namely, that the creditor has given value for the mistaken payment."  Id.  Second, it reasoned that "[a]ny sensible application of the discharge-for-value rule . . . must account for constructive as well as actual notice of a mistake."  Id.[10]

---

[10]   This approach is consistent not only with the language in the Restatement but also with the official comment to § 4A-303(a). The official comment states that the discharge-for-value defense applies if a mistaken payment is received "in good faith in discharge of the debt."  D.C. Code § 28:4A-303.  It is clear that when a beneficiary receives actual or constructive  notice that funds were mistakenly transferred before he credits a debtor's account, he has not received the payment "in good faith in
(continued...)

In the present case, Winmar has provided no reason to reject the Sixth Circuit's conclusions.  Accordingly, the discharge-for-value rule applies only if Winmar did not have actual or constructive notice before Winmar credited Al-Jazeera's account.

Here, QNB wired the second payment to the Citibank account on January 30, 2006, and the funds arrived in the account on the next day.  On February 24, 2006, Al-Jazeera wrote a letter to Janson in which it stated that the $474,677 payment was a "mistake."  Pl.'s Mot., Ex. 6.  In Winmar's response on March 9, 2006, it acknowledged that it had been "unaware" prior to the receipt of this letter that "any wire had been accomplished on January 31st [2006]."  Id.  Winmar does not dispute that it did not become aware of the mistake until February 24, 2006, nor does it present any evidence that it credited Al-Jazeera's account prior to that date.  In fact, it is clear that Winmar could not have credited Al-Jazeera's account prior to February 24, 2006 if it did not even know of the transfer until that date.  Therefore Winmar's March 9, 2006 letter provides undisputed evidence that Winmar received actual notice of QNB's mistake before it credited Al-Jazeera's account.[11]

---

[10](...continued)
discharge of the debt."

[11]  In its Opposition, Winmar argues that "for all practical intents and purposes, [Al-Jazeera's] account, such as it was, was immediately credited upon receipt of the funds."  Def.'s Opp'n at
(continued...)

Even if Winmar did not have actual notice that the payment was a mistake, it had constructive notice of the error.  Less than two months after it received a payment of $474,677, it received a second payment of the exact same amount.  That second payment substantially exceeded the $355,297 that Winmar had claimed it was owed in its January 23, 2006 certification.  These two undisputed facts show that Winmar had constructive notice that the second payment had to have been a mistake.  See In re Calumet, 398 F.3d at 560 ("[C]onstructive notice of a mistake may also occur simply as a result of the size of the transfer.").  Winmar received this constructive notice at the moment the payment arrived in its account, which occurred prior to February 24, 2006.  As discussed supra, Winmar could not have credited Al-Jazeera's account prior to February 24, 2006.  Therefore, it had constructive notice prior to crediting Al-Jazeera's account.  For these reasons, the discharge-for-value defense does not apply to QNB's mistaken payment to Winmar.

In Credit Lyonnais, a case remarkably similar to the present one, the plaintiff bank received a request to confirm a previous payment made four days earlier of $171,821.30.  Instead of responding to the confirmation request, the plaintiff bank

---

[11](...continued)
11.  Winmar offers no evidence to support this argument or to rebut QNB's argument that it could not have credited Al-Jazeera's account before February 24, 2006. Therefore Winmar fails to create a genuine dispute of material fact on this issue.

mistakenly -- as in this case -- made a second wire transfer of the same amount to its affiliate.  In that case, it took nearly six months for the plaintiff bank to discover its mistake and demand return of the funds.  Despite the substantial passage of time, Judge Robertson ruled for the plaintiff bank on the basis of "settled law:  where one person receives money that in equity and good conscience belongs to another, action will lie for 'money had and received.'"  <u>Credit Lyonnais</u>, 886 F. Supp. at 93 (citations omitted).

Accordingly, Winmar has not shown that it would be inequitable to require it to refund QNB's mistaken payment.[12]  <u>See</u> D.C. Code § 28:4A-303 (stating that in the case of a mistaken payment, a bank would "normally have a right to recover the overpayment" from the beneficiary); <u>In re Calumet</u>, 393 F.3d at 561 ("It is difficult to see what is unfair about requiring a bank to return money if it was notified of the mistaken payment before it gave value for the payment.") (internal quotation marks and citations omitted).

---

[12]  Winmar argues that the present case is similar to <u>Chase Manhattan Bank v. Burden</u>, 489 A.2d 494 (D.C. 1985), in which the court held that the defendant was not unjustly enriched, and he was not required to pay restitution.  However, as QNB correctly states, <u>Burden</u> is distinguishable because the debtor authorized the payment and because Burden spent the money "[s]everal months]" before he received notice of the mistake.  <u>Id.</u> at 495-96.  In addition, Burden had no reason to know that the money was transferred in error.

**IV.   Conclusion**

        For the reasons set forth above, QNB's Motion for Summary
Judgment [Dkt. No. 35] is **granted.**   An Order shall accompany this
Memorandum Opinion.


                                  /s/
                                  _____
September 3, 2009                 Gladys Kessler
                                  United States District Judge


**Copies to: Attorneys of record via ECF**