# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WINMAR, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 06-1307 (GK) |
| | ) |
| AL JAZEERA INTERNATIONAL, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Third-party Plaintiff Winmar, Inc., a Washington, D.C.-based construction firm, brings this claim for breach of contract and unjust enrichment against Third-party Defendant Al Jazeera International, a division of Al Jazeera Satellite Network, an international news network headquartered in Doha, Qatar.[1] Al Jazeera International counter-claims against Winmar for breach of contract, mistake, and unjust enrichment. This dispute arises out of a 2005 contract between Al Jazeera and Winmar to construct a state-of-the-art television studio and office space at 1627 K Street, N.W., Washington, D.C. On June 30, 2010 through July 2, 2010, a bench trial was held in which eight witnesses testified. Based on the testimony presented by those witnesses, the exhibits admitted into evidence, the parties' representations of what facts

---

[1]    On May 4, 2010, the Court granted the Motion for Summary Judgment of the original Plaintiff in this case, Qatar National Bank, against Winmar, Inc. [Dkt. No. 62].

were not in dispute, and the applicable caselaw, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.  Third-party Plaintiff Winmar, Inc. ("Winmar" or "Plaintiff") is a corporation organized under the laws of the District of Columbia with its principal place of business located in the District of Columbia. Defendant Al Jazeera International ("Al Jazeera" or "Defendant") is a division of Al Jazeera Satellite Network, an entity organized under the laws of the Government of the State of Qatar which has its principal place of business in Doha, Qatar.

2.  In 2005, Al Jazeera and Winmar entered into a contract ("the Contract") for the construction of a state-of-the-art television studio and office space on the fourth and seven floors rented by Al Jazeera in a building located at 1627 K Street, N.W., Washington, D.C. (the "Project"). The Contract consisted of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997 ("Standard Form") and AIA Document A201-1997 ("General Conditions"), as modified by the parties, as well as other "Contract Documents," including a one-page Monthly Cash Flow Statement and a four-page Construction proposal dated September 16, 2005.

3.  The Contract is governed by the laws of the District of Columbia. Jurisdiction and venue in this district are proper both

for Winmar's claims against Al Jazeera and Al Jazeera's counterclaims against Winmar. Pursuant to § 4.6.2 of the General Conditions of the Contract, Winmar and Al Jazeera have waived their right to a jury trial.

4. Although the Contract was not executed until November 23, 2005, Winmar began work on the Project on October 16, 2005, and was scheduled to reach substantial completion 136 days later,[2] on March 1, 2006. For the duration of Winmar's work on the Project, John J. Kirlin, Inc., a Maryland-based firm, performed the Project's mechanical engineering work and Pel-Bern, Inc., also a Maryland-based firm, performed the Project's electrical work as Winmar's sub-contractors.

5. The Project's architect was Janson Design Group ("Architect"), a New York-based architecture firm. As the Project's Architect, and pursuant to § 4.2.1 of the General Conditions, Janson Design Group acted as Al Jazeera's representative throughout the events discussed herein.

6. In September 2005, Winmar submitted the sole bid in response to the Architect's solicitation to perform construction work on the Project. The bid included a project summary, as well as specific line items derived from the set of plans received from the Architect and the bids that Winmar received from sub-contractors.

---

[2]    Both parties inexplicably state that the period between October 16, 2005 and March 1, 2006 includes 129 days. In fact, it includes 136 days.

Winmar bid to perform the Project for $2,351,615 under a lump-sum contract. The amount bid did not include extra charges for any change orders submitted by the Architect. On September 16, 2005, as a part of its bid, Winmar included a one-page Monthly Cash Flow Projection Sheet and a four-page Construction Proposal.

7.    On October 4, 2005, Winmar sent a letter of intent to Al Jazeera proposing "to furnish and install all necessary labor and materials for the interior construction per the plans that have been issued and the bid proposal that has been given and the scope of work that is listed" for $2,351,615, plus a $365,135 premium time contingency. On October 5, 2010, Gary Napier, the Al Jazeera representative who oversaw the Project's financing, approved and acknowledged the letter of intent. Winmar began work on the Project on October 16, 2005.

8.    It was not until November 23, 2005, after over a month of negotiations between Winmar and Al Jazeera, that the parties executed the Contract.

9.    Section 4.1 of the Standard Form provides that "[t]he Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be two million three hundred fifty one thousand six hundred fifteen dollars ($2,351,615.00), subject to additions and deductions as provided in the Contract Documents." This Contract Sum did not include any change orders.

10.   The Contract Documents incorporated into the Contract included in part (1) the Monthly Cash Flow Projection Sheet with a base contract amount of $2,351,615, revised at the time of the Contract's execution to include an additional $522,135[3] for the Architect's October 11, 2005 Change Orders (Number 1, to furnish and install a Multistak Chiller and Number 2, for premium time), for a total contract amount of $2,873,750, and (2) the Construction Proposal, which allocated the base contract amount of $2,351,615 across categories of work.

11.   On November 23, 2005, when the Contract was signed, the parties agreed to a total contract amount of $2,873,750, subject to any further additions and/or reductions resulting from additional change orders submitted by the Architect. The Contract is a fixed price or lump sum contract, and therefore the total Contract amount is not subject to any adjustment on the basis of the costs incurred by Winmar in performing the work.

12.   The Contract required Al Jazeera to make progress payments on the total Contract amount throughout the period of Winmar's work.[4] These progress payments were essential to assure an

---

[3]      The Monthly Cash Flow Projection Sheet incorrectly states the total amount for change orders #1 and #2 when it states that it "represents the projected schedule of payments per the base contract amount ($2,351,615.00) plus the change orders #1 & #2 ($522,145.00) for a grand total of $2,873,750." The correct total for change orders #1 and #2 is $522,135. <u>See</u> JE 1 at 1-62.

[4]      Section 5.1.1 of the Standard Form states that "[b]ased
(continued...)

adequate cash flow for the Project, since Winmar was often required to make advance deposits, large purchases for both custom-made and standard equipment and other pre-orders, and payments to sub-contractors.

13. Article 5 of the Standard Form sets forth the procedures for making the progress payments: specifically, Al Jazeera agreed to deposit the amounts provided on the Monthly Cash Flow Projection Sheet into an escrow account[5] no later than the last day of the month preceding the month in which the work was to be performed. Section 5.1.2.4 of the Standard Form provides that any failure by Al Jazeera to deposit the amounts listed on the Monthly Cash Flow Projection Sheet constitutes a "material breach" of the Contract, giving Winmar the right to immediately suspend or terminate work after one day's notice to Al Jazeera.

---

[4](...continued)
upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor . . . ."

[5] The parties were unable to establish a traditional escrow account because Al Jazeera was not a licensed business in the District of Columbia at that time. As an alternative, Winmar created a "holding" account with Citibank which could receive funds wired by Al Jazeera. No funds that were wired by Al Jazeera were transferred out of the Citibank account into Winmar's operating account at BB&T Bank until the Architect certified the related Payment Applications. Al Jazeera raised no objections to this alternative arrangement, either during performance of the Contract or at trial.

14. In order to actually receive payments, Winmar was required to submit an Application and Certification for Payment ("Payment Application") to the Architect certifying that current payment is due for the work covered in the Payment Application. Section 5.1.5 of the Standard Form of the Contract states that "Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment." Under § 5.1.6, the Applications for Payment shall be computed by taking "that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage [of 5%] [plus] "that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction . . . ."

15. Section 4.2.5 of the General Conditions states that "[b]ased on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts." Within seven days of receipt of Winmar's Payment Application, the Architect was obligated under § 9.4.1 of the General Conditions to either issue a Certificate for Payment to Al Jazeera, with a copy to Winmar, for such amount as the Architect

determined was properly due, or notify Al Jazeera and Winmar in writing of the Architect's reasons for withholding certification. After the Architect certified a Payment Application, the funds deposited in the escrow account by Al Jazeera were to be released to Winmar within three calendar days.

16. Section 9.4.2 of the General Conditions states that the Architect's certification "constitute[s] a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents."

17. On October 20, 2005, the Architect certified that an initial deposit of $645,164, an amount which was required under § 5.1.2.1 of the Standard Form, should be paid into the escrow account by Al Jazeera.[6] Al Jazeera submitted the deposit in full one week later, on October 27, 2005.

18. Beginning on October 20, 2005, Winmar, through its President, Edwin Villegas, also submitted a series of Payment Applications for amounts due for work executed which were not covered by the $645,164 deposit. Specifically:

---

[6]     Section 5.1.2.1 of the Standard Form actually requires an initial deposit of $645,161, not $645,164, upon execution of the Contract. However, the Architect certified that an initial deposit of $645,164 was due, and Al Jazeera paid that amount. The parties offered no explanation for this discrepancy.

- On October 20, 2005, Winmar submitted Payment Application Number 2,[7] claiming it was due $474,677, and Payment Application Number 2b, claiming an additional $115,872, for work done in the period ending October 31, 2005;

- On November 21, 2005, Winmar submitted Payment Application Number 3, claiming it was due $775,913, for work done in the month of November 2005; and

- On December 7, 2005, Winmar submitted Payment Application Number 1, claiming it was due $471,678, for work done on change orders for the period ending December 7, 2005.

19. Thus, by December 2005 Winmar had submitted Payment Applications claiming a total of $2,483,304 for work executed. After taking into consideration the $645,164 initial deposit paid by Al Jazeera, the total outstanding amount that Winmar claimed it was owed by Al Jazeera for work completed in December 2005 was $1,838,140.

20. All of the Payment Applications were based on Winmar's certification that the amount due represented the "total completed and stored to date," minus a ten percent retainage fee for Payment Application Numbers 2, 2b, and 3 and a zero percent retainage fee for Payment Application Number 1.

---

[7]   On October 20, 2005, Christopher Condon, Vice President of Winmar, certified a separate Payment Application Number 2, claiming Winmar was due $599,103 for the period ending October 31, 2005. Although the Architect certified this version of Payment Application Number 2 on November 30, 2005, Winmar now admits it is due only the lesser amount claimed in the version submitted by Villegas, $474,677, which the Architect certified on December 7, 2005. In addition, Condon admitted at trial that his version of Payment Application Number 2 was prepared incorrectly. The Court will consider only Villegas's submission of Payment Application Number 2.

21.   The amounts claimed in Winmar's Payment Applications were calculated based on the Monthly Cash Flow Projection Sheet. For example, the amounts claimed for the months of October and November--$590,549 and $775,913, respectively--match the projected amounts listed on the Monthly Cash Flow Projection Sheet. Those projected monthly amounts were based on an estimate that 70% of the construction work on the Project would be completed by the end of November 2005. Winmar submitted its Payment Applications before the end of the month in which they were due. The amounts claimed by Winmar were projections of the work forecast to be completed by the end of the month in which the Payment Application was submitted. However, Winmar claims that the work estimated was in fact completed at the end of the payment period.

22.   On December 7, 2005, the Architect's project manager, Francisco Tsai, certified Payment Applications Numbers 1, 2, 2b, and 3 for the amounts claimed by Winmar. Tsai was given specific information about Winmar's progress on the Project before certifying Winmar's Payment Applications. For example, Steven Nease, who was employed by Al Jazeera as a consultant to manage the day-to-day progress of the Project from September 2005 through February 2006, met daily with Winmar and was on the construction site every day, usually from 8:00 a.m. until 8:00 p.m., to observe and report on progress. Nease worked regularly with Tsai to confirm that work was done before the Payment Applications were certified.

In addition, Tsai performed walk-throughs of the work site in order to decide what payments should be certified for Winmar.

23.  On December 12, 2005, Al Jazeera wired $474,677 for the certified Payment Application Number 2 to Winmar, reducing the total amount due from $1,838,140 to $1,363,463.

24.  Al Jazeera made no other payments to Winmar. The total amount paid by Al Jazeera was therefore $1,119,841.

25.  On December 22, 2005, Christopher Condon, Vice President of Winmar, sent Al Jazeera a Notice of Default and Direction to Cure stating that Al Jazeera was in material breach of the Contract for failure to pay the remaining amount owed, as certified by the Architect, of $1,363,463.

26.  Later that month, Al Jazeera engaged Mark G. Anderson Consultants, a Washington, D.C.-based design and construction consulting firm, as Construction Manager on the Project in order to resolve the disputed billing issues, to determine if Winmar was over-billing, and to speed up completion of the Project. By letter and Proposed Construction Management Agreement dated December 29, 2005, Kris Collins of Mark G. Anderson Consultants represented to Al Jazeera that he believed Winmar to have completed at least fifty to sixty percent of the work on the Project.

27.  On January 4, 2006, after not having received any further payment from Al Jazeera or response to its Notice of Default, Winmar informed Al Jazeera that it was suspending performance of

the Contract pursuant to § 5.1.2.4 of the Standard Form because it had not been paid those amounts certified by the Architect. Winmar's letter stated that, "[i]f AJI can provide Winmar with all amounts owed under the contract amounting to $1,363,463 by Friday, January 6, 2006, Winmar may decide not to assess the $3,500 [per day] amount against AJI" to which it was entitled under § 5.1.2.4.[8]

28.  One day later, on January 5, 2006, in a letter to Winmar, the Architect rescinded his certification of Payment Application Numbers 1, 2b, and 3, which encompassed the total amount of $1,363,463. The Architect stated that the certifications had been made in error, and were being withdrawn due to "a number of discrepancies in the . . . Application documents, as well as the lack of appropriate supporting documentation."

29.  On January 6, 2006, the Architect wrote a second letter to Condon which clarified the discrepancies and documentation needed in order to "re-certify" the rescinded certifications:

> (1)  Partial lien releases for Winmar, all subcontractors and suppliers, indicating initial contract amounts, showing payments to date, and showing payments pending for work in place. Such lien releases should be on [sic] a form acceptable to AJI. Please submit your form of lien release to our owner's representative, Mark G. Anderson Consultants, with copy to our firm.

---

[8]  Section 5.1.2.4 of the Standard Form states that a Contractor's suspension of services for the Owner's failure to deposit progress payments "shall be a minimum of five (5) days and $three [sic] thousand five hundred dollars ($3500) per day over seven (7) calendar days."

(2) Evidence in the form of purchase orders and delivery dates for long lead time equipment (generators, chillers, air handling equipment, electrical gear) indicating receipt of deposits. Previous evidence from the subcontractor is not acceptable - it needs to be from the manufacturer, showing that the equipment has been ordered. Also, an appropriate value for the released equipment needs to be agreed to, prior to releasing funds. Winmar has not provided the value of this equipment, from review of our available documents.

(3) Backup for the overtime expenditure to date, including a calculation of how the premium time rates are calculated. Provide backup indicating what subcontractors have billed, along with self-performed work. We would expect time sheets, and the superintendent's daily reports indicating man power levels by trade.

(4) Correction of Winmar's Requisitions, which contains [sic] mathematical errors, and billings in excess of approved change order amounts.

(5) Provide full back up for change order numbers 6A, 6C and 10.

(6) Previously submitted subcontractor backup for change orders does not provide adequate information for review / verification. Provide further backup for all change orders, including material breakdown, rates, markups, fees, and other charges, with a breakdown by subcontractor, general conditions and fees.

30. The items listed in the Architect's letter of January 6, 2006, were based on the recommendations made by Kris Collins of Mark G. Anderson Consultants in a January 6, 2006 letter to the Architect. These requests were recommended by Collins based on his view that § 5.1.6 of the Standard Form "requir[es] payment for 1) costs of actual work in place, and 2) appropriate advance funding for actual equipment and/or materials that have been ordered." In

his letter to the Architect, Collins also stated his view that, under the Contract, the Monthly Cash Flow Projection Sheet "is not in fact a payment schedule for direct payments to Winmar, but an escrow-funding vehicle."

31. Winmar refused to provide the documentation requested by the Architect, believing that it was not obligated to do so under the Contract.

32. On January 11, 2006, a meeting was held between Villegas and Condon of Winmar, Collins and Mark G. Anderson of Mark G. Anderson Consultants, and Clive Brady of Al Jazeera. Counsel for Winmar and Al Jazeera were also present.

33. The parties disagree about the purpose of the January 11, 2006, meeting and whether it was held for the purpose of "settlement discussions." In fact, no agreement was ever reached between Winmar and Al Jazeera at that meeting as to the amounts due Winmar for work completed, or as to the percent of progress completed in each category of work.[9]

---

[9]     Condon testified that the parties reached agreement as to the percentage of work completed for each line item in the Construction Proposal and for the change orders. However, it became clear through Villegas's testimony that any "agreement", if one occurred, could only have been between Condon of Winmar and Mark G. Anderson of Mark G. Anderson Consultants, with whom progress on individual line items was discussed. See JE 28. Since Anderson did not have the authority to make a binding agreement on behalf of Al Jazeera with Winmar, as Villegas acknowledged in his testimony, no agreement could have been formed. Thus, Villegas's testimony that an agreement had been reached was an overly optimistic interpretation of the January 11, 2006 meeting, albeit an
(continued...)

34.  At the end of the meeting, counsel for Al Jazeera informed counsel for Winmar that Al Jazeera would be terminating the Contract for convenience under § 14.4 of the General Conditions, and followed up with a letter confirming that termination on January 12, 2006.

35.  In an effort to recoup some of the money Winmar claimed it was due, Winmar subsequently submitted two revised Payment Applications that substantially reduced the amounts previously claimed.

36.  First, on January 18, 2006, Winmar submitted a revised version of Payment Application Number 3, described as "Final Closeout," claiming $653,449, rather than the total amount of $1,363,463 claimed in Winmar's earlier Payment Applications, for the entire period of Winmar's work ending January 11, 2006. Winmar prepared this submission on the basis of the figures Villegas believed that Chris Condon and Mark G. Anderson had agreed to at the January 11, 2006 meeting.

37.  This revised Payment Application was submitted to Mark G. Anderson Consultants. Kris Collins responded by fax, dated January 23, 2006, that the Architect had the sole authority to certify invoices. He also indicated that he had forwarded the revised

_____

[9](...continued)
understandable one considering the probable confusion resulting from discussion among multiple individuals of hotly contested facts.

Payment Application to the Architect, who, on January 19, 2006 refused to certify it in the absence of documentation.

38.   On January 23, 2006, Winmar submitted, through counsel, a second revised version of Payment Application Number 3, claiming $355,297 due for the period ending January 11, 2006. Winmar's President calculated this amount as follows: he started with the first revised version of Payment Application Number 3, which claimed $653,449, and then subtracted approximately $300,000 on the basis that he would have had to spend that amount if the dispute had to be litigated.

39.   The second revised submission was sent to a number of people on the Project, but no response was made.

40.   On or about January 30, 2006, Al Jazeera's bank, Qatar National Bank ("QNB"), erroneously transferred $474,677 to Winmar's holding account in response to Al Jazeera's request to confirm that its December 12, 2005 payment of that amount had been made.[10]

41.   Winmar used the funds received as a result of QNB's erroneous transfer to pay all its sub-contractors for work

_____

        [10]    This erroneous transfer was the subject of the dispute between QNB and Winmar in the original Complaint [Dkt. No. 1]. On May 4, 2010, this Court granted QNB's Motion for Entry of Final Judgment, entering summary judgment for QNB in the amount of $474,677 plus prejudgment interest under D.C. Code § 15-108 in the amount of $102,764.32 for the period between February 8, 2006 and September 18, 2009, plus $78.03 for each additional day after September 18, 2009 that the judgment remains not paid in full. On June 15, 2010, Winmar's Motion to Stay Enforcement of the May 4, 2010 Judgment was denied [Dkt. No. 62].

performed and all other outstanding bills related to its work on the Project.

42. On February 3, 2006, Al Jazeera informed Winmar that, according to its calculations, it had overpaid Winmar by approximately $200,000, apart from the $474,677 erroneous transfer by QNB. Al Jazeera accordingly submitted a formal claim on February 24, 2006 to the Architect, with notice to Winmar, for refund of the overpaid amounts. Winmar replied, through counsel, that it "[was] unaware until [Al Jazeera's February 24, 2006] letter was received that any wire had been accomplished on January 31, 2006."

43. On March 9, 2006, Winmar tendered to Al Jazeera a check in the amount of $119,380--the difference between the $355,297 claimed in Winmar's second revised Payment Application Number 3 and the erroneous $474,677 payment it had received from QNB.

44. On March 20, 2006, the Architect ruled on Al Jazeera's claim for $200,000. The Architect stated that he rescinded certification of Payment Applications Numbers 1, 2b, and 3 because they were certified in error, given his interpretation of the Contract, the lack of supporting documentation from Winmar, and inconsistencies in invoices submitted by Winmar. The Architect then ruled that he was rescinding his certification of Payment Application Number 2 for $474,677, which Al Jazeera had paid, for lack of appropriate documentation. The Architect further ruled that, "[p]ursuant to Section 4.3 and 4.4 of the General Conditions

and based on the services performed by Winmar prior to Al Jazeera International's termination of the Contract, Winmar has been overpaid by the amount of $855,976 and Al Jazeera International is due a refund in that amount less that portion of the overhead and fee for which Winmar may be entitled as a result of Al Jazeera International's termination of the Contract."

45. By letter dated March 21, 2006, to Chris Condon of Winmar, the Architect rescinded his certification of Payment Application Number 2 "for change order No. 1 and No. 2 in the amount of $157,000 and $225,000 respectively until such time as they can be corrected or otherwise supported by appropriate documentation sufficient to warrant them being certified."

46. The Architect justified his rescissions on the lack of documentation from Winmar. At no time did he state that his decision to rescind certification of any of Winmar's Payment Applications was based, in whole or in part, on the seven reasons for which rescission is permitted under § 9.5.1 of the Contract.

47. Section 14.4.3 of the General Conditions states that "[i]n case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." In addition, § 7.2 of the Standard Form provides that "[p]ayments due

and unpaid under the Contract shall bear interest from the date payment is due at [12% per annum]. . . ."

48. Winmar claims it is owed $1,790,096 plus $966,654 in interest,[11] for a total of $2,756,750. See Ex. A to Winmar's Supp. Post-Trial Brief. Winmar calculates the specific amounts owed by Al Jazeera as follows: $2,690,832 owed for work executed,[12] plus $24,500 in suspension fees, plus $75,222 in overhead and profit on work not executed, minus the $1,119,838 paid by Al Jazeera,[13] plus the $119,380 refund paid by Winmar, which equals $1,790,096.

---

[11]    Winmar claims both pre-judgment and post-judgment interest. In addition, Winmar's claim for $966,654 in pre-judgment interest is limited to the period from January 2006 through July 19, 2010, when it submitted its calculation of damages.

[12]    The Court calculated this subtotal by adding the figures listed in the column titled "WM Earned to Termination" for all Base Bid Line Items and all Change Orders in Exhibit A to Winmar's Supplemental Post-Trial Brief. Winmar claims this entire amount in Exhibit A as the amount it earned prior to termination. However, Winmar erred by including 100% of the overhead and fee portions for Change Order Nos. 4, 5, 6A, 6B, 6C, 7, 8, and 10 in this category, as portions of this work remained unfinished at the time of Al Jazeera's termination on January 11, 2006. The Court accounts for this error in its discussion of the amounts owed to Winmar. See infra n.33.

[13]    It should be noted that the parties' undisputed total amount that Al Jazeera paid Winmar, $1,119,838, does not equal the sum of the two payments Al Jazeera actually made. Rather, the $645,164 initial deposit and $474,677 payment for Payment Application No. 2 equal $1,119,841. Because the parties do not dispute the three-dollar difference, the Court accepts the undisputed $1,119,838 figure.
    In addition, Winmar lists the "Amount pd to Winmar" as $1,000,458 on Exhibit A to its Supplemental Post-Trial Brief. For the sake of consistency and clarity, the Court has broken this amount out into the separate $1,119,838 in payments made by Al Jazeera and the $119,380 refund paid by Winmar, the difference of which is $1,000,458.

49. Al Jazeera claims it is owed $262,146.50 by Winmar. Al Jazeera calculates the amount it is owed by Winmar as follows: the $1,119,838 paid to Winmar under the Contract, minus the $119,380 refund paid by Winmar, minus $713,811.50 due to Winmar under the Contract for work performed,[14] minus $24,500 in suspension fees, which equals $262,146.50. Supp. Brief of Al Jazeera at 10-11.

50. Winmar and Al Jazeera agreed in the Joint Pretrial Statement that Winmar is entitled to $24,500 in suspension fees under Section 14.3.1 of the General Conditions; $9,500 for Line Item No. 2 (Demolition); $0 for Line Item No. 9 (Equipment); $0 for Line Item No. 10 (Third Party Inspections); and $17,927 for Line Item No. 11 (Fire Protection). Winmar claims no costs incurred by reason of Al Jazeera's termination for convenience.

## CONCLUSIONS OF LAW

Winmar argues it is entitled to damages both under the common law because Al Jazeera did materially breach the Contract when it failed to deposit the progress payments into the escrow account, as well as under § 14.4.3 of the General Conditions for Al Jazeera's termination for convenience. As an initial matter, the facts established at trial make clear that Al Jazeera failed to deposit

---

[14] Al Jazeera lists the amounts due to Winmar for work performed as $672,604 for all Line Items under the base Contract, and $41,207.50 for all Change Orders, which totals 713,811.50. See Supp. Brief of Al Jazeera at 10-11. For the sake of consistency and clarity, the Court has added these figures to calculate the total amount Al Jazeera claims that Winmar is owed for work performed under the Contract.

the funds required under Article 5 of the Standard Form into Winmar's holding account after the Architect certified the Payment Applications. Section 5.1.2.4 of the Standard Form states that the owner's failure to make such progress payments constitutes a material breach of the contract. Thus, Al Jazeera materially breached the Contract when it failed to make those progress payments.

Section 5.1.2.4 gave Winmar a right to respond to that breach by immediately suspending or terminating the work with one day's notice. Section 14.1.1.3 of the General Conditions also gave Winmar the right to terminate the Contract for Al Jazeera's failure to make timely payments with seven days' notice. Winmar, in a good faith attempt to resolve the matter, delayed suspension of its work under § 5.1.2.4 until January 4, 2006. However, Winmar never gave Al Jazeera notice of its intent to terminate the Contract for lack of payment under § 14.1.1.3. As a result, the Contract was still in effect when Al Jazeera terminated it for convenience under § 14.4.1 of the General Conditions on January 11, 2006.[15]

The issue presented is therefore whether Al Jazeera's termination for convenience supplants Winmar's common law remedies

---

[15]    Winmar does not argue that Al Jazeera's termination for convenience is invalid because done in bad faith. See Krygoski Const. Co., Inc. v. United States, 94 F.3d 1537, 1541 (Fed. Cir. 1996) ("When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach.").

for Al Jazeera's prior material breach, or whether Winmar may sue for breach of contract even after Al Jazeera's termination for convenience. Termination for convenience clauses are typically included in construction contracts in order to permit the party receiving services to "unilaterally cancel its contractual obligations and still <u>avoid</u> committing a breach of contract which would expose it to damages." 2 Philip L. Bruner and Patrick J. O'Connor, Jr., <u>Bruner & O'Connor on Construction Law</u> § 5:270 (1st ed. 2002) (hereinafter "<u>Bruner & O'Connor on Construction Law</u>")(emphasis added). In other words, the provision gives the customer the power to cancel the contract without cause, an act that would normally constitute a breach, while affording the contractor some compensation but not a right to common law damages. <u>See</u> <u>id.</u> However, there is no indication that the termination for convenience clause is intended to permit a contracting party to escape damages for its material breaches of the contract committed <u>prior</u> to its termination for convenience.

In fact, the parties' Contract quite clearly states the opposite. Section 13.4.1 of the General Conditions provides that "[d]uties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law." Under the common law, "[e]very breach gives rise to a claim for damages, and may give

rise to other remedies." Restatement (Second) of Contracts § 236 (1981). Section 14.4.3 includes no language suggesting that the remedies it provides in the event of a termination for convenience are exclusive of a contractor's common law remedies for prior breaches of contract. Indeed, as the facts of this case demonstrate, it would be most inequitable to reach a contrary result since the wrongdoer who breached its contractual duties would easily escape liability for damages by terminating for convenience. Thus, the Court concludes that Winmar's common law remedies are not supplanted by Al Jazeera's termination for convenience. Cf. Phenix-Georgetown, Inc. v. Charles H. Tompkins Co., 477 A.2d 215, 224 (D.C. 1984).

However, Winmar may not recover doubly for the same losses by proceeding on two different theories--damages for breach of contract and damages under the termination for convenience provision. The Court will therefore consider the theories of recovery advanced by Winmar in more detail, and determine the proper measure of recovery.

Under breach of contract theory, a defendant is liable for such damages as are the natural consequence and proximate result of his conduct. Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 736-37 (D.C. 2000) (quotations and citation omitted). Under the parties' Contract, Section 14.4.3 provides that, in the event of a termination for convenience, Winmar is "entitled to

receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." Section 7.2 of the Standard Form provides that "[p]ayments due and unpaid under the Contract shall bear interest from the date payment is due at [12% simple interest]. . . ."

On July 6, 2010, this Court ordered the parties to submit supplemental briefing on the proper calculation of damages [Dkt. No. 63]. Winmar argued in its supplemental briefing that the "total actual damages"--including damages for breach of contract and for the termination for convenience--"should ultimately correspond to the value of the work in place with respect to the Project at the time of termination as well as all monies due pursuant to the terms of the termination for convenience provision in the parties' contract." Winmar's Supp. Post-Trial Brief at 1-2.

A claim for damages focuses on the loss to the plaintiff, whereas a claim for restitution focuses on the gain to the defendant. 22 Am. Jur. 2d Damages § 56 (2010). Winmar's breach of contract claim therefore is not technically a claim for damages resulting from Al Jazeera's failure to make the required progress payments. See 24 Williston on Contracts § 64:4 (4th ed. 2010) ("Where a contract calls for the payment of a definite sum of money, the measure of damages for breach of the contract is that sum of money together with legal interest.").

Instead, Winmar seeks restitution for the partial work performed, using the Architect's certifications as the best evidence of the value of the work in place at the time of termination. Restitution "has as its objective not the enforcement of contracts through the protection of a party's expectation or reliance interests but the prevention of unjust enrichment through the protection of his restitution interest. A party who has received a benefit at the expense of the other party to the agreement is required to account for it, either by returning it in kind or by paying a sum of money." Restatement (Second) of Contracts ch. 16, Introductory Note (1981). Under District of Columbia law, restitution is available for partial performance by a plaintiff of services under an express contract which has been breached by the defendant. Lee v. Foote, 481 A.2d 484, 486 (D.C. 1984); see also Harrington v. Trotman, 983 A.2d 342 (D.C. 2009).

The Court will therefore calculate the amount owed to Winmar for Al Jazeera's breach of contract by determining the value of the work in place at the time of Winmar's termination. It should be noted that, while the parties contest how much work Winmar performed prior to the January 11, 2006 termination, they agree that the value of the work should be measured by multiplying the percent of total work completed by the total Contract amount for that category of work. See Supp. Brief of Al Jazeera Intn'l at 10-

20; Winmar's Post-Trial Supp. Brief. The Court accepts this methodology in determining the value of the work completed.

The value of the work completed is the equivalent of the amount owed under § 14.4.3 for "payment for Work executed." See, e.g., In re Frischhertz Const. Co., Inc., Bankruptcy No. 05-21605, 2007 WL 2965049 (E.D.La. 2007) (unreported opinion) (determining that "payment for Work executed" under parties' contract was owed for work which was actually completed). Winmar is not entitled to double recovery for this amount, but is entitled to recovery for the value of the work performed under either theory of recovery. In addition to this amount, Section 14.4.3 provides that Winmar is entitled to compensation for any costs incurred as a result of the termination and reasonable overhead and profit on work not executed. Other provisions of the Contract permit recovery for suspension fees and pre-judgment and post-judgment interest.

The Court will first determine the amount of work performed by Winmar up until the time of termination, using the parties' agreed-upon formula to determine the value of that work. Next, the Court will turn to the remaining categories of damages claimed by Winmar under the parties' Contract. Because Winmar does not claim any costs incurred as a result of the termination, and because the parties do not dispute that $24,500 is due in suspension fees, these items need not be considered. Thus, the Court will focus on whether Winmar has carried its burden to prove compensation owed

for reasonable overhead and profit on work not executed and for pre-judgment and post-judgment interest.[16]

Under District of Columbia law, "a plaintiff need prove damages only with reasonable certainty." <u>Affordable Elegance Travel, Inc. v. Worldspan, L.P.</u>, 774 A.2d 320, 329 (D.C. 2001) (citing <u>Edmund J. Flynn Co. v. LaVay</u>, 431 A.2d 543, 549-50 (D.C. 1981)). "The trial court's award will be upheld as long as it is a just and reasonable estimate based on relevant data, even if it is not proven with mathematical precision." <u>Id.</u> (citations and internal quotations omitted). Thus, under either the common law or § 14.4.3, Winmar must show that it is entitled to recovery of the amount claimed "with reasonable certainty, leaving no room for speculation or guesswork." <u>Bender v. Williams</u>, 848 A.2d 590, 591 (D.C. 2004) (citation omitted).

**A.    Payment for Work Performed.**

Winmar first argues that it is entitled to no less than the amounts claimed in its certified Payment Applications minus payments made by Al Jazeera, or $1,363,463, for the period ending December 7, 2006. In support of its argument, Winmar contends that

---

[16]    As an initial matter, it must be noted that the parties were less than helpful, clear, consistent, or thorough in the presentation of their evidence. As the following analysis demonstrates, there are many gaps in the record where no evidence at all was presented as to certain material items. Most significantly, the parties' positions were far from clear and certainly not consistent as to what theory and/or what section of the Contract was being relied on to support their claims, and in a number of instances their numbers simply did not add up.

the Architect's December 7, 2005 certification of Payment Application Nos. 1, 2, 2b, and 3 are the best evidence of the extent of the work performed on the Project up until that point.

Under § 9.4.2 of the General Conditions of the parties' Contract, the certifications constitute the Architect's representation, "based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract documents." Thus, the Architect's certifications are evidence of the opinion held by the Architect--who was Al Jazeera's agent--of Winmar's progress on the Project.

These certifications were made close in time to the periods of work in dispute. In addition, the Architect acted as Al Jazeera's representative throughout the payment certification process. Thus, if there was any bias in the Architect's decision to certify the Payment Applications, it is reasonable to assume it would have been in Al Jazeera's favor. The evidence also showed that the Architect had inquired into Winmar's progress before certifying the Payment Applications, as discussed above.

The Court therefore accepts the certified Payment Applications as the most reliable evidence of the work completed by Winmar in the periods covered. See Jefferson Hotel Co. v. Brumbaugh, 168 F.

867 (4th Cir. 1909) (where construction contract made the architects the owner's supervising agents, but did not authorize the architects to issue a conclusive final certificate, an architect's certificate was prima facie evidence that the work had been performed according to the contract, placing the burden of proof on the owner to impeach the certificate). Al Jazeera bears the burden of rebutting the presumption of the certified Payment Applications' accuracy by presenting evidence that they were prepared incorrectly. However, Al Jazeera offered no evidence at trial showing how the Architect arrived at the decision to certify the Payment Applications.[17] Instead, Al Jazeera simply argued that the Architect's rescission of its certification for the Payment Applications means they lack any evidentiary significance. That argument fails to rebut the presumption that the certified Payment Applications were prepared correctly.

The Architect's subsequent rescission of certification of Payment Application Nos. 1, 2, 2b, and 3 does not alter the Court's conclusion that they are reliable and accurate evidence of the work completed by Winmar. The rescission for lack of documentation was not authorized under the Contract, see § 5.3.5 of the Standard Form, and therefore has no legal validity. For the same reasons, the Architect's March 20, 2006 rescission of his prior approval of

---

[17]     The Court has never been able to understand why neither party ever called the Architect to testify.

all of Winmar's certified Payment Applications and his conclusion that "Winmar has been over paid [sic] by the amount of $855,976" does not alter the Court's conclusion. JE 27 at 27-1. The Architect's rescission rested in large part on its conclusion "that Winmar is required to provide supporting information for all payment requests as a condition for receiving any payment." This conclusion is erroneous. Id. While the Architect might have required documentation from Winmar before certifying the Payment Applications, see § 5.1.4 of the General Conditions, there is no authority under the Contract to require such documentation after certifying the Payment Applications.

Finally, the fact that Winmar submitted two revised Payment Applications after Al Jazeera's termination for convenience does not alter the Court's conclusion. The two revised Payment Applications No. 3 were prepared by Villegas with the motive and intent of settling the parties' claims, and not as an accurate representation by Winmar of the work it believed was executed.[18]

Next, Al Jazeera seeks to rebut the certified Payment Applications in two ways: first, by pointing to a much lower estimate of the work completed prepared by its own expert and,

---

[18]    Although the Court concludes that the certified Payment Applications are, on the whole, the most reliable evidence of the work actually completed by Winmar up until December 7, 2005, the Court is mindful of certain discrepancies in Winmar's Payment Applications that contributed in part to the present dispute.

second, by pointing to alleged errors in the figures used by Winmar to calculate the amounts it claimed on the Payment Applications.

As to its first argument, Al Jazeera introduced testimony from Michael Etherton, Vice President of Mark G. Anderson Consultants, that in 2007, over a year after Winmar's termination, he prepared an evaluation of the work executed by Winmar on the Project. Etherton's evaluation estimated only 15-25% progress on several line items for which Winmar had claimed 70% progress on the Payment Applications. Etherton prepared his evaluation on the basis of his visits to the construction site shortly after Winmar's termination, the site logs kept by Winmar's site supervisor, photographs taken of the job site in late December 2005 by Francisco Tsai, the Architect's Project Manager, in the presence of Kris Collins of Mark G. Anderson Consultants, and additional photographs taken by Mark G. Anderson Consultants shortly after the January 11, 2006 termination for convenience.

Although Etherton had considerable experience as a professional estimator on construction projects, his testimony was impeached on cross examination on a number of issues. Winmar was able to show that several of his calculations were based on erroneous assumptions or miscategorizations of work under the Contract.[19] In addition, Etherton's evaluation, which estimated that

_____

[19]    For example, Etherton admitted on cross-examination that he erroneously concluded that Winmar was entitled to $0 in profits
(continued...)

Winmar completed only 25.55% of the work under the base contract, see JE 30, stands in sharp contrast to the evaluation prepared shortly after Winmar's termination by Kris Collins, also of Mark G. Anderson Consultants.[20] Collins estimated that Winmar had completed 50-60% of all work at the time of Al Jazeera's termination. Finally, over a year had passed between Winmar's termination from the Project and Etherton's evaluation, whereas Collins's evaluation was done shortly after the termination. For these reasons, the Court is not persuaded that Etherton's evaluation was more reliable regarding Winmar's progress than the Architect's contemporaneous certifications of completion.[21]

As to its second argument, Al Jazeera also introduced evidence seeking to show that certain work that Winmar represented was completed at the end of each period covered in the Payment Applications was not, in fact, completed. However, as noted above, Al Jazeera produced no evidence at trial to show how the Architect decided to certify Winmar's Payment Applications. In the absence of

---

[19](...continued)
and fees on unexecuted work under § 14.4.3, that he based his estimate of Winmar's progress on the documented costs to Winmar, despite the fact that the Contract was a lump-sum contract, and that he misinterpreted the categories of work covered in Line Item Nos. 4 and 5, which led to potentially erroneous estimates.

[20]    As with the Architect, it is reasonable to assume that if there was any bias in Collins's estimate, it would have been in Al Jazeera's favor since he was working for Al Jazeera's consultant.

[21]    Etherton's demeanor during his testimony also raised strong doubts about his credibility.

any evidence from Al Jazeera that the Architect neglected its duties under the Contract in making the certification decisions, the certified Payment Applications are the most reliable evidence of the services performed by Winmar in the periods covered. Bearing this in mind, the Court will address each category of work in turn.

### 1.    Line Item No. 1 - General Conditions.

Winmar claims 77% (or $62,986) of the total contract amount of $81,800 for Line Item No. 1 - General Conditions, which includes charges for administrative costs. The parties agree that the proper method of measuring the work completed under Line Item No. 1 is to take the number of days that Winmar spent working on the Project and divide it by the total number of days between the commencement of work and the termination for convenience on January 11, 2006. Using this methodology, Winmar calculates its claim by taking the number of days it spent on the Project, which is 98[22] (from the October 5, 2005 Letter of Intent to the January 11, 2006

_____

[22]    Winmar counted 99 days from October 5, 2005 to January 11, 2006, which is consistent with its apparent approach of including March 1, 2006 as a day within the Contract period. Al Jazeera, in contrast, did not include March 1, 2006 in its count. Section 3.2 of the Standard Form states that "[t]he Contractor shall achieve Substantial Completion of the entire Work . . . as follows: Substantial Completion Date March 1, 2006." Because substantial completion means "the date on which all material elements of the work are sufficiently complete in conformance with the contract so that the owner can use the work for its intended purpose," the Court concludes that Al Jazeera's approach is correct, and that the work was to be completed by March 1, 2006 so that Al Jazeera could use it on that date. Bruner & O'Connor on Construction Law § 15:15. Winmar's calculations have therefore been adjusted.

termination for convenience), and dividing that by 129, which is the total number of days between the commencement of work on October 16, 2005 and the termination for convenience on January 11, 2006. See Winmar's Supp. Post-Trial Brief, Ex. A.

As noted earlier, both parties have erroneously counted the number of days between October 16, 2005, the date on which Winmar began work, and March 1, 2006, the contractually agreed upon date for substantial completion, as 129. The total number of days between October 16, 2005 and March 1, 2006 is 136.

Even accounting for this error, it is not clear why Winmar would use 129 as the denominator in its calculation when it claims the period in which it incurred costs for General Conditions started on October 5, 2005. The period between October 5, 2005 and March 1, 2006 includes 147 days. The mathematically correct calculation, using Winmar's own method, is thus 98/147, which is rounded to 67%, or $54,806.

Al Jazeera claims that Winmar is due only 67%, not 77% as Winmar claims, for Line Item No. 1. Al Jazeera uses the same methodology that Winmar does, but includes only 87 days spent on the Project, beginning on October 16, 2005--the actual date that Winmar began work--and ending on January 11, 2006, rather than Winmar's 98 days. Al Jazeera's calculation is based on the same flawed count of 129 days between October 16, 2005 and March 1, 2006. The proper calculation is therefore 87/136, which is rounded

to 64%, or $52,352.

The Court concludes that Al Jazeera is correct in assuming that work started on October 16, 2005. There is no evidence in the record that Winmar executed any work between October 5, 2005--when Al Jazeera approved its Letter of Intent--and October 16, 2005, which the parties agree was the date that Winmar's work actually began. See Jt. Pretrial Stmt. [Dkt. No. 57] at 22, 32. Thus, Winmar is entitled to **$52,352** for Line Item No. 1 - General Conditions.

### 2.   Line Item No. 2 - Demolition/Sitework.

The parties agree that Winmar is entitled to 100%, or **$9,500**, for Line Item No. 2.

### 3.   Line Item No. 3 - Concrete.

Winmar claims 70% of the Contract Amount of $12,655 for Line Item No. 3 - Concrete, or $8,858. This claim is based on the Architect's certification of this amount in Payment Application Nos. 2 and 3.[23] Al Jazeera claims that Winmar is entitled to $0, pointing to the fact that the parties agreed on this amount in their Joint Pretrial Statement. See Jt. Pretrial Stmt. at 10.

"A party's failure to advance a theory of recovery in a pretrial statement issued following discovery conference constitutes waiver of that theory." Gregory v. Shelby County, Tenn., 220 F.3d 433, 442-43 (6th Cir. 2000); see also McCarthy v.

---

[23]   The Architect certified 10%, or $1,266, in Payment Application No. 2 and an additional 60%, or $7,593, in Payment No. 3.

Lerner Stores Corp., 9 F.R.D. 31 (D.D.C. 1949). The purpose of the pretrial statement is to narrow the issues and to put both the Court and the parties on notice of which issues of fact and law are in dispute. The Court, as well as the parties, are entitled to rely on the representations made in the pretrial statement in order to be fully prepared for trial.

Winmar failed to advance a theory of recovery in the Joint Pretrial Statement for Line Item No. 3 when it conceded it was not entitled to any recovery at all. In addition, Winmar raised no objection at trial to the Court's admission of paragraph 72 of Al Jazeera's proposed findings of fact, which states that "Winmar and Al Jazeera have agreed that Winmar is entitled to $0 for Line Item No. 3 of the Contract, Concrete." Jt. Pretrial Statement at 43. Thus, Winmar has waived its claim for monies owed under Line Item No. 3. The Court therefore concludes that Winmar is entitled to **$0**.

### 4. Line Item No. 4 - Rough & Finish Carpentry.

Winmar claims 49% of the Contract Amount of $36,525 for Line Item No. 4 - Rough & Finish Carpentry, or $17,897. This claim is based on the Architect's certification of 25% due in Payment Application No. 2, as well as testimony from Condon that additional work had been executed in the period from December 7, 2005 to January 11, 2006, which was not included in the Architect's certifications.

Al Jazeera claims that Winmar is entitled to 15% of Line Item

No. 4, or $5,749, based upon its presentation of evidence at trial, including the photographs in Joint Exhibits 2 and 3. The Court did not find this evidence convincing.

The Architect's certification of 25% work completed for Line Item No. 4 is the most reliable evidence of the work done between October 16, 2005 and December 7, 2005. The Court therefore concludes that Winmar is entitled to 25% of Line Item No. 4 - Rough & Finish Carpentry for this period, which is **$9,153**. Whether Winmar is entitled to additional damages for work completed from December 7, 2005 through January 11, 2006 will be discussed below in Section A.26.

### 5. Line Item No. 5 - Doors, Frames & Misc.

Winmar claims that it is entitled to payment for 70% of the Contract Amount of $115,623 for Line Item No. 5 - Doors, Frames & Misc., or $80,936. This claim is based on the Architect's certification for payment of 70% of the Contract Amount in Payment Application Nos. 2 and 3 and on the evidence introduced at trial.[24]

Al Jazeera claims that Winmar is entitled to $0, pointing to the fact that the parties agreed on this amount in their Joint Pretrial Statement. See Jt. Pretrial Stmt. at 11. As discussed above, Winmar waived any claims for recovery not raised in the Joint Pretrial Statement. In addition, Winmar raised no objection

---

[24] The Architect certified 10%, or $11,562, in Payment Application No. 2 and an additional 60%, or $69,374, in Payment No. 3.

at trial to the Court's admission of paragraph 74 of Al Jazeera's proposed findings of fact, which states that "Winmar and Al Jazeera have agreed that Winmar is entitled to $0 for Line Item No. 5 of the Contract, Doors, Frames & Misc." Jt. Pretrial Statement at 44. Because Winmar failed to advance a claim under Line Item No. 5 in the Joint Pretrial Statement or at trial, the Court concludes that Winmar is entitled to **$0**.

**6.    Line Item No. 6 - Drywall, Partitions & Framing.**

Winmar claims that it is entitled to 75% of the Contract Amount of $156,215 for Line Item No. 6 - Drywall Partitions & Framing, or $117,161. This claim is based on the Architect's certification of payment for 70% of the Contract Amount in Payment Application Nos. 2 and 3, and on the evidence introduced at trial of work completed on the Project from December 7, 2005 through January 11, 2006, which was not included in the Architect's certifications.

Al Jazeera claims that Winmar is entitled to 25%, which is $39,054, for Line Item No. 4, based upon its presentation of evidence at trial, including the photographs in Joint Exhibits 2 and 3. The Court did not find this evidence convincing.

The Architect's certification of 70% work completed for Line Item No. 6 is the most reliable evidence of what work was done between October 16, 2005 and December 7, 2005. The Court therefore concludes that Winmar is entitled to 70% of Line Item No. 6 -

Drywall Partitions & Framing for this period, which is **$109,351.**
Whether Winmar is entitled to additional damages for work completed
from December 7, 2005 through January 11, 2006 will be discussed
below in Section A.26.

### 7.    Line Item No. 7 - Carpet.

Winmar claims that it is entitled to payment for 10% of the
Contract Amount of $43,915 for Line Item No. 7 - Carpet, or $4,392.
This claim is based on the Architect's certification for payment of
10% of the Contract Amount in Payment Application No. 2 and on the
evidence introduced at trial that the carpet had been ordered prior
to December 7, 2005.

Al Jazeera claims that Winmar is entitled to $0, pointing to
the fact that the parties agreed on this amount in their Joint
Pretrial Statement. See Jt. Pretrial Stmt. at 11. As discussed
above, Winmar waived any claims for recovery not raised in the
Joint Pretrial Statement. In addition, Winmar raised no objection
at trial to the Court's admission of paragraph 76 of Al Jazeera's
proposed findings of fact, which states that "Winmar and Al Jazeera
have agreed that Winmar is entitled to $0 for Line Item No. 7 of
the Contract, Carpet." Jt. Pretrial Statement at 44. Because Winmar
failed to advance a claim under Line Item No. 7 in the Joint
Pretrial Statement or at trial, the Court concludes that Winmar is
entitled to **$0.**

### 8.    Line Item No. 8 - Painting.

Winmar claims that it is entitled to payment for 70% of the Contract Amount of $10,115 for Line Item No. 8 - Painting, or $7,081. This claim is based on the Architect's certification for payment of 70% of the Contract Amount in Payment Application Nos. 2 and 3 and on the evidence introduced at trial.[25]

Al Jazeera claims that Winmar is entitled to $0, pointing to the fact that the parties agreed on this amount in their Joint Pretrial Statement. <u>See</u> Jt. Pretrial Stmt. at 11. As discussed above, Winmar waived any claims for recovery not raised in the Joint Pretrial Statement. In addition, Winmar raised no objection at trial to the Court's admission of paragraph 77 of Al Jazeera's proposed finding of fact, which states that "Winmar and Al Jazeera have agreed that Winmar is entitled to $0 for Line Item No. 8 of the Contract, Painting." Jt. Pretrial Statement at 44. Because Winmar failed to advance a claim under Line Item No. 8 in the Joint Pretrial Statement or at trial, the Court concludes that Winmar is entitled to **$0.**

### 9. Line Item No. 9 - Equipment.

Winmar makes no claim for Line Item No. 9.

### 10. Line Item No. 10 - Third Party Inspections.

Winmar makes no claim for Line Item No. 10.

### 11. Line Item No. 11 - Fire protection.

---

[25] The Architect certified 10%, or $1,012, in Payment Application No. 2 and an additional 60%, or $6,069, in Payment No. 3.

Winmar claims that it is entitled to payment of 70% of the Contract Amount of $53,515 for Line Item No. 11 - Fire Protection, or $37,461. This claim is based on the Architect's certification for payment of 70% of the Contract Amount in Payment Application Nos. 2 and 3 and on the evidence introduced at trial.[26]

Al Jazeera claims that Winmar is entitled to $17,927, pointing to the fact that the parties agreed on this amount in their Joint Pretrial Statement. <u>See</u> Jt. Pretrial Stmt. at 11. As discussed above, Winmar waived any claims for recovery not raised in the Joint Pretrial Statement. In addition, Winmar raised no objection at trial to the Court's admission of paragraph 80 of Al Jazeera's proposed finding of fact, which states that "Winmar and Al Jazeera have agreed that Winmar is entitled to $17,927 for Line Item No. 11 of the Contract, Fire Protection." Jt. Pretrial Statement at 44. Because Winmar represented in the Joint Pretrial Statement and at trial that it would not dispute that it is owed $17,927 for work completed under Line Item No. 11, its current claim for $37,461 is rejected. The Court therefore concludes that Winmar is entitled to **$17,927.**

> **12. Line Item Nos. 12 and 13 - Plumbing and HVAC.**[27]

---

[26] The Architect certified 33%, or $17,477, in Payment Application No. 2 and an additional 37%, or $19,984, in Payment Application No. 3.

[27] In its Supplemental Post-Trial Brief, Winmar combined Line Item Nos. 12 - Plumbing and 13 - HVAC into one category of (continued...)

Winmar claims that it is entitled to payment of 70% of the combined Contract Amount of $708,257 for Line Item No. 12 - Plumbing and Line Item No. 13 - HVAC, or $480,418. This claim is based on the Architect's certification for payment of 100% of the Contract Amount of $21,945 for Plumbing and 70% of the Contract Amount of $686,312 for HVAC in Payment Application Nos. 2, 2b, and 3 and on the evidence introduced at trial.[28]

Al Jazeera claims that Winmar is entitled to $0 for Line Item No. 12 - Plumbing on the theory that title must pass to Al Jazeera for work to be considered "executed" under § 14.4.3 and, alternatively, based on the testimony of Bradlee Bolino from John J. Kirlin, Inc. that no plumbing work was done.

Al Jazeera relies on § 9.3.3 of the General Conditions, which states that "[t]he Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment." Al Jazeera interprets this provision to mean that passage of title is a precondition to payment. In other words, Al Jazeera argues that Winmar must pass

[27](...continued)
work, for which it claims 70% of the total Contract Amount.

[28]    The Architect certified 100%, or $21,946, for Line Item No. 12 and 32%, or $222,631, for Line Item No. 13 in Payment Application No. 2. The Architect also certified an additional 8%, or $57,936, for Line Item No. 13 in Payment Application No. 2b and an additional 29%, or $199,851, in Payment Application No. 3. Thus, the Architect certified total payment due of $502,364 for Line Item Nos. 12 and 13. Winmar has not explained why it seeks a lesser amount here.

title to Al Jazeera in order to receive payment. However, Section 9.3.3 simply states that, upon payment for Winmar's work, title shall pass to Al Jazeera. It does not make passage of title a precondition to payment. See Bruner & O'Connor on Construction Law § 5:169.

In addition, Article 5 of the Standard Form makes clear that Winmar's Payment Applications were to be based on its estimate of the amounts needed for the coming month. Section 5.1.2.2 states that the "Owner agrees to deposit each Monthly Estimated Draw with an escrow agent selected by the Contractor ("Escrow Agent") on or before the last day of the month prior to month [sic] the Monthly Estimated Draw is actually incurred by the Contractor." The Contract also clearly states that "[a]ny inconsistency in the Contract Documents shall be resolved by giving precedence to" the Standard Form over the General Conditions. Thus, even if Al Jazeera's interpretation of § 9.3.3 were accepted, it would conflict with Article 5 of the Standard Form, which takes precedence.

In any event, there is nothing in the parties' Contract to suggest that payment for "Work executed" under § 14.4.3 is to be calculated by reference to Article 9, which sets forth the procedures for making payment applications to the Architect for "operations completed." More significantly, the provision has no application at all to Winmar's restitution claim, which is based on

the value of the services performed.

Finally, to the extent that Al Jazeera makes this argument in order to rebut the presumption of accuracy and reliability given to the certified Payment Applications by suggesting that they were prepared incorrectly, it is rejected. As discussed above, there is reason to doubt whether § 9.3.3 applies because it appears to conflict with Article 5 of the Standard Form. More importantly, there is no evidence in the record as to how the Architect justified its decision to certify the Payment Applications. In the absence of such evidence, the presumption of accuracy and reliability given to the certified Payment Applications is not rebutted.

Furthermore, the Court is not persuaded by Bolino's testimony that no plumbing work was done in light of the Architect's certification and the extensive credible testimony from Chris Condon of Winmar, based on his review of the photographs in Joint Exhibits 2 and 3, that the labor-intensive portions of the HVAC and plumbing work were, in fact, completed. Thus, as Winmar claims a lesser amount than that certified by the Architect, the Court concludes it is entitled to its claim for **$480,418.**

### 13.  Line Item No. 14 - Electrical & Fire Alarm.

Winmar claims that it is entitled to 70% of the Contract Amount of $865,955 for Line Item No. 14 - Electrical & Fire Alarm, or $606,169. This claim is based on the Architect's certification

of payment for 70% of the Contract Amount in Payment Application Nos. 2, 2b, and 3 and on the other evidence introduced at trial.[29]

Al Jazeera claims Winmar is entitled to 25%, which is $216,489, for Line Item No. 14 based upon its presentation of evidence at trial, including the photographs in Joint Exhibits 2 and 3.

The Architect's certification of 70% of work completed for Line Item No. 14 is the most reliable evidence of what work was done on the Project. The Court therefore concludes that Winmar is entitled to 70% of Line Item No. 14 - Electric and Fire Alarm, which is **$606,169.**

### 14. **Line Item No. 15 - General Conditions Overhead and Fee**

Winmar claims that it is entitled to 100% of the Contract Amount of $250,740 for Line Item No. 15 - General Conditions Overhead and Fee. This claim is based on the Architect's certification of payment for 70% of the Contract Amount in Payment Application Nos. 2 and 3 and Winmar's interpretation of "reasonable overhead and profit" in § 14.4.3.

Line Item No. 15 - General Conditions Overhead and Fee does not cover work that was to be completed on the Project, but is rather a separate allotment in the base contract for profits and

---

[29]    The Architect certified 52%, or $451,056, in Payment Application Nos. 2 and 2b and an additional 18%, or $155,113, in Payment No. 3.

fees. Al Jazeera concedes that Winmar is entitled to a portion of Line Item 15, to be calculated by taking the percent of work completed on Line Items 1-14 and multiplying it by the Contract Amount of $250,740 for overhead and fee. Supp. Brief of Al Jazeera at 16.

As discussed, the Court concludes that Winmar is entitled to a total payment of $1,284,870 for work completed under Line Item Nos. 1-14, which is 61% of the total base contract amount of $2,100,875 for Line Item Nos. 1-14. The Court therefore concludes that Winmar is entitled to 61% of Line Item No. 15, or **$153,350**, for work completed. The remainder of Winmar's claims for overhead and fee on work not executed are considered separately as claims for "reasonable overhead and profit" under § 14.4.3.

### 15.  Change Order #1 - Trane Multistack Chiller

Winmar claims that it is entitled to payment of 100% of the $157,000 Contract Amount for Change Order No. 1 - Trane Multistack Chiller, or $157,000. Change Order No. 1 was issued to furnish and install a Trane Multistack Chiller, which is a large air conditioning unit for the building's central cooling system. JE 5 at 5-1. The Architect certified that 100% of this amount was due in Payment Application No. 2 for work ending October 31, 2005.

Al Jazeera relies on § 9.3.2 of the General Conditions, which states that "[u]nless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment

delivered and suitably stored at the site for subsequent incorporation in the Work." Al Jazeera argues, based on this provision, that Winmar is entitled to $0 because the Trane Multistack Chiller was not delivered to the job site while Winmar was on the Project.

First, as noted above, Article 5 of the Standard Form, which sets forth the procedures for progress payments, takes precedence over conflicting provisions of the General Conditions. Second, nothing in the Contract indicates that payment for "Work executed" under § 14.4.3 is to be calculated by reference to Article 9. Third, regardless of the application of § 9.3.2, Winmar is still entitled to the value of services performed for its restitution claim.

Finally, Al Jazeera's argument fails to adequately rebut the presumption of accuracy and reliability given to the certified Payment Applications. While § 9.3.2 provides that payment shall generally be made upon delivery and/or storage of equipment at the work site, it also makes clear that there are exceptions to that rule: for example, if "otherwise provided in the Contract Documents" or if advance approval is given by Al Jazeera. Al Jazeera has offered no evidence of the Architect's reasons for certifying the Payment Applications, including why the Architect chose to certify payment when equipment was allegedly not delivered or stored on site. In the absence of such evidence, Al Jazeera's

efforts to discredit the certified Payment Applications must be rejected.[30]

The Architect's certification of 100% of work completed for Change Order No. 1 is the most reliable evidence of what work was done on the Project. The Court therefore concludes that Winmar is entitled to **$157,000.**

### 16.  Change Order No. 2 - Premium Time

Winmar claims it is entitled to payment of 100% of the $365,135 Contract Amount for Change Order No. 2 - Premium Time. This claim is based on the Architect's certification for payment of 100% of the Contract Amount in Payment Application Nos. 2 and 3 and on the other evidence at trial.[31]

Al Jazeera argues that Winmar is limited to $225,000 in premium time because the October 11, 2005 Change Order,[32] which predates the Contract and also predates Change Order No. 2, was limited to that amount, see JE 5 at 5-2. This argument fails

_____

[30]    It should be noted that Condon testified credibly that the Trane Multistack Chiller was ordered by Winmar, and that Winmar paid a $120,000 deposit required by John J. Kirlin. Condon also stated that, although Payment Application No. 2 was sent on October 20, 2005, by the time it was certified on December 7, 2005 all materials referenced in it were either on site or had been ordered through vendors. Al Jazeera offered no conflicting evidence on this point.

[31]    The Architect certified 62%, or $225,000, in Payment Application No. 2 and an additional 38%, or $140,135, in Payment No. 3.

[32]    This Change Order pre-dated the signing of the Contract, and therefore has no number.

-48-

because the Monthly Cash Flow Projection Sheet, which was incorporated into the Contract, specifically states that the Total Contract Amount is the base contract amount of $2,351,615, plus $522,135 for change orders #1 and #2. Because Change Order No. 1 - Trane Multistack Chiller is for $157,000, Change Order No. 2 - Premium Time is, as a matter of logic, $522,135 minus $157,000, which is $365,135.

Next, Al Jazeera argues that Winmar is limited to only $17,000 because that is all that Kirlin invoiced, see Al Jazeera's Exhibit 18. However, the evidence established that Winmar's claim for 100% of Change Order No. 2 was based on overtime performed by multiple sub-contractors, as well as by Winmar employees. The Architect's certification of payment for 100% of the agreed-upon amount for overtime work is the most reliable evidence of the overtime worked, especially given the credible testimony that Winmar was under substantial time pressure because of Al Jazeera's multiple design changes. Thus, the Court concludes that Winmar is entitled to payment of 100% of the Contract Amount for Change Order No. 2 - Premium Time, or **$365,135.**

### 17. Change Order No. 3 - Buckhoist

Winmar claims it is entitled to payment of 77% of the $48,415 Contract Amount for Change Order No. 3 - Buckhoist, or $37,280. Change Order No. 3 was issued for a buckhoist, which is a temporary elevator attached to the outside of the building used to lift heavy

materials. Winmar bases its claim on the Architect's certification for payment of 50% of the Contract Amount in Payment Application No. 1 and on Condon's testimony that the buckhoist was provided for three of the four months of work under the Contract.

Al Jazeera claims Winmar is entitled to 50%, which is $24,207.50, for Change Order No. 3 based upon its presentation of evidence at trial which shows that Winmar provided the buckhoist for only two months (November 11, 2005 - January 13, 2006). See Al Jazeera Exhibits 16, 23, 35, 36 and 37.

The Architect's certification of payment for 50% of the agreed-upon amount is the most reliable evidence of the work completed under Change Order No. 3 by December 7, 2005. The invoices from Millstone Enterprises, Inc., the sub-contractor who provided the buckhoist, and the checks made out to Millstone by Winmar, see Al Jazeera Exhibits 16, 23, 35, 36, and 37, lend support to the finding that the buckhoist was provided by Winmar for two months, not three. Thus, the Court concludes that Winmar is entitled to payment of 50% of the Contract Amount for Change Order No. 3, or **$24,207.50.**

### 18. Change Order No. 4 - UPS Changed Spec

Winmar claims that it is entitled to payment of 80% of the $48,355 Contract Amount for Change Order No. 4 - UPS Changed Spec,

or $38,684.[33] Change Order No. 4 was issued to furnish and install a Liebert Uninterrupted Power Source, which is an electrical apparatus that provides an emergency power source. The Architect certified that 80% of the Contract Amount was due in Payment Application No. 1.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 4 because the equipment was neither installed nor delivered to the construction site. As discussed above, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$38,684.**

### 19.  Change Order No. 5 - Generator

Winmar claims that it is entitled to payment of 70% of the $93,447 Contract Amount for Change Order No. 5 - Generator, or $65,413. This claim is based on the Architect's certification for payment of 70% of this amount in Payment Application No. 1.

---

[33]    The Contract Amounts Winmar lists for Change Order Nos. 4, 5, 6A, 6B, 6C, 7, 8, and 10 in Exhibit A to its Supplemental Post-Trial Brief are not equal to the "scheduled value" listed in the certified Payment Application No. 1 or in the Contract because Winmar has separated the overhead and fee portion of the scheduled value, for which it claims 100% is due under § 14.4.3. Because the Court addresses Winmar's § 14.4.3 claims for reasonable overhead and profit on work <u>not</u> executed separately from its claims for payment for work completed, it relies on the scheduled values in the Contract in its discussion of the amount due for work completed for these change orders.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 5 because the equipment was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$65,413**.

### 20. Change Order No. 6A - Steel Dunnage

Winmar claims that it is entitled to payment of 60% of the $152,515 Contract Amount for Change Order No. 6 - Steel Dunnage, or $91,509. Change Order No. 6A was issued to furnish and install steel dunnage, which is a structural support platform, on the building's roof in preparation for installation of the HVAC system. Winmar's claim is based on the Architect's certification for payment of 60% of the Contract Amount in Payment Application No. 1.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 6A because the equipment was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute

reliable and accurate evidence of the work performed.[34] Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$91,509**.

### 21. Change Order No. 6B - Fuel Tank and Equipment and Additional Piping

Winmar claims that it is entitled to payment of 55% of the $81,625 Contract Amount for Change Order No. 6B - Fuel Tank, or $44,894. Winmar's claim is based on Condon's testimony at trial that this was the number agreed upon at the January 11, 2006 meeting.

As has already been discussed, there was no agreement reached at the January 11, 2006 meeting. In addition, Condon testified that Winmar never ordered the equipment because Change Order No. 6B was never signed, as is required under § 7.2.1 of the General Conditions, and that no work was performed apart from "due diligence". Thus, the Court concludes that Winmar has failed to prove that it is entitled to $44,894 for Change Order No. 6B, and therefore is entitled to **$0**.

### 22. Change Order No. 6C - Revised MEP Plans #1

Winmar claims that it is entitled to payment of 90% of the $37,385 Contract Amount for Change Order No. 6C - Revised MEP Plans

---

[34]     In addition, Condon testified credibly that, although the equipment was never delivered or installed, the amount claimed is attributable to payments made to a sub-contractor of John J. Kirlin, Inc. for shot drawings and equipment.

#1, or $33,647. Change Order No. 6C was issued for "[s]heet metal and insualtion [sic], per new plans Re-dsign [sic] time for new lay-out and configuration." JE 5 at 5-11. Winmar's claim is based on the Architect's certification for payment of 90% of the Contract Amount in Payment Application No. 1 and on other evidence at trial.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 6A because the work was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. In addition, Condon testified credibly that the work required under Change Order No. 6C was installed.

In light of this testimony, and because the Architect's certification of payment for 90% of the Contract Amount is the most reliable evidence of the value of the work done by Winmar under Change Order No. 6C, the Court concludes that Winmar is entitled to **$33,647.**

### 23. Change Order No. 7 - Sprinklers

Winmar claims that it is entitled to payment of 50% of the $33,523 Contract Amount for Change Order No. 7 - Sprinklers, or $16,762. Winmar's claim is based on the Architect's certification for payment of 50% of the Contract Amount in Payment Application No. 1.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 7 because the equipment was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$16,762.**

### 24. Change Order No. 8 - Glass

Winmar claims that it is entitled to payment of 24% of the $20,467 Contract Amount for Change Order No. 8 - Glass, or $5,000. Winmar's claim is based on the Architect's certification for payment of 24% of the Contract Amount in Payment Application No. 1.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 7 because the equipment was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$5,000.**

### 25. Change Order No. 10 - Electrical Revisions

Winmar claims that it is entitled to payment of 65% of the $302,238 Contract Amount for Change Order No. 10 - Electrical Revisions, or $196,455. Winmar's claim is based on the Architect's certification for payment of 65% of the Contract Amount in Payment Application No. 1.

Al Jazeera argues that Winmar is entitled to $0 under Change Order No. 7 because the equipment was neither installed nor delivered to the construction site. For the reasons given above in the discussion of Change Order No. 1, this argument fails to rebut the presumption that the certified Payment Applications constitute reliable and accurate evidence of the work performed. Because the Architect's certification of Payment Application No. 1 is the most reliable evidence of the work performed, the Court concludes that Winmar is entitled to **$196,455.**

### 26. Payment for Work Completed Between December 7, 2005 and January 11, 2006

The Architect's certifications offer no evidence of what work was executed by Winmar on Line Item Nos. 4 (Rough & Finish Carpentry) and 6 (Drywall Partitions & Framing) between December 7, 2005--the end of the period covered in the Payment Applications--and January 11, 2006, when Winmar was terminated for convenience. By the Court's own calculation, Winmar claims $16,554 for the work completed in that period.[35]

---

[35] The Court based its calculation on the spreadsheet
(continued...)

Winmar relies on the testimony of Chris Condon that it had completed approximately 80% of Line Item No. 4 on the seventh floor, 15% of Line Item No. 4 on the fourth floor, and 5% of Line Item No. 4 on the first floor by January 11, 2006. Condon also testified that Winmar had completed 75% of Line Item No. 6 by January 11, 2006. Condon based his testimony on his considerable knowledge of the work done on the construction site, as well as careful explanations of the photographs contained in Joint Exhibits 2 and 3. The Court finds his testimony credible, and concludes that Winmar has proven that it is entitled to an additional amount of **$16,554** for work completed on Line Item Nos. 4 and 6 for the period from December 7, 2005 to January 11, 2006.

Thus, Winmar has met its burden to prove, with reasonable certainty, that a total of **$2,448,586.50** is due for the value of the work performed on the Project at the point of termination:

---

[35](...continued)
attached as Exhibit A to Winmar's Supplemental Post-Trial Brief. Specifically, Winmar claims an additional 24% of work completed beyond the 25% previously certified for the earlier period by the Architect, or $8,744, for Line Item No. 4 - Rough & Finish Carpentry and an additional 5% of work completed beyond the 70% previously certified for the earlier period by the Architect, or $7,810, for Line Item No. 6 - Drywall Partitions & Framing. See Ex. A to Winmar's Supp. Post-Trial Brief.

| Line Item No. | Amount Owed Under Section 14.4.3 |
|---|---|
| 1 | $52,352.00 |
| 2 | $9,500.00 |
| 3 | $0.00 |
| 4 | $9,153.00 |
| 5 | $0.00 |
| 6 | $109,351.00 |
| 7 | $0.00 |
| 8 | $0.00 |
| 9 | $0.00 |
| 10 | $0.00 |
| 11 | $17,927.00 |
| 12 & 13 | $480,418.00 |
| 14 | $606,169.00 |
| 15 | $153,350.00 |
| | |
| Change Order No. | |
| 1 | $157,000.00 |
| 2 | $365,135.00 |
| 3 | $24,207.50 |
| 4 | $38,684.00 |
| 5 | $65,413.00 |
| 6A | $91,509.00 |
| 6B | $0.00 |
| 6C | $33,647.00 |
| 7 | $16,762.00 |
| 8 | $5,000.00 |
| 10 | $196,455.00 |
| | |
| Period from 12/7/05 - 1/11/06 | $16,554.00 |
| TOTAL: | $2,448,586.50 |

**B. Reasonable Overhead and Profit on Work Not Executed**

The parties also dispute the amount of overhead and profit on the unexecuted work to which Winmar is entitled under § 14.4.3. Winmar claims that it is owed approximately $125,000,[36] which is the

_____

[36]    Winmar claims that "[t]otal overhead and fee on this Project, left unpaid at the time of termination is $211,483."
(continued...)

-58-

sum of the remaining amount in Line Item No. 15 - General
Conditions Overhead & Fee of the Contract and any remaining
portions of the overhead and fee components broken out by Winmar in
Change Order Nos. 4, 5, 6A, 6B, 6C, 7, 8, and 10.

Al Jazeera contends that those "overhead and fee" provisions
do not constitute "reasonable overhead and profit" under § 14.4.3
because the former includes a general fee not recoverable under the
latter provision. Specifically, Al Jazeera argues that:

> Winmar's Overhead and Fee Claims [] fail as a
> matter of law because the amount of its
> 'overhead' is never separately broken out from
> its 'fee' and because 'profit' within the
> meaning of Section 14.4.3 is not synonymous
> with 'fee.' A fee is simply an amount charged,
> whereas lost profits are the difference
> between gross income and the costs or expenses
> that had to be expended to produce that
> income.

Supp. Brief of Al Jazeera at 4-5. Winmar has made no response to
this legal argument, which Al Jazeera raised at trial.

In fact, Winmar's only argument offered to prove "reasonable
overhead and profit" is that "the overhead and fee amounts were
agreed to by the parties as part of the base contract and on the
approved change orders." Winmar's Supp. Post-Trial Brief at 2.
Winmar's burden to prove its damages under § 14.4.3 requires more

---

[36](...continued)
Winmar's Post-Trial Supp. Brief at 2. The Court has already
determined that portions of this total overhead and fee amount are
owed for work which has been executed, supra Section I.A.14. The
"reasonable overhead and profit" to which Winmar is entitled under
§ 14.4.3, however, is for unexecuted work.

than this. Winmar has not offered any persuasive legal arguments explaining why the "reasonable overhead and profit" it is entitled to under § 14.4.3 should be interpreted as the agreed-upon Contract Amount for "Overhead and Fee."[37] See, e.g., Vector Realty Grp., Inc. v. 711 Fourteenth Street, Inc., 659 A.2d 230, 234 (D.C. 1994) (evidence offered in support of damages must form an adequate basis for a reasoned judgment) (citation omitted). The Court therefore concludes that Winmar has not carried its burden with respect to proving the reasonable overhead and profit it is due under § 14.4.3.

### C. Pre-Judgment and Post-Judgment Interest

Finally, Winmar claims both pre-judgment and post-judgment interest on its damages. Section 7.2 of the Standard Form provides: "[p]ayments due and unpaid under the Contract shall bear interest from the date payment is due at [12% simple interest]. . . ."

Al Jazeera does not deny that § 7.2 of the Standard Form applies to Winmar's damages claims, but instead argues that D.C. Code § 15-108 governs the Contract. Supp. Brief of Al Jazeera at 6-7 [Dkt. No. 65]. Section 15-108 establishes a statutory mandate for

---

[37]    While it is not necessary to decide this issue, it may well be that § 14.4.3 requires Winmar to prove, to a reasonable certainty, the amount of profit it would have actually realized through performance of the Contract. For example, under a similar termination for convenience provision used in government contracts, the Federal Acquisition Regulations require a far more complicated calculation of the actual profit a contractor would have made had performance of the contract been completed. See Bruner & O'Connor on Construction Law § 5:270.

prejudgment interest in actions to recover a liquidated debt:

> In an action in the United States District
> Court for the District of Columbia . . . to
> recover a liquidated debt on which interest is
> payable by contract or by law or usage the
> judgment for the plaintiff shall include
> interest on the principal debt from the time
> when it was due and payable, at the rate fixed
> by the contract, if any, until paid.

Under District of Columbia law, "a debt is liquidated if, at the time it arose, it was an easily ascertainable sum certain." Elzeneiny v. District of Columbia, 699 F.Supp.2d 31, 34-35 (D.D.C. 2010). As this Opinion demonstrates, Winmar's damages under § 14.4.3 of the General Conditions were not easily ascertainable when Al Jazeera terminated for convenience. Thus, Al Jazeera is correct that D.C. Code § 15-108 does not mandate pre-judgment interest for Winmar's unliquidated debts.

However, Al Jazeera has cited no authority to support its conclusion that, as a result, Winmar is precluded from enforcing an independent contractual right to pre- and/or post-judgment interest. There is nothing in the language of § 15-109 to suggest that it precludes the enforcement of a contractual provision granting a party the right to collect interest on payments due at a given rate.[38] The Court therefore concludes that Winmar is entitled to pre- and post-judgment interest under § 7.2 of the

---

[38]    In addition, D.C. Code § 15-109 gives the Court broad discretion to award pre-judgment interest on unliquidated breach of contract claims "if necessary to fully compensate the plaintiff." D.C. Code § 15-109 (2010).

Standard Form. See, e.g., Klayman v. Judicial Watch, Inc., 628 F.Supp.2d 112, 159-60 (D.D.C. 2009) (asking whether contract provided for pre-judgment interest on breach of contract claim before turning to D.C. Code).

## CONCLUSION

For the foregoing reasons, the Court concludes that Winmar is entitled to $2,448,586.50 in compensation for work completed on the Project and $24,500 in suspension fees, for a total of $2,473,086.50. Winmar is entitled to no payment for reasonable overhead and profit on work not executed under § 14.4.3. The amount of $2,448,586.50 shall be increased by the $119,380 refund Winmar paid to Al Jazeera and reduced by the $1,119,841 in payments made to Winmar by Al Jazeera, which results in a final amount owed of **$1,472,625.50,** to which pre-judgment and post-judgment interest applies.


September 29, 2010                  /s/_____
                                    Gladys Kessler
                                    United States District Judge


Copies to: attorneys on record via ECF